**2023-1146**

# United States Court of Appeals
# for the Federal Circuit

LITE-NETICS, LLC,

*Plaintiff-Appellant,*

– v. –

NU TSAI CAPITAL LLC, dba Holiday Bright Lights,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Nebraska in No. 8:22-cv-00314-BCB-CRZ Honorable Brian C. Buescher*

## BRIEF FOR PLAINTIFF-APPELLANT

VINCENT J. ALLEN
J. MIGUEL HERNANDEZ
CARSTENS, ALLEN, & GOURLEY, LLP
*Attorneys for Plaintiff-Appellant*
7500 Dallas Parkway, Suite 300
Plano, Texas 75024
(972) 367-2001
allen@caglaw.com
hernandez@caglaw.com

DECEMBER 5, 2022

**PATENT CLAIMS:**

7549779:

1. A light fixture assembly, comprising:

(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;

(b) a base attached to the second end of the light bulb socket; and

(c) a neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds.

8128264:

1. A light fixture assembly, comprising:

a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places a light bulb inserted into the first end in electrical contact with said electrical wires;

a base integrally attached to the second end of the light bulb socket; and

a magnet embedded in the base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.

# Certificate of Interest

1.      The full name of every party represented by us is:

Lite-Netics, LLC

2.      The name of any real party in interest represented by us, and not identified in response to Question 3, is:

Not Applicable

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

Not Applicable

4.      The names of all law firms and the partners or associates who appeared for the party now represented by us in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Not Applicable

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal, per Fed. Cir. R. 47.4(a) and 47.5(b):

Not Applicable

6.      Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

Certificate of Interest ................................................................ i

Statement of Related Cases ...................................................... 1

Jurisdictional Statement .......................................................... 1

Statement of the Issues ........................................................... 1

I.    Introduction ................................................................... 3

II.   Statement of the Case .................................................... 7

      A.    Overview of the Asserted Patents ......................... 7

      B.    Nu Tsai's Infringing Actions ................................ 9

      C.    Lite-Netics informed its customers about infringing
            products. ............................................................ 11

      D.    The Proceedings Below ...................................... 12

            1.    The District Court's TRO ........................... 12

                  (a)    The Magnetic Cord ........................... 12

                  (b)    The Magnetic Clip ............................ 13

            2.    The District Court's Preliminary Injunction. ............................ 14

                  (a)    The Magnetic Cord ........................... 14

                  (b)    The Magnetic Clip ............................ 15

III.  Summary of the Argument ........................................... 16

IV.   Arguments .................................................................. 18

      A.    Standard of Review ............................................ 18

      B.    The Magnetic Cord's semicircle magnets form a single
            magnet. .............................................................. 19

      C.    The district court erred in restricting "a neodymium
            magnet" to a single magnet ................................ 26

            1.    The rule is well-established that "a neodymium
                  magnet" in a claim means "one or more
                  neodymium magnets." ................................. 26

            2.    The pull strength of the Magnetic Cord's magnets
                  must be aggregated. ................................... 30

D.    The district court's analysis failed to properly consider the doctrine of equivalents. .................................................32

E.    The district court assigned a special definition to "attached" instead of its ordinary meaning. ........................................35

F.    The Asserted Patents did not disclaim the Magnetic Clip. .................39

G.    The district court erred in its *Noerr-Pennington* analysis...................41

    1.    The district court erred in failing to consider Lite-Netics' subjective good faith in granting the Preliminary Injunction. ...........................................42

    2.    The district court erred in concluding that Lite-Netics' infringement claims were objectively baseless........................................................44

V.    Conclusion and Statement of Relief Sought...................................................45

Addendum

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997).................................27

*Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005) ..................................................................................................31

*Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262 (Fed. Cir. 2010) ......... 37, 38

*Canon Computer Sys. v. Nu-Kote Int'l̥ Inc.*, 134 F.3d 1085 (Fed. Cir. 1998) ....................................................................................... 21, 25

*CCS Fitness, Inc. v. Brunswick Corp.* 288 F.3d 1359 (Fed. Cir. 2002) .................20

*Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331 (Fed. Cir. 2008)................19

*Comair Rotron, Inc. v. Matsushita Elec. Corp. of Am.*, No. 93-1410, 1994 U.S. App. LEXIS 18325 (Fed. Cir. July 19, 1994) .......................... 23, 24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,* 776 F.3d 1343 (Fed. Cir. 2014) ............................................................42

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005)............................................................. 20, 21, 22, 29

*Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012)..........................38

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254 (Fed. Cir. 2008)...........................................................................41

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013) .................................................................................37

*Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320 (Fed. Cir. 2019) ..........................34

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278 (Fed. Cir. 2010)..................................................................................41

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722 (2002)................................................................................32

*Festo v. Shoketsu Kinzoku Kogyo Kabushiki*, 344 F.3d 1359 (Fed. Cir. 2003) .................................................................................34

*Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343 (Fed. Cir. 2005) .................................................................................29

iv

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997)............................36

*Golan v. Pingel Enter.*, 310 F.3d 1360 (Fed. Cir. 2002) ........................................42

*GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369 (Fed. Cir. 2007) .....................18

*iLOR, LLC v. Google, Inc.*, 631 F.3d 1372 (Fed. Cir. 2011)....................................44

*In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (Fed. Cir. 2015).........................36

*Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334 (Fed. Cir. 2008)................42

*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2000)............. 27, 28

*Lite-Netics, LLC v. Nu Tsai Capital LLC*, No. 22-3289 (8th Cir. Nov.
    15, 2022) ...................................................................................................................1

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir.
    2009) ......................................................................................................................21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843
    F.3d 1315 (Fed. Cir. 2016) ....................................................................................18

*Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed.
    Cir. 2013) ...............................................................................................................36

*Southco, Inc. v. Fivetech Tech., Inc.*, 611 F. App'x 681 (Fed. Cir.
    2015) ........................................................................................................... 36, 37, 38

*SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298 (Fed. Cir.
    2003) ......................................................................................................................25

*Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 F. App'x 23
    (Fed. Cir. 2012)......................................................................................................20

*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir.
    2012) ......................................................................................................................39

*Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190 (Fed. Cir.
    2017) ......................................................................................................................36

*Utica Enters., Inc. v. Fed. Broach & Mach. Co.*, 109 F. App'x 403
    (Fed. Cir. 2004)......................................................................................................20

*Winans v. Denmead*, 56 U.S. 330 (1854)................................................................32

**Statutes**

28 U.S.C. § 1292(a)(1) ................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1332 ........................................................................1

28 U.S.C. § 1338 ........................................................................1

**Rules**

Fed. Cir. R. 47.4(a) .................................................................... i

Fed. Cir. R. 47.5 ........................................................................1

Fed. Cir. R. 47.5(b) .................................................................... i

Fed. R. App. P. 26.1(b) ............................................................. i

## Statement of Related Cases

In accordance with Federal Circuit Rule 47.5, Appellant Lite-Netics, LLC ("Lite-Netics") is unaware of any other appeal from the underlying action that was previously before this court. The instant appeal of the underlying action was forwarded to the Eighth Circuit by mistake but has since been dismissed. *See Lite-Netics, LLC v. Nu Tsai Capital LLC*, No. 22-3289 (8th Cir. Nov. 15, 2022).

## Jurisdictional Statement

The district court had subject matter jurisdiction over this infringement action under 28 U.S.C. §§ 1331, 1332, and 1338. The district court granted Nu Tsai's motion for preliminary injunction on October 27, 2022, enjoining Lite-Netics from suggesting to others that Nu Tsai's products infringe the Asserted Patents. Lite-Netics timely filed a Notice of Appeal on October 31, 2022. This Court has jurisdiction over this appeal of an order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## Statement of the Issues

Lite-Netics and its founder developed, patented, and commercialized a unique magnetic light fixture to allow easy mounting and removal of light strings. Former customer Nu Tsai developed its own version, simply cutting the magnet in half in an attempt to avoid infringement. With no clear disavowal of any particular

number, structure, size, or shape of the magnet in the intrinsic evidence, the district court nevertheless construed the clams narrowly to require only a single magnet.

The questions presented are:

1.    Whether construing "a neodymium magnet" to require a unitary structure is consistent with this Court's precedent that multiple components can form a single element, even where the specification discloses only a unitary element. Here, a disk magnet is cut into two semicircle pieces and mounted side by side in the base of the light fixture to create a single magnetic field.

2.    Whether construing "a neodymium magnet" to require a singular magnet is consistent with this Court's rule that "a" presumptively means "one or more" where the patentee does not evince a clear intent to limit the element to a singular element. Here, the specification discloses a single neodymium magnet that is not functionally connected to any other elements of the claim, and the patentee expressly refused the examiner's suggestion to add structural limitations to the magnet.

3.    Whether construing "attached" with a special meaning requiring "something more than touching" is proper where this Court has consistently applied the ordinary meaning of joined, fastened, or connected, either directly or indirectly. Here, the magnetic base of the Magnetic Clip is joined with the existing

base of a light fixture to form a singular base, and the joinder is firmly maintained with clips attached to wires that are, in turn, attached to the light fixture.

4.    Whether the district court's application of specification estoppel excluding all clips is proper given this Court's rule that only features that are specifically criticized in statements by the patentee about the prior art are excluded from the claim scope. Here, the patentee discussed deficiencies with prior art light string "clips" that attached only to the cord between light fixtures and are not physically connected to and joined with the light fixture like the Magnetic Clip.

5.    Whether the district court erred in finding subjective bad faith based on "inferences" that Lite-Netics knew it was sending objectively baseless communications to Nu Tsai's customers when this Court has required the moving party to provide evidence supporting such claims. Here, there is no evidence in the record to support those inferences. Instead, the evidence shows that Lite-Netics exercised diligence in investigating infringement claims before filing suit and sending the communications to its own customers.

## I.    Introduction

This patent infringement case arises from Nu Tsai's decision to stop purchasing Lite-Netics' patented magnetic light fixtures and begin selling its own version. Nu Tsai's Magnetic Cord light fixture assembly is identical to Lite-Netics'

products in all material respects. But Nu Tsai claims that simply dividing a single neodymium magnet in two and placing them side by side avoids infringement.

Four months before the lawsuit, Lite-Netics notified certain of its customers of known infringers of the Asserted Patents. After filing suit, Lite-Netics again notified certain of its customers that it had sued Nu Tsai for infringement. Nu Tsai responded by aggressively going on offense, filing counterclaims on the date the answer was due, and requesting a TRO and preliminary injunction—claiming that Lite-Netics was making baseless infringement claims. Nu Tsai urged the court to use "common sense" to interpret the claims by requiring that two magnets cannot equal one.

Disregarding well-settled claim construction rules, the district court legally erred by granting injunctive relief based on a finding that Lite-Netics' infringement claims are objectively baseless. The court enjoined Lite-Netics from even suggesting to others that Nu Tsai's products infringe the Asserted Patents while allowing Nu Tsai to freely publicize the court's finding that the infringement claims are objectively baseless, up-ending the status quo.

The propriety of the preliminary injunction turns, in large part, on the construction of two claim terms. Concerning the Magnetic Cord, the sole claim element disputed in the '779 Patent is "a neodymium magnet." The district court erred as a matter of law by restricting the claims to a single magnet based on the

4

specification disclosing an embodiment with a single disc-shaped magnet and not discussing the possibility of cutting that disc magnet in two pieces and placing them side by side.

This Court has made clear that importing limitations of an embodiment into the claim language is one of the cardinal sins of claim construction. Contrary to the district court's findings, there are no statements in the intrinsic evidence evincing a clear intent to limit the structure of the claimed magnet to a single magnet. There is, however, a clear intent ***not*** to limit the structure to specific shapes, sizes, or thicknesses explicitly expressed in the specifications of the Asserted Patents. The failure to disclose all potential embodiments of the invention does not foreclose coverage of embodiments not disclosed as the district court has held. Further, the district court failed to consider that the applicant refused to adopt the examiner's proposal to limit the structure of the magnet because it would unduly limit the claims.

Further, the district court erred as a matter of law by precluding infringement under the doctrine of equivalents. Neither the district court, nor Nu Tsai argue that the semicircle magnet structure does not perform the same function, in the same way, to reach the same result. Rather, the court relies only on its narrow interpretation of the claim term based on a disclosure of a unitary magnet structure in the specifications to find specification estoppel applies. This is circular logic that

improperly conflates infringement under the doctrine of equivalents with literal infringement.

As to the second product at issue in this case, the Magnetic Clip, the sole issues are the interpretation of the commonly used word "attached" and whether the Asserted Patents disclaim the Magnetic Clip in discussing very different prior art "clips." First, the district court erred in applying a special definition to "attached" ("something more than touching") instead of its ordinary meaning (joined, fastened, or connected, either directly or indirectly).

Even though the base of the Magnetic Clip is in fact joined to and secured to the bottom of the light fixture, the court found that securing the Magnetic Clip in place using the wires attached to the light fixture does not meet the claim limitation. The court's narrow construction of this term is contrary to the plain and ordinary meaning that this Court has applied numerous times, allowing both direct and indirect attachment to satisfy the term "attached."

Second, the district court concluded that the Asserted Patents broadly disclaimed all "clips" based on statements distinguishing two prior art references. While the Asserted Patents discuss specific embodiments of the invention and some of the disadvantages of prior art devices, none of these prior art devices attach to the base of the light fixture like the Magnetic Clip. The district court also erred by applying the same reasoning in its literal infringement analysis to the

doctrine of equivalents allegations without reviewing the intrinsic record, as required by this Court.

The district court's incorrect legal conclusions resulted in a finding that Lite-Netics' infringement allegations were made in bad faith. But under proper construction, the Magnetic Cord directly (both literally and under equivalents) infringes and the Magnetic Clip indirectly infringes. Thus, Lite-Netics' infringement allegations cannot be considered baseless. Accordingly, the Court should reverse the district court's preliminary injunction.

## II.    Statement of the Case

### A.    Overview of the Asserted Patents

Before Shawn Genenbacher invented the magnetic light fixture, time-consuming techniques (*e.g.*, stapling, wrapping, clipping) were required to secure light fixtures to a surface, which often damaged the surface. Appx599 (¶ 5). Genenbacher's magnetic light fixtures solved these deficiencies by incorporating a magnet into the light fixture's base, allowing users to secure and remove fixtures from a surface quickly. Appx599 (¶ 5). Genenbacher received two patents—U.S. Patent No. 7,549,779 ("the '779 Patent") and U.S. Patent No. 8,128,264 ("the '264 Patent") (collectively, the "Asserted Patents")—directed toward these magnetic light fixtures. Appx599 (¶¶ 4–5).

Examples of an embodiment of a magnetic light fixture disclosed in the Asserted Patents and a commercial product are shown below. The magnetic light fixture includes a socket (8) configured to couple with a light bulb (7) and a base (3). Appx108 (3:9–11). A magnet (1) is configured to be embedded in the base (3). Appx108 (3:14–15).



Appx106 (Figure 9A).



Appx122.

Genenbacher formed Lite-Netics in 2009 to bring his magnetic light fixtures to the market. Appx599 (¶ 6). By 2013, Lite-Netics' growing operations resulted in sales of magnetic light fixtures to larger retail stores. Appx599 (¶ 6). Nu Tsai was one of Lite-Netics' customers until it recently stopped purchasing Lite-Netics' patented magnetic light fixtures. Appx600 (¶ 9).

### B.    Nu Tsai's Infringing Actions

While Nu Tsai casts Lite-Netics as a bad faith actor that victimized Nu Tsai with "false" representations of patent infringement, that reputation came from Nu Tsai's own actions. Nu Tsai has developed a less-than-sterling reputation in the holiday lighting community because it has been known to look for ways to design around others' products. Appx600 (¶ 9). Between 2011 and 2014, a holiday lighting company sued Nu Tsai for patent infringement. Appx553–554; Appx565 (¶ 13). Nu Tsai asserts that it prevailed because it invalidated the patent—not that the product at issue was non-infringing. Appx565 (¶ 13).

In 2017, some of Lite-Netics' competitors—including Nu Tsai—began offering a Magnetic Clip that Genenbacher believed infringed the Asserted Patents when added to a light fixture. Appx600 (¶ 8). Examples of the Magnetic Clip are shown below.



Appx774 (annotation removed). After investigating these products and concluding they infringed the Asserted Patents, Genenbacher instructed his patent counsel to send cease and desist letters to these companies. Appx525–526; Appx600 (¶ 8). Nu Tsai never responded. Appx600 (¶ 8).

In Spring 2022, one of Lite-Netics' customers notified it that Nu Tsai was marketing magnetic light fixtures—the Magnetic Cord—and was confused about how Nu Tsai could sell products that were essentially the same as Lite-Netics' patented products. Appx601 (¶ 10). An example of the Magnetic Cord is shown below.



Appx123. Customers informed Lite-Netics they would stop purchasing if it did not defend its patent rights, given that the customers could obtain the products significantly cheaper from Nu Tsai. Appx602 (¶ 14).

After investigating these products and concluding they infringed the Asserted Patents, Lite-Netics instructed its counsel to send Nu Tsai a cease and desist letter. Appx528–529; Appx601 (¶ 10). Nu Tsai responded by denying liability but asked if Lite-Netics would provide "a sum for a fully paid-up release and covenant not to sue" that would allow Nu Tsai "design freedom if it ever chose to change its design." Appx531.

Having built Lite-Netics from the ground up, Genenbacher was not interested in licensing or selling his patents to a competitor that believed it could buy him off and instructed his counsel to respond accordingly. Appx536–537; Appx601 (¶ 11). Nu Tsai's counsel restated its position and tersely concluded the communications. Appx539; Appx601 (¶ 11). It was apparent to Lite-Netics that Nu Tsai would not stop, prompting Lite-Netics to file this lawsuit to protect its property rights and avoid price erosion. Appx602 (¶¶ 12–13).

## C.    Lite-Netics informed its customers about infringing products.

After Lite-Netics' customer notified it about Nu Tsai marketing the Magnetic Cord, Lite-Netics sent its customers correspondence in May 2022 explaining that Lite-Netics owns patents covering magnetic light fixtures and that

"other companies" were offering products that infringed the patents. Appx533–534; Appx602–603 (¶ 14). After filing this lawsuit, Lite-Netics sent correspondence to its top customers informing them that it had taken action to protect the Asserted Patents against Nu Tsai's infringing products. Appx603 (¶ 14). Nu Tsai responded aggressively to the lawsuit by filing counterclaims, and a motion for TRO alleging tortious interference with business and defamation based solely on the communications Lite-Netics had sent out to its customers before and after the lawsuit was filed.

### D.    The Proceedings Below

### 1.    *The District Court's TRO*

#### (a)    *The Magnetic Cord*

Nu Tsai filed its motion for TRO and preliminary injunction on Friday, September 30th, the day its answer was due. On the following Monday afternoon, the district court ordered Lite-Netics to file a responsive brief by 5:00 p.m. on Wednesday—affording Lite-Netics two days to respond. Appx566–567. The district court initially analyzed Lite-Netics' infringement claims only under literal infringement because it contended that pleading "direct infringement" only satisfied the pleading standards for literal infringement and not the doctrine of equivalents. Appx655–656; *but see* Appx585 (n.1), Appx125 (¶ 26), *and* Appx126 (¶ 38).

The district court limited the claims to require a single magnet having a five-pound pull strength because the specification never suggested that multiple magnets might be used. Appx655. The district court rejected Lite-Netics' argument that the Magnetic Cord's two semicircle magnets form a single magnet when embedded into the base of the magnet. Appx585. With no opportunity for a proper claim construction briefing and hearing, the district court concluded that Lite-Netics' claims were baseless, a mere seven days after Nu Tsai's motion was filed. Appx656.

### (b)    The Magnetic Clip

Initially, the district court analyzed Lite-Netics' infringement claims for the Magnetic Clip under direct infringement instead of indirect infringement, even though Lite-Netics alleged indirect infringement for the Magnetic Clip in its original complaint. *Compare* Appx654 ("The Magnetic Clips are not 'light fixture assemblies' at all"), *with* Appx125 (¶¶ 26–28) (pleading induced and contributory infringement), *and* Appx126–127 (¶¶ 38–41) (same). The district court further concluded that the Magnetic Clip did not attach to the base of the light fixture but only to the sides of the fixture. Appx654–655. Finally, the court found that the Asserted Patents disclaimed the Magnetic Clip because the specifications distinguished two prior references showing "clips" different from the Magnetic clip. Appx655; *but see* Appx107 (1:35–65), *and* Appx765–770 (¶¶ 8–15).

Accordingly, the district court concluded that Lite-Netics could not have reasonably believed the Magnetic Clip infringed the Asserted Patents. Appx654.

### 2.    *The District Court's Preliminary Injunction.*

*(a)    The Magnetic Cord*

With the TRO in place, the court allowed supplemental briefing, giving Lite-Netics an opportunity to more fully address claim construction and attempt to correct the errors in the TRO's limited treatment of claim construction. Lite-Netics pointed out that "a" means "one or more" and that claimed ranges are aggregated over the corresponding components. Appx730–731. But the court had already made up its mind, concluding once again that the '779 Patent is confined to a single magnet with a pull strength of at least five pounds. Appx32–35. The court reasoned that an exception to the ordinary rule applied because the '779 Patent repeatedly referred to "a neodymium magnet" and "the neodymium magnet," and the claims recited, "said magnet." Appx35.

Further, the court found that the lack of disclosure of an embodiment using multiple magnets somehow demonstrated a clear intent to narrow the claims to one magnet. Appx35–36. However, the district court did not consider that the applicant refused, as unduly limiting, the examiner's suggestion to add structural limitations to the magnet in the claims. Appx238; Appx736. Accordingly, the district court refused to interpret the claims as covering multiple magnets with an aggregated

pull strength of at least five pounds and again deemed Lite-Netics' literal infringement claims baseless.

The district court analyzed Lite-Netics' infringement claims after it amended its complaint to explicitly allege the doctrine of equivalents (Appx688 (¶ 29); Appx690 (¶ 42)) but found the claims baseless simply because Lite-Netics had only disclosed a single magnet embodiment in the specifications. Appx47–48. The court found it unnecessary to address Lite-Netics' position that the pull strength is aggregated over the magnets even though Lite-Netics takes that position for literal infringement, not equivalents. Appx48 (n.19); *but see* Appx730–732.

### (b) *The Magnetic Clip*

Lite-Netics explained to the district court that its claims against the Magnetic Clip were for indirect infringement. Nu Tsai provided the Magnetic Clip to end-users, thereby inducing and contributing to their direct infringement. Lite-Netics also explained that the Magnetic Clip forms a single base when it attaches to the light fixture. Appx738; Appx746. The court steadfastly maintained its conclusion that the Magnetic Clip does not attach to the fixture, manufacturing a narrow definition of "attached" to reach this conclusion. Appx25. Although the court acknowledged that the Magnetic Clip "pockets" the base of the fixture, it concluded that "attached" means "something more than touching." Appx25–26.

The court explained that the Magnetic Clips did not infringe because they clip onto the cord attached to the light fixture instead of the base. Appx26.

Lite-Netics also argued that the Asserted Patents did not disclaim the Magnetic Clip. Rather, the Asserted Patents distinguished clips that connected only to the cord of the light assembly and never attached to the light fixture. Appx740–741. But yet again, the court stuck to its original decision, reasoning that the Magnetic Clips are disclaimed simply because they "clip" onto the cord. Appx27–28. The district court applied the same analysis to the doctrine of equivalents, concluding that Lite-Netics was estopped from asserting equivalents because of the disclaimer. Appx43–45.

## III. Summary of the Argument

In granting the preliminary injunction, the district court erred as a matter of law in construing the claims. First, when a patent is silent on multiple components, it is a cardinal sin to limit the claims without finding a clear intent to limit a component to a unitary component in the intrinsic evidence. Further, the district court deviated from the rule that "a" equals "one or more" and incorrectly limited the claims to a single magnet.

This Court has explained that—absent an explicit statement—a claimed component is restricted to a single article only when it is functionally interconnected with other components in the claims. Here, the claimed magnet is

not functionally interconnected with other components. The district court acknowledged that the Asserted Patents were silent on multiple magnets, and although claiming to find a "clear intent" to limit to a single magnet, there is no evidence of such. On the contrary, the applicant refused the examiner's suggestion to provide structural limitations of the magnet as unduly limiting. Likewise, the district court erred in finding no infringement based on equivalents by using the same arguments that it used for its narrow claim construction.

Second, the district court erred as a matter of law by applying a special definition to "attached"—something more than touching—instead of its plain and ordinary meaning. This Court has repeatedly interpreted "attached" to mean joined, fastened, or connected—directly or indirectly—so that the device functions properly. Here, it is undisputed that the Magnetic Clip is physically joined to the bottom of the light fixture. Without being attached to the light fixture, it would not function as designed.

Third, the district court erred as a matter of law by excluding the Magnetic Clip based on distinctions from the prior art in the Asserted Patents' specifications. This Court has explained that a disclaimer applies only to distinguished features. The Asserted Patents distinguished the claimed inventions from clips that connected only to the cord of an assembly. Here, the Magnetic Clip is physically

joined to the light fixture and does not present the same flaws as the distinguished references.

Finally, the district court erred as a matter of law by not properly considering the evidence of Lite-Netics' subjective good faith. The court erred in concluding that Lite-Netics brought the suit in bad faith and thus was not covered by *Noerr-Pennington* immunity when the record does not support the inferences drawn by the court.

## IV.  Arguments

### A.  Standard of Review

This Court reviews claim construction *de novo* and any underlying factual determinations involving extrinsic evidence for clear error. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1326 (Fed. Cir. 2016). A grant of a preliminary injunction is reviewed under the law of the regional circuit. *See Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 10 (Fed. Cir. 2020).

This Court and the Eighth Circuit use similar tests to analyze a preliminary injunction: (1) a reasonable likelihood of success on the merits; (2) irreparable harm; (3) a balance of hardships in its favor; and (4) a public interest in favor of the injunction. *See GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1373 (Fed. Cir. 2007). The Court applies federal patent law whenever a preliminary injunction enjoins a patentee from communicating its patent rights. *Id*. Applying Eighth

Circuit law, the Court reviews the grant of a preliminary injunction for clearly erroneous factual findings or an erroneous legal conclusion. *See Dixon v. City of St. Louis*, 950 F.3d 1052, 1055 (8th Cir. 2020).

Federal patent law requires a showing of bad faith before a patentee can be enjoined from communicating their patent rights. *See Myco*, 955 F.3d at 10. A showing of "bad faith" must be supported by a finding that the claims asserted were objectively baseless—*i.e.*, no reasonable litigant could realistically expect success on the merits. *Id.* Determining whether infringement contentions are objectively baseless turns on claim construction, a question of law that the Court reviews *de novo*. *See Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). "

### B.    The Magnetic Cord's semicircle magnets form a single magnet.

The '779 Patent includes a single independent claim (claim1) and recites as follows:

1. A light fixture assembly, comprising:

(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;

(b) *a base attached to the second end of the light bulb socket*; and

(c) *a neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds.*

Appx108 (4:52–63) (emphasis added).

The district court erred by construing the claims to require a single unitary structure magnet, finding that Nu Tsai can simply split a magnet in two and affix the pieces side by side with a thin plastic separator to avoid literal infringement. Appx36. The district court improperly relied on the singular phrasing to conclude that the use of "a neodymium magnet" in the claims and specification can only be a single, unitary structure. Appx36. But that singular phrasing is not dispositive as this term says nothing about the magnet's shape, size, number, or structure, and it is certainly not preceded by "single" or any shape designation in the claim to indicate that the structure of the magnet is important.

The disputed claim terms in *Textron, Cross Med.*, and *CCS Fitness* were also each phrased in the singular, yet this Court concluded that the terms were not limited to a unitary structure. *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 F. App'x 23, 30 (Fed. Cir. 2012); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309 (Fed. Cir. 2005); *CCS Fitness, Inc. v. Brunswick Corp.* 288 F.3d 1359, 1367 (Fed. Cir. 2002); *see also Utica Enters., Inc. v. Fed. Broach & Mach. Co.*, 109 F. App'x 403, 407–408 (Fed. Cir. 2004) (finding that despite the specification describing only a one-piece tool holder, the claim covers a

multi-piece tool holder); *Canon Computer Sys. v. Nu-Kote Int'l¸Inc.*, 134 F.3d 1085, 1090 (Fed. Cir. 1998) (holding that a "first chamber" used in ink cartridges covers more than one chamber in the case where the ink chamber was separated into multiple chambers by partitions).

Like the losing parties in *Textron, Cross Med.*, and *CCS Fitness*, Nu Tsai and the district court here erroneously rely on unitary embodiments in the specification showing only a single magnet embedded in the base. *See* Appx36. While claims are read in light of the patent's specification and prosecution history, it is a "cardinal sin[]" to limit the claims based on examples in the specification, and a patentee is entitled to their full scope, absent a clear indication to the contrary. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319–20 (Fed. Cir. 2005) (en banc); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009).

In reaching its decision, the district court attempted to distinguish *Cross Medical* but provided no rationale for why that case is different than the present case. Appx36. The *Cross Medical* court acknowledged that the ***sole embodiment*** described in the asserted patent depicted a unitary structure but refused to limit the claims because "the mere depiction of a structural claim feature as unitary in an embodiment, without more, does not mandate that the structural limitation be unitary." *Cross Med.*, 424 F.3d at 1309. The district court here reasoned that the

21

use of "a neodymium magnet" and "the neodymium magnet," in the specifications and the use of "said magnet" in the claim demonstrate a repeated effort to limit the structure of the magnet "unlike the situation in *Cross Medical*." Appx36. But the specification for the patent in *Cross Medical* only disclosed a single, unitary embodiment and thus did not contemplate an anchor seat comprised of multiple components. *See id.* at 1303–04.

Neither the district court, nor Nu Tsai point to anything in the specification or prosecution history here that *requires* limiting the magnet to a unitary structure. Lite-Netics certainly never distinguished the magnet as having a "unitary" structure, nor did it specify that having a "unitary" structure or any particular structure of the magnet was important to the invention.

The claim language has no constraint on the neodymium magnet's physical form, unitary or not. Thus, there is no need to consult the specification to import limitations from a preferred embodiment. Notably, the applicant refused the examiner's suggestion to provide structural limitations of the magnet as unduly limiting. Appx238.

While a disc shape structure for the magnet is disclosed in the specifications, the specifications expressly disclose that "[o]ther shapes, sizes, and thicknesses can be used.…" Appx108 (3:17–20); Appx116 (3:29–31). Further, the specifications describe the description as an "illustrative embodiment," (Appx107 (2:31–37);

Appx115 (2:43–48)) and provides that "[m]any modifications and variations will be apparent to those of ordinary skill in the art" and that "numerous variations will be possible to the disclosed embodiments without going outside the scope of the invention as disclosed in the claims." Appx108 (4:35–48); Appx117 (5:7–17).

In a case very similar to the instant case, this Court found that a claimed "integral annular field and commutation magnet" is literally infringed by a two-piece magnet assembly. *Comair Rotron, Inc. v. Matsushita Elec. Corp. of Am.*, No. 93-1410, 1994 U.S. App. LEXIS 18325 (Fed. Cir. July 19, 1994). In *Comair*, the claim was even more restrictive than the claims at issue because it required a magnet "formed on a single piece" of magnetizable material. *Id.* at *4. As illustrated below, the magnet (24) consisted of two magnetized sections, an upper end (32) and a lower end (30). *Id.* at *3. Yet, this Court affirmed the district court's summary judgment of infringement for a two-piece magnet where the two pieces were affixed side by side instead of manufactured as a unitary piece. *Id.* at *11–13.

23



FIG. 2A

FIG. 2B

FIG. 2C

*Id.* at 3.

In the instant case, there is no structural limitation in the language of the independent claims, nor any requirement in the spec that the magnet must be a single disc-shaped magnet, nor that the magnet must be formed from a single piece.

Dependent claim 9 in the '779 Patent and dependent claim 13 in the '264 Patent, however, do specify both a disc shape and size limitation of the magnet:

> 9. The light fixture assembly according to claim 1, wherein the magnet is a disc one half inch in diameter and one eighth inch thick.

Appx109 (5:15–17); Appx117 (6:9–12) (same). Under claim differentiation, an independent claim is generally given a broader reading so that it does not require

such structural limitations. *See SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1441 (Fed. Cir. 2003). Absent structural limitations in the independent claims, the claim must be interpreted broadly to include any structure, unitary or multi-component, that otherwise meets the limitations of the claims.

The Magnetic Cord has a multi-component magnet, with semicircle pieces affixed side by side with a thin plastic separator. This is very similar to dividing a chamber into two chambers by a partition found to be a single chamber in the *Canon* case. *Canon*, 134 F.3d at 1090. As illustrated below, the claimed device in Canon included a printer cartridge with two chambers including the claim element "a first ink chamber." The infringing product divided the ink chamber into multiple chambers with a partition to form interconnected ink chambers. *Id.* Like *Canon*, adding a partition between the two semicircle components does not change the fact that the magnets are joined together and the magnetic fields are interconnected to form a single magnet.



## C.    The district court erred in restricting "a neodymium magnet" to a single magnet.

Lite-Netics has shown that the claims should be interpreted not to require a unitary structure for the magnet, and that should be the end of the inquiry with respect to the Magnetic Cord. However, even if the claims were narrowly construed to require a unitary structure, the Magnetic Cord would still meet the claim limitations when the claim term "a neodymium magnet" is interpreted under established precedent to mean "one or more neodymium magnets."

Moreover, this Court has considered the purpose of a limitation when determining whether all such "one or more" elements should be aggregated to meet a follow-on limitation of the claim. In this case, the purpose of the "neodymium magnet" is to provide an overall pull strength of five pounds, meaning that the pull strength of each magnet should be aggregated in determining whether the Magnetic Cord meets the claim limitation.

### 1.    *The rule is well-established that "a neodymium magnet" in a claim means "one or more neodymium magnets."*

The term "a neodymium magnet" must be interpreted as "one or more neodymium magnets" under this Court's rules of construction. The district court concluded that the claims are limited to a single magnet, resting its conclusion on the "context" that the '779 Patent never contemplated multiple magnets. Appx35–36. Such a finding does not meet the narrow exception to the general rule that "a"

in open-ended claims using the word "comprising" must be interpreted as "one or more."

"That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one'." *Baldwin*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (citing *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)).

While the district court acknowledged that the '779 Patent is silent on the number of magnets (Appx32), it concluded that the specifications' use of "a neodymium magnet" and "the neodymium magnet," and the use of "said magnet" in the claim demonstrate a "clear" intent to limit the claims to one magnet. Appx35–36. The cases the district court relied on are inapposite. Appx32–35 (citing *Insituform Techns., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098 (Fed. Cir. 1996) and *AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997)).

In *Insituform*, the Court concluded that the requirement of the claims for a discontinuous vacuum could only be accomplished with a single vacuum cup, and therefore so limited the claim language. *Insituform*, 99 F.3d at 1106. While the *Insituform* case resulted in a finding of no literal infringement, the defendant's product was found to infringe under the doctrine of equivalents after remand. *See*

*Insituform Techns., Inc. v. Cat Contracting, Inc.*, 385 F.3d 1360, 13 (Fed. Cir. 2004).

   *AbTox* is limited in two aspects. First, the *AbTox* court relied heavily on the use of "said" in the claims to restrict the scope to a single chamber. *Abtox*, 122 F.3d at 1024 ("This term itself, 'said chamber,' reinforces the singular nature of the chamber."). But the Court has since explained that the use of "the" and "said" to refer to the same claim term does not change the rule that "a" means "one or more." *See Baldwin*, 512 F.3d at 1343.

   Second, the Court has clarified that *Abtox*'s holding is confined to situations where the claims define a relationship between the element in question and other apparatus components. *See KCJ Corp.*, 223 F.3d at 1356. In *Abtox*, the Court limited the claim to a single chamber because each of the components were interconnected with "said chamber," and a single chamber could only perform the claimed functions. *Abtox*, 122 F.3d at 1024 (explaining that a single chamber with separate zones was required to sterilize materials).

   Here, the claims require only that a magnet be embedded into the base of the light fixture. No other components are functionally connected to the magnet in a way that would restrict the number or structure of the magnet. Accordingly, the independent claim of the '779 Patent does not have any limitations like existed in *Abtox* or *Insituform* that would require a departure from the general rule.

The district court also relied on the lack of disclosure of the possibility of multiple magnets as showing an intent to limit "a" to "one." Appx35. However, this Court has routinely held that disclosing only a single article embodiment in the specification does not "evince a clear intent by the patentee to limit the article to the singular." *See Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1350 (Fed. Cir. 2005) (refusing to limit "a cable" to a single cable, even though the specification repeatedly described the cable as a "single cable."); *Cross Med.*, 424 F.3d at 1309 (refusing to limit the claims to a unitary channel despite the sole embodiment depicting a unitary structure); *Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999) (refusing to limit "a feed tube" to a single tube despite repeated references to "a feed tube" and "the feed tube" in the specification and the depiction of a single feed tube in the figures).

The Asserted Patents disclose an embedded neodymium magnet as part of a preferred (or illustrative) embodiment. Appx107 (2:35–36, 2:40, 3:6-8); Appx115 (2:46–47, 2:50, 3:18–19). Further, the titles—Magnetic Light Fixture—and specifications express the invention as *a magnetic base*. Appx107 (1:1); Appx108 (3:3–4); Appx115 (1:1); Appx116 (3:14–15). In some cases, the shape of the magnet is referred to as a "disc" magnet, but the specifications make clear that "[o]ther shapes, sizes, and thicknesses can be used. . . ." Appx108 (3:17–20); Appx116 (3:29–31). And it bears repeating that, during prosecution, the applicant

refused examiner's suggestion to amend the claims to add structural limitations of the magnet as unduly limiting. Appx238.

The '779 Patent explains that the disclosed embodiments may be modified. Appx108 (4:35–45). When a patent is silent on multiple components, it is inappropriate to limit the claims without finding a clear intent to limit to one component in the prosecution history. *See Elkay*, 192 F.3d at 978. Here, there is no such intent.

Rather, the record shows a clear intent ***not*** to limit the structure of the magnet. As such, there is no suggestion or requirement in the specification that only one magnet can be used, nor is there any reason why more than one would not work to solve the problem addressed by the invention. Indeed, the Magnetic Cord does just that.

### 2. *The pull strength of the Magnetic Cord's magnets must be aggregated.*

In addition to finding that the claim should be interpreted as "one or more neodymium magnets," the Court should also find that the pull strength of the "one or more magnets" should be aggregated to determine if the minimum five pound pull strength requirement is met. While Nu Tsai argues that the pull strength can only apply to a single magnet, this argument conflicts with this Court's precedent that claimed amounts must be aggregated when analyzing literal infringement. *See*

*Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1300, 1305 (Fed. Cir. 2005).

Nu Tsai posits that *Biagro* is limited to situations where the specification and the prosecution history require the component amounts to be aggregated (Appx824), but this contention is unsupported. First, the Court focused on the purpose of the claimed element (at least one phosphorous-containing component) and the accused element (two phosphorous components)—noting that all phosphorous-containing components served the same purpose. *Id*. at 1304. *Biagro* never found that the specification or prosecution history estoppel contained statements that multiple phosphorous components must be aggregated. Second, the Court stressed that the concentration of the phosphorous-containing components was significant, which meant that the total amount of the accused solution's two phosphorous acid salts must be tabulated to determine infringement—not the amount of a single salt. *Id*.

Similar to the "concentration" in *Biagro*, the overall pull strength is important in this case. The "one or more" magnets serve the same purpose— mounting the light fixture to a ferrous surface. Further, the overall pull strength is what is important to keep the light fixture mounted to the surface, not the individual pull forces of the multi-component magnet. Requiring each magnet to have five pounds of pull strength is contrary to the purpose of the claim limitation.

It is undisputed that the Magnetic Cord's magnets produce a pull strength greater than five pounds. Appx133. Accordingly, the Magnetic Cord literally infringes the '779 Patent.

### D.    The district court's analysis failed to properly consider the doctrine of equivalents.

In the alternative, the Court should find infringement under the doctrine of equivalents. The Magnetic Cord infringes the '779 Patent under the doctrine of equivalents because the semicircle magnet structure performs the same function in substantially the same way with substantially the same result as the '779 Patent's claimed "neodymium magnet." Appx699–701.

In the equivalents analysis, the district court concluded that the claims are limited to a single magnet for the same reasons as its literal infringement analysis (Appx47–48). This was an error of law because a finding of no literal infringement based on the claims being restricted to a single component does not preclude infringement under the doctrine of equivalents. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 732 (2002) (citing *Winans v. Denmead,* 56 U.S. 330 (1854)). To find otherwise, would eviscerate the doctrine of equivalents.

Nu Tsai argues that prosecution history estoppel applies because the claims were amended to include the pull strength limitation for patentability reasons related to the Magnetic Cord. However, Lite-Netics is not arguing for equivalents

on the pull strength limitation, but rather, on the structure or number of magnets limitation that the district court improperly reads into the term "a neodymium magnet."

Nu Tsai's reliance on *Biagro* is misplaced because that case precluded a patentee from ensnaring the accused product based on equivalents where the claimed element on which equivalents was requested was added during prosecution. As illustrated below, the combined pull strength of Magnetic Cord's magnets satisfies the '779 Patent's five-pound pull strength requirement, and therefore there is no presumption of prosecution history estoppel precluding infringement under the doctrine. Appx699–701. This is unlike *Biagro* where the claimed range was exceeded after aggregation.

Biagro's Claim: $30 \leq wt\% \leq 40$

| Biagro Accused Solution | |
|---|---|
| Phosphorous-containing acid #1 wt% = X | Phosphorous-containing acid #2 wt% = Y |
| X + Y = 60 wt% | |

Lite-Netics' Claim: $X + Y \geq 5$ pounds pull strength

| Magnetic Cord | |
|---|---|
| Magnet #1 pull strength = X | Magnet #2 pull strength = Y |
| $X + Y \geq 5$ pounds pull strength | |

Even if the *Festo* presumption applied here, the amendment was merely tangential to the accused equivalent. *See Festo v. Shoketsu Kinzoku Kogyo Kabushiki*, 344 F.3d 1359, 1369 (Fed. Cir. 2003). The '779 Patent applicant amended the claims to distinguish the claimed invention from a reference disclosing a refrigerator magnet, emphasizing that the magnet needed to be strong. Appx238; Appx241–242. The applicant rejected the examiner's proposal to define the structure of the magnet in the claims. Appx238. Further, the cited reference did not contain the accused equivalent—two semicircle magnets—indicating that the amendment was unrelated to the equivalent and thereby rebutting any *Festo* presumption. *See Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1331 (Fed. Cir. 2019). Accordingly, the Magnetic Cord also infringes the '779 Patent under the doctrine of equivalents.

**E.    The district court assigned a special definition to "attached" instead of its ordinary meaning.**

Next, we turn to the Magnetic Clip. The Magnetic Clip utilizes a unitary magnet structure, and it is undisputed that the Magnetic Clip has the requisite pull strength. The only issues in dispute are whether the Magnetic Clip is "attached" to the light fixture by utilizing a removable clip structure and whether the Magnetic Clip was disclaimed by the applicant in a discussion of the prior art in the specification.

The Asserted Patents cover the Magnetic Clip because it forms a singular magnetic base when attached to the bottom of a light fixture. The district court concluded that the Magnetic Clip attaches only to the ***cords*** of a light assembly exiting each side of the fixture and not the fixture itself. In reaching this conclusion, the court provided a special meaning for "attached" as "something more than touching." Appx25–26.

The district court relied on a case construing the term "fixed" to support its conclusion. Appx26 (citing *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285 (Fed. Cir. 2021)). *Seabed* does not discuss the mechanical threshold two objects must have to be considered attached but instead analyzes whether the term "fixed" has a special or an ordinary meaning in the patents at issue. *Seabed*, 8 F.4th at 1287.

As there is no special definition given to "attached" in the intrinsic record, the Court should apply its ordinary meaning. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 496 (Fed. Cir. 1997). This Court has interpreted "attached" broadly to mean joined, fastened, or connected, either directly or indirectly. *See Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1197 (Fed. Cir. 2017); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015); *Southco, Inc. v. Fivetech Tech., Inc.*, 611 F. App'x 681, 686 (Fed. Cir. 2015); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 937–38 (Fed. Cir. 2013).

In *Tinnus*, the asserted patent concerned an apparatus to fill multiple water balloons at one time. The apparatus comprised, among other things, a plurality of tubes attached to a housing. The water balloons clamped to the plurality of tubes and were simultaneously filled from a connecting hose. The defendant argued that its product's tubes did not attach to the housing—as required by the claims— because the tubes slid in and out of the housing. *Tinnus*, 846 F.3d at 1204. But the Court rejected this argument because under the ordinary meaning, the accused product must be attached to function properly. *Id*; *see Cuozzo*, 793 F.3d at 1280; *AGA Med. Corp.*, 717 F.3d at 937–38. Here, it is undisputed that the Magnetic Clip is physically joined to the bottom of the light fixture. Appx25 ("[I]t 'pockets' the base."). Additionally, the Magnetic Clip must be attached to the bottom of the light

fixture to maintain its position (*i.e.*, project out) and function properly to rigidly secure the fixture in place. Appx124 (Figure).

Further, the Court has interpreted connecting terms (e.g., "coupled," "joined," "connected," "attached") to include both direct and indirect connections. *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270 (Fed. Cir. 2010) ("'[C]oupled to' … should be construed broadly so as to allow an indirect attachment"); *Genentech, Inc*, 112 F.3d at 501 ("To be joined or connected does not necessitate a *direct* joining or connection"); *Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("The ordinary meaning of 'connected to' encompasses indirect linkages"); *Southco*, 611 F. App'x at 686("the ordinary meaning of 'attached' includes both direct and indirect attachment").

In *Southco*, the asserted patent covered a captive screw comprising, among other things, a knob secured to the head of the screw, and a ferrule, "slidably and rotatably attached" to the knob. *Southco*, 611 F. App'x at 685. The district court interpreted this limitation to mean that the knob is "directly connected" to the ferrule, which precluded infringement because the accused device did not have a direct connection. On appeal, the Court affirmed the district court's narrow construction of "attached" because the claims required a particular means of attachment to perform the claimed function. *Id*. at 686 ("[I]f the ferrule and knob are already separated—*i.e.*, not directly attached—the threaded shaft captivation

37

means cannot prevent them from separating."). But the Court acknowledged that "the ordinary meaning of 'attached' includes both direct and indirect attachment." *Id*; *see Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012); *Bradford Co.,* 603 F.3d at 1270.

Here, the '779 Patent requires the base to be "attached to the second end of the light bulb socket" and the '264 Patent requires the base to be "integrally attached to the second end of the light bulb socket." Appx108 (4:60–61); Appx117 (5:26–27). Unlike *Southco*, the base does not attach to the socket in a specific way to perform a function that could not be accomplished through indirect attachment. Instead, all that is needed to satisfy the claims is for the base to be attached to the socket in a manner that will keep the light fixture mounted to the surface. Appx107 (1:6–8).

As illustrated below, the Magnetic Clip is twisted onto the cord at the Magnetic Clip's grooves (orange arrows), causing the base (green arrows) to be pressed securely against the bottom of the socket. Appx771 (¶ 19). Accordingly, the Magnetic Clip also satisfies the indirect attachment definition endorsed by the Court. If it were not attached to the bottom of the socket, it would not work as intended.



Appx771.

### F.    The Asserted Patents did not disclaim the Magnetic Clip.

In addition to finding the "attached" limitation satisfied under the claim terms' ordinary definition, the Court should also find that the Asserted Patents did not disclaim the Magnetic Clip. In finding that the Asserted Patents disclaimed the Magnetic Clips, the district court failed to follow this Court's precedent that the disclaimer applies only to the "particular feature" of the prior art distinguished. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The district court applied a disclaimer to all clips that connected to the cord, but this conclusion was overbroad as the Magnetic Clip is very different than the features of the prior art discussed. Appx28.

The Asserted Patents explained the shortcomings with devices shown in two patent references directed toward clips connected solely to the cord between the

light fixtures. Examples of these two references—*Dougan* (left) and *Clement* (right)—are reproduced below.



Appx779 (Figure 3); Appx805 (Figure 1).

*Dougan* disclosed a clip (12) that attached to an electric cord (18). *Dougan*'s clip was then inserted between the fascia (20) and soffit (22) of a house. *Clement* disclosed a clip (8) having a magnet (10) that attached to an electrical cord (32). The Asserted Patents distinguished *Dougan* and *Clement* because they utilized clips to attach to ***only the cord*** of a light fixture. These devices were undesirable because they were cumbersome (significantly stuck out) and slid along the length of the cord, making rolling up the lights difficult unless removed after use. Appx768 (¶ 12); Appx770 (¶¶ 15–16).

In contrast, the Magnetic Clip does not possess any of these disadvantages. First, the Magnetic Clip is physically joined with the fixture and cannot move along the length of the cord. Second, the Magnetic Clip does not significantly stick out and does not present the same entanglement issues as *Dougan* and *Clement*.

40

Third, not only is the Magnetic Clip not required to be removed, but it is also preferable to leave it installed on the fixtures to avoid the hassle of reattachment. Appx771–772 (¶ 20). Accordingly, the Asserted Patents disclaimed a particular feature—clips attaching only to a cord not forming a part of the light fixture—not all clip attachment mechanisms in general.

Moreover, the '264 Patent discusses and claims in claim 3 that the magnet embedded in the base can be embedded in a removable end piece having a threaded portion. Appx116 (4:55–65); Appx117 (5:36–39). Claim differentiation requires that claim 1 must also cover other removable type bases such as the Magnetic Clip. The reason that the *Dougan* and *Clement* clips were undesirable is because they were cumbersome which resulted in time-consuming detangling or re-attachment. Appx768 (¶ 12); Appx770 (¶ 15).

### G.    The district court erred in its *Noerr-Pennington* analysis.

Federal patent law preempts state-law tort liability when a patentee alleges infringement in good faith. *See Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). To demonstrate bad faith in overcoming *Noerr-Pennington* immunity, a suit must be both objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than to obtain judicial relief. *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291 (Fed. Cir. 2010). The party attempting to

show bad faith must present clear and convincing evidence for both objective and

subjective prongs. *See Golan v. Pingel Enter.*, 310 F.3d 1360, 1371 (Fed. Cir.

2002); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank,*

*Nat'l Ass'n,* 776 F.3d 1343, 1350 (Fed. Cir. 2014)**.**

### 1.     *The district court erred in failing to consider Lite-Netics' subjective good faith in granting the Preliminary Injunction.*

Even if a court concludes that a patentee's infringement claims were

objectively baseless, the court must still consider the subjective component before

granting injunctive relief enjoining a patentee from communicating. *Judkins v. HT*

*Window Fashion Corp.*, 529 F.3d 1334, 1339 (Fed. Cir. 2008).

In this case, Nu Tsai has not provided any evidence that Lite-Netics

subjectively brought this suit in bad faith, let alone shown any clear and

convincing evidence. Similarly, the district court did not consider Lite-Netics'

good faith before granting the Preliminary Injunction.

In its order granting the TRO, the district court "inferred" that Lite-Netics

knew that its customers were also Nu Tsai's without any evidence to support the

inference. Appx651–652. The court's findings were not inferences but simply

hunches. The court concluded that Lite-Netics' letters to its own customers were a

"threat." Appx652. Yes, Lite-Netics sent these letters out to many of its own

customers, and that is the sole evidence in the record. Appx11–12. Yet, the court

reasoned that normally people do not threaten their own customers. Appx652.

Again, there is no evidence that Lite-Netics did not send these letters out to its own customer list.

The court hypothesized that Lite-Netics should have taken active steps to seek out potential infringing products from its customers without any evidence that Lite-Netics did not in fact do just that. Appx652 (n.9). Instead of requiring Nu Tsai to show evidence of Lite-Netics' intent, the district court placed the burden of proof on Lite-Netics to show that it had exclusive agreements with its customers as evidence of its subjective intent. Appx652. The district court restated these conclusions in its Preliminary Injunction order. Appx22. Whether Lite-Netics has an exclusive agreement with a customer or not is irrelevant to the question of whether Lite-Netics had any knowledge that the recipients were already customers of Nu Tsai.

In its order denying Lite-Netics' motion to stay the Preliminary Injunction, the district court concluded that Lite-Netics waived any argument requiring Nu Tsai to assert subjective bad faith. *See* Appx83. However, Lite-Netics had earlier addressed that Nu Tsai had not presented any evidence of Lite-Netics' subjective bad faith (Appx583), and later incorporated that argument by reference into its brief opposing the motion for the Preliminary Injunction (Appx724). Thus, the district court erred as a matter of law in finding that Lite-Netics waived this argument.

Furthermore, this Court has stated that failing to raise an argument does not excuse a judge's duty from applying the correct legal standard. *See Myco*, 955 F.3d 1, 11 n.4. Here, as in *Myco*, the district court failed to apply the correct legal standard before granting a preliminary injunction enjoining a patentee from communicating.

## 2. *The district court erred in concluding that Lite-Netics' infringement claims were objectively baseless.*

An infringement claim is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *Id*. at 10 (citations omitted). Even if a parties' claim construction is ultimately unsuccessful, as long as the claim language does not preclude the patentee's construction it can be a reasonable interpretation. *See iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011).

The district court erred in concluding that Lite-Netics' infringement claims against the Accused Products were objectively baseless. Lite-Netics included claim charts in its amended complaint explaining its infringement theories against the Accused Products. Appx695–716. Nevertheless, the district court concluded that Lite-Netics' infringement claims against Nu Tsai were in bad faith. Appx53.

As shown above, Lite-Netics has demonstrated that its infringement claims are reasonable and that the claim language does not preclude its construction on its

face. Therefore, the district court erred in concluding that Lite-Netics'

infringement claims were brought in bad faith.

## V.    Conclusion and Statement of Relief Sought

Lite-Netics has demonstrated that the district court misapplied the law in

interpreting the scope of the claims of the Asserted Patents. Lite-Netics

respectfully requests the Court dissolve the district court's preliminary injunction.


Dated:  December 5, 2022                Respectfully submitted,


*/s/Vincent J. Allen*
Vincent J. Allen
J. Miguel Hernandez
CARSTENS, ALLEN & GOURLEY, LLP
7500 Dallas Pkwy, Suite 300
Plano, Texas 75024
(972) 367-2001
(972) 367-2002 Fax
allen@caglaw.com
hernandez@caglaw.com

*Attorneys for Appellant*
*Lite-Netics, LLC*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LITE-NETICS, LLC, | |
| Plaintiff/Counter-Defendant, | NO. 8:22CV314 |
| vs. | MEMORANDUM AND ORDER REGARDING DEFENDANT/COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY INJUNCTION |
| NU TSAI CAPITAL LLC, d/b/a HOLIDAY BRIGHT LIGHTS, | |
| Defendant/Counterclaimant. | |

In its October 7, 2022, Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Temporary Restraining Order, Filing 26,[1] this Court observed that the rough-and-tumble of competition is a hallmark of the American marketplace, but the American marketplace does not tolerate unfair competition based on false and baseless statements by one vendor about another vendor. The Court granted a temporary restraining order (TRO) in this case, because the Court concluded preliminarily that plaintiff and counter-defendant Lite-Netics had crossed that line. Now, after further briefing and a preliminary injunction hearing, the Court concludes that the TRO should be continued as a preliminary injunction during the pendency of this litigation or until dissolved by court order. Thus, for the reasons stated below, the Court grants the September 30, 2022, Motion for Preliminary Injunction, Filing 12, by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL).[2]

---

[1] See *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 6151898 (D. Neb. Oct. 7, 2022).

[2] The Motion before the Court is part of a Motion for Temporary Restraining Order and Preliminary Injunction. Filing 12.

1

# I.   INTRODUCTION

## A.   Factual Background

This background is drawn from Lite-Netics's Complaint and HBL's Counterclaim. It has been augmented, where necessary, with information from the parties' submissions concerning the Motion for TRO and the Motion for Preliminary Injunction, including supplemental briefing, evidence submitted after the TRO was issued, Lite-Netics's First Amended Complaint filed October 16, 2022, and arguments presented at the preliminary injunction hearing.

### 1.   *The Parties, Patents, and Claims*

Lite-Netics alleges that it is a Texas limited liability company with a place of business in Lubbock, Texas. Filing 1 at 2 (¶ 4); Filing 31 at 2 (¶ 4).[3] Lite-Netics alleges that it sells patented magnetic light strands used to illuminate homes and businesses during the holidays. Filing 1 at 1 (¶ 2); Filing 31 at 1 (¶ 2). It identifies the patents at issue here as U.S. Patent No. 7,549,779 (the '779 Patent) and U.S. Patent No. 8,128,264 (the '264 Patent) (collectively, the Asserted Patents), which the inventor and company founder, Shawn Genenbacher, has assigned to Lite-Netics. Filing 1 at 3 (¶ 10); Filing 31 at 3 (¶ 10). Both patents describe the invention as "a light fixture assembly." Filing 1-1 at 2 ('779 Patent, abstract); Filing 31-1 at 2 (same); Filing 1-2 at 2 ('264 Patent, abstract); Filing 31-2 at 2 (same).[4] The light fixture assembly has "[a] neodymium disc magnet" ('779 Patent) or "[a] strong magnet" ('264 Patent) "embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces." Filing 1-1 at 2 ('779 Patent, abstract); Filing 1-2 at 2

---

[3] Citations to most documents are to the docket number and the docket page number (*e.g.*, Filing 13 at 2), not to any internal page number in the document, unless the Court finds it appropriate to cite to numbered paragraphs within such documents (*e.g.*, Filing 14-1 at 1 (Martini Decl., ¶ 1). Citations to pleadings are to the docket number, docket page number, and paragraph number (*e.g.*, Filing 1 at 2 (¶ 4)).

[4] For the sake of simplicity and consistency, further citations to the Asserted Patents will be to the attachments to Lite-Netics's original Complaint.

('264 Patent, abstract). Lite-Netics alleges that "[t]he patented products provide users with an easy, damage-free installation and effortless take-down." Filing 1 at 1 (¶ 2); Filing 31 at 1 (¶ 2).

In its Complaint filed August 31, 2022, (and its First Amended Complaint filed October 16, 2022), Lite-Netics provides the following image as an example of one embodiment of a magnetic light fixture disclosed in the Asserted Patents and the following photograph of its actual product:

 

Filing 1 at 4 (¶ 13), 5 (¶ 17); Filing 31 at 4 (¶ 13), 5 (¶ 17). Referring to Fig. 9A, Lite-Netics explains, "The magnetic light fixture includes a socket (8) configured to couple with a light bulb (7) at a first end and a base (3) at a second end. A magnet (1) is configured to be embedded in the base (3)." Filing 1 at 3 (¶ 13); Filing 31 at 3 (¶ 13). The Asserted Patents explain that the light fixture assembly also includes "[a] plastic protective coating **2**," "two retaining clips **5**," an optional "side clip **6**," and "a copper conductor **10**." Filing 1-1 at 7 ('779 Patent at 3:36–37, 3:46, 3:54); Filing 1-2 at 6 ('264 Patent at 3:57–59, 3:62, 4:1).

Lite-Netics alleges that, by 2017, Genenbacher had noticed that competing lighting companies were offering certain clip-on magnetic light fixtures that he believed infringed the Asserted Patents when added to a light string. Filing 1 at 6 (¶ 20); Filing 31 at 6 (¶ 20). Genenbacher instructed his counsel to send over thirty cease-and-desist letters, and one recipient was HBL. Filing 1 at 6 (¶ 20); Filing 31 at 6 (¶ 20). The record does not indicate that there were

3

any communications between Lite-Netics and HBL for the next five years. Subsequently, in spring 2022, Lite-Netics alleges that it learned that HBL is marketing a "Magnetic Cord" and a "Magnetic Clip" that Lite-Netics believes infringe the Asserted Patents. Filing 1 at 6 (¶ 21); Filing 31 at 6 (¶ 21). Lite-Netics filed its Complaint for Willful Patent Infringement against HBL initiating this action on August 31, 2022. Filing 1. Count I of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '779 Patent. Filing 1 at 7-9 (¶¶ 24–35). Count II of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '264 Patent. Filing 1 at 9–11 (¶¶ 35–48).

After the Court issued a TRO, Lite-Netics filed its First Amended Complaint for Willful Patent Infringement on October 16, 2022. Filing 31. Count I of its First Amended Complaint again asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '779 Patent. Filing 31 at 8-10 (¶¶ 27–39). Count II of its First Amended Complaint again asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '264 Patent. Filing 31 at 10–12 (¶¶ 40–52). One of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both." Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42).

In its Counterclaim filed September 30, 2022, HBL alleges that it is an Illinois limited liability company with a principal place of business in Omaha, Nebraska. Filing 11 at 1 (unnumbered first paragraph and ¶ 2).[5] HBL denies that its products infringe either of the

---

[5] HBL has not yet filed an Answer either separately or with its Counterclaim. Instead, on September 30, 2022, the same day it filed the Motion for TRO, it filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims on which relief can be granted. Filing 8. After Lite-Netics filed its First

Asserted Patents. It alleges that, among other differences, the Magnetic Cord has two embedded magnets per fixture protruding from the base, rather than one magnet flush with the base, and that the magnets it uses do not have the "pull strength" claimed in the Asserted Patents. Filing 11 at 2 (¶ 8). HBL alleges that it owns its own patent, U.S. Patent No. 11,333,309 (the '309 Patent), for its Magnetic Cord design. Filing 11 at 4 (¶ 14). HBL also contends that its Magnetic Clip is a separate "slip on" device that is not a light fixture assembly. Filing 11 at 2–3 (¶ 8).

HBL acknowledges that Lite-Netics's Complaint includes the following photograph of HBL's Magnetic Clip with a light fixture, and Lite-Netics includes with the Second Declaration of Shawn Genenbacher the following photograph of unmounted HBL Magnetic Clips:



**C7/C9 Magnetic Clip**
AC-MAGCLP-250
*These magnetic intermediate base socket caps slip on easily to convert plastic light string sockets to magnetic ones.*



Filing 1 at 7 (¶ 21) (image of mounted clip); Filing 31 at 7 (¶ 21) (image); Filing 13 at 10 (acknowledging that Lite-Netics includes photographs of the accused products in its Complaint); Filing 33-1 at 11 (¶ 19) (colored arrows inserted by Mr. Genenbacher omitted).

---

Amended Complaint on October 16, 2022, this Court denied HBL's Motion to Dismiss as moot and without prejudice to the filing of a pre-answer motion directed at the First Amended Complaint. Filing 36. HBL has not so far refiled a Motion To Dismiss.

HBL includes the '309 Patent as Exhibit H to its Counterclaims. Filing 11-8. One image of the patented product from the '309 Patent and a photo of the actual Magnetic Cord[6] from Lite-Netics's Complaint are shown below:




Filing 11 at 2 ('309 Patent, cover page image); Filing 1 at 6 (¶ 21) (photograph of device); Filing 31 at 6 (¶ 21) (same). The '309 Patent explains that "two magnets **20** and **50** [with **50** not shown in the image above] protrude from the base of a socket **10**," with "a pocket **30** shaped to receive a magnet **50**" and "drain holes **40** for the socket **10**." Filing 11-8 at 7 ('309 Patent, 2:17–18, 2:24–25, 2:65). The '309 Patent explains further that "a channel between magnets **20** and **50** further helps the circulation of air when socket **10** is magnetically fixed to a surface." Filing 11-8 at 7 ('309 Patent, 2:59–61).

In its Counterclaim against Lite-Netics, HBL asserts six causes of action. Count I asserts a federal claim for unfair competition and false advertising under 15 U.S.C. § 1125(a). Filing 11 at 7–9 (¶¶ 28–36). Count II asserts a claim of unfair competition under the Nebraska Consumer

---

[6] Although HBL's product is called a "Magnetic Cord," as these images show, the only parts of the product that are magnetic and stick to the gutter or other metal surface are the magnets in the base of each light fixture.

Protection Act, Neb. Rev. Stat. § 59-1602. Filing 11 at 9–10 (¶¶ 37–43). Count III asserts a claim for deceptive trade practices in violation of the Nebraska Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-302 and 87-303. Filing 11 at 10–11 (¶¶ 44–49). Count IV asserts tortious interference with business relations and prospective business relations. Filing 11 at 11–12 (¶¶ 50–58). Count V asserts defamation. Filing 11 as 12–13 (¶¶ 59–65). Count VI asserts a claim of bad faith patent infringement communications under Colorado law, Colo. Rev. Stat. § 6-12-102 (2018). Filing 11 at 13–14 (¶¶ 66–69).[7]

### 2. The Parties' Communications about Infringement

The focus for purposes of the Motion now before the Court is Lite-Netics's recent conduct in the marketplace accusing HBL of misconduct. HBL alleges that it has been marketing and selling its Magnetic Clip product since before 2017. Filing 11 at 3 (¶ 9). It acknowledges that in 2017, it received a cease-and-desist letter from Lite-Netics and/or Mr. Genenbacher, through counsel. Filing 11 at 3 (¶ 9). A copy of that letter is attached to HBL's Counterclaim as Exhibit A. Filing 11-1. The letter advised HBL of the Asserted Patents, then states in pertinent part, as follows:

> We are now aware that you are currently using, offering to sell and selling light fixture assemblies provided by Daryl Holland, as shown in the image below. We would like to let you know that these light fixture assemblies may infringe one or more of the Genenbacher Patents. Please see attached Exhibit C for a comparison of the light fixture assembly in comparison to the Genenbacher Patents.

> [Image of Magnetic Clip omitted.]

---

[7] On October 21, 2022, Lite-Netics filed its Partial Motion to Dismiss Defendant/Counterclaim Plaintiff Nu Tsai Capital, LLC d/b/a Holiday Bright Lights' Count VI – Bad Faith Patent Infringement Communications Under Co Rev. Stat. § 6-12- 102 (2018) Counterclaim seeking dismissal of Count VI pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Filing 39. Lite-Netics's motion for partial dismissal of HBL's Counterclaim is not before the Court at this time.

> We ask that you stop selling these products or any other products that infringe the Genenbacher Patents. If you have any questions or if you would like to discuss a possible resolution of this matter, please do not hesitate to contact me.

Filing 11-1 at 2–3 (exhibits attached to the letter were not included with this filing). HBL alleges,

> This communication was facially and obviously wrong, since clips like the Magnetic Clip were expressly disclaimed by the inventor as inferior prior art in columns 1 and 2 of the Asserted Patents. Thus it would have been impossible for any reasonable investigation to conclude that the Magnetic Clips infringed.

Filing 11 at 3 (¶ 9). HBL alleges that "Lite-Netics did not attempt any relevant communications with HBL for almost five years, until 2022. HBL relied on this silence, and [HBL] continued to sell the Magnetic Clip." Filing 11 at 3 (¶ 10). Lite-Netics alleges in its First Amended Complaint that HBL never responded to its 2017 letter. Filing 31 at 6 (¶ 20).

HBL alleges that, over the years, it learned of complaints in the marketplace about Lite-Netics's light fixtures tending to fail in use because of moisture buildup when the lights were used outdoors as intended. Filing 11 at 3 (¶ 11). Lite-Netics states that it is unaware of receiving any complaints that its products failed in the field because of moisture buildup. Filing 21-1 at 2–3 (Genenbacher Decl. at ¶ 7). Lite-Netics contends that HBL has a "less than sterling reputation in the holiday lighting community" because it "has been known to look for ways to design around others' products, apparently to maximize their profits and avoid the middleman." Filing 21-1 at 3 (Genenbacher Decl. at ¶ 9). Indeed, in its TRO briefing, Lite-Netics repeatedly accuses HBL of "knocking off" other companies' products. *See, e.g.*, Filing 20 at 6, 7–9.

Even though the parties dispute whether Lite-Netics's products failed in the field, "HBL set out to invent an improvement over the Lite-Netics design." Filing 11 at 3 (¶ 12). Specifically,

> To provide customers an improved product resolving the moisture issues of Lite-Netics' fixtures, HBL devised its own proprietary moisture-mitigating design, incorporating it into the accused Magnetic Cords. In the improved design, two protruding magnets exist at the base of each light fixture, separated by a drain channel and having apertures (weep holes), facilitating evaporation of moisture built up [sic]. This new design works well.

8

Filing 11 at 3–4 (¶ 12); *see also* Filing 11-8 at 7 ('309 Patent, 1:33–60 (explaining the problems

with the '779 Patent and summarizing the invention). HBL alleges that it "did not desire to, and

did not, 'copy' any product of Lite-Netics." Filing 11 at 4 (¶ 13). HBL was granted its own patent,

U.S. Patent No. 11,333,309 (the '309 Patent), for the Magnetic Cord design. Filing 11 at 4 (¶ 14);

Filing 11-8 (Counterclaim, Exhibit H). The '779 Patent is identified as prior art in the '309 Patent,

Filing 11-8 at 2, and HBL disclosed and discussed at least the '779 Patent in its own patent

specification. Filing 11 at 4 (¶ 14); Filing 11-8 at 7 ('309 Patent at 1:31–45).

Notwithstanding HBL's own patent, on April 12, 2022, Lite-Netics sent HBL a cease-and-

desist letter, through counsel, accusing HBL's Magnetic Cord of infringing the Asserted Patents,

but not mentioning the Magnetic Clip. Filing 11 at 4 (¶ 16); Filing 11-2 (Counterclaim, Exhibit B

(chart for comparison not included with this Exhibit)). HBL's counsel responded on April 19,

2022, pointing out reasons why the Magnetic Cord did not infringe the Asserted Patents and

questioning whether the claims of the '779 patent were invalid as indefinite. Filing 11 at 5 (¶ 17);

Filing 11-3 (Counterclaim Exhibit C). HBL alleges, "As of at least April 19, 2022, Lite-Netics and

Genenbacher (and their counsel) were aware of HBL's noninfringement (both by the Magnetic

Clip and the Magnetic Cord), and likely patent invalidity as well." Filing 11 at 5 (¶ 19). Lite-Netics

points out that in HBL's response, HBL also states,

> Finally, your letter noted FRE 408, but did not supply a settlement demand.
> If your client has in mind a price for a fully paid-up release and covenant not to sue,
> my client will consider it under FRE 408 for purposes of achieving an increment of
> design freedom if it ever chose to change its design.

Filing 11-3 at 2 (Counterclaim, Exhibit C); Filing 20 at 9 (citing this language). From this

language, Lite-Netics asks the Court to infer that such a request for settlement is "not exactly what

someone so sure it is non-infringing would be requesting." Filing 20 at 9. Lite-Netics asserts that

Genenbacher was not interested in licensing or selling his patents to a competitor. Filing 21-1 at 4 (¶ 11).

Lite-Netics responded to HBL's April letter on May 27, 2022, reiterating accusations that HBL's Magnetic Cords infringe the Asserted Patents, Filing 11 at 5-6 (¶ 22), because "the magnet . . . does not protrude outside the perimeter . . . of the base," and including a photo of a "pull test" demonstrating that the two magnets in HBL's product have a combined pull strength of more than 5 pounds. Filing 11-5 at 2–3 (Counterclaim, Exhibit E). HBL contends this letter provides no plausible factual showing to support a claim that the Magnetic Cord or Magnetic Clip infringe every claim limitation of any claim of the Asserted Patents. Filing 11 at 6 (¶ 22). HBL responded to this communication by email on June 21, 2022, reaffirming HBL's position that the Magnetic Cord does not infringe the Asserted Patents. Filing 11 at 6 (¶ 23). HBL explained in that letter, in pertinent parts,

> There is no infringement of the '779 patent at least because no single magnet has a pull strength greater than 5lbs (regardless of measurement technique). The picture in your letter supports this (showing 6.88lbs for two magnets acting together - not one).
>
> * * *
>
> There is no infringement of the '264 patent at least because the two magnets protrude below the base. The negative limitation you personally added during prosecution to overcome prior art does not describe perimeter protrusion, as your letter suggests. It is instead a negative limitation written broadly to make any type of protrusion (such as an item protruding below the base - seen in the Chou prior art you distinguished) exclude a product from the claim's scope.

Filing 11-6 at 2 (Counterclaim, Exhibit F).

### 3. Lite-Netics's Communications to HBL's Customers

HBL alleges that, despite its response to Lite-Netics's cease-and-desist letter in April, in May 2022, Lite-Netics's counsel sent several letters to HBL's clients and customers "alerting" them of activities allegedly infringing Lite-Netics's patents. *See* Filing 11 at 5 (¶ 20); Filing 11-4

(Counterclaim, Exhibit D). HBL "understands" that Ace Hardware Corp., Decorator's Warehouse, Novelty Lights, and Jabo's Ace Hardware are customers that received such letters. Filing 11 at 5 (¶ 20). Lite-Netics alleges that these communications were sent to its own customers after its customers asked how HBL could sell the same product as Lite-Netics's patented product. Filing 21-1 at 5 (Genenbacher Decl. at ¶ 14). As Lite-Netics points out, Filing 20 at 10, the letter submitted as Exhibit D to HBL's Counterclaim does not identify any alleged infringer.

HBL alleges that in September 2022, after Lite-Netics had filed this lawsuit, Lite-Netics sent letters or emails to HBL's clients and customers accusing HBL by name of infringing the Asserted Patents. Filing 11 at 6–7 (¶ 26); Filing 11-7 (Counterclaim, Exhibit G). Again, Lite-Netics contends that the correspondence was sent to its own top customers to notify them that Lite-Netics had taken action to protect the Asserted Patents against HBL's products. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 14). Lite-Netics asserts that it was unaware of any purported business relationship that these companies might have had with HBL when the communications were sent out, because the recipients were customers of Lite-Netics. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15). There is no evidence in the record that Lite-Netics had any exclusive agreement with any of these companies.

The key paragraph of this communication, as shown in Exhibit G to HBL's Counterclaim, states the following:

> We have become aware of recent attempts by other companies to make and sell similar products that infringe our patents. While we encourage healthy competition, copying of patented products does not promote innovation in our industry, nor does it recognize the efforts undertaken by Litenetics [sic] in developing its' [sic] products. For your information, Litenetics has filed a major patent infringement lawsuit against Holiday Bright Lights to include all legal rights and remedies to stop them from making and selling infringing products. We are also considering including any known company using or reselling the HBL products as co-defendants in this lawsuit. Litenetics has invested a significant amount of time,

11

effort, and resources in developing its intellectual property, and we will not allow
our patent rights to be trampled.

Filing 11-7 at 2. The communication ends with the following paragraph:

The following is the 1st page of the complaint. Should you need additional
information, please let us know.

Filing 11-7 at 2. Lite-Netics did indeed attach the first page of the Complaint in this action to this

communication. Filing 11-7 at 3; Filing 1 at 1.

HBL alleges that Lite-Netics knew that its statements in its September 2022

communications were false; that Lite-Netics sent these letters or emails with knowledge that its

patent infringement allegations against HBL are objectively baseless, and with intent to injure

HBL and its business; and that threats of this nature to HBL customers were misleading because,

even if Lite-Netics added purchasing parties as new defendants to the suit, controlling federal law

would lead to an immediate stay of claims against them. Filing 11 at 7 (¶ 26) (citing *In re Nintendo

of Am., Inc.*, 756 F.3d 1363, 1364 (Fed. Cir. 2014) (granting mandamus)). HBL identifies some of

its clients and customers that received Lite-Netics's "letters and injurious threats" after Lite-Netics

filed this lawsuit as Novelty Lights, Inc., in Denver, Colorado; Jabo's Ace Hardware with

businesses throughout Texas; and Decorator's Warehouse with businesses in Arlington, Texas.

Lite-Netics alleges that the communications were proper because they fall within the "litigation

privilege." Filing 20 at 22–23; Filing 32 at 34–36.

### B. Procedural Background

#### 1. The TRO Proceedings

HBL filed a combined Motion for Temporary Restraining Order and Preliminary

Injunction shortly after noon on Friday, September 30, 2022. Filing 12. The request for a TRO,

like the request for a preliminary injunction now before the Court, was based on HBL's

counterclaims of tortious interference with business relationships and defamation. Filing 12 at 4;

12

Filing 12 at 6. No party requested an evidentiary hearing on the Motion for TRO. Therefore, after

expiration of an expedited briefing schedule set by the Court, the Court entered a Memorandum

and Order Regarding Defendant/Counterclaimant's Motion for Temporary Restraining Order and

Temporary Restraining Order on October 7, 2022. In most pertinent part, the TRO ordered the

following:

> [P]ending the hearing of HBL's application for a preliminary injunction under Rule
> 65 of the Federal Rules of Civil Procedure, Lite-Netics, along with its officers,
> directors, shareholders, and other agents, is temporarily restrained from making
> statements via letters, emails, Facebook, Twitter, or any other social media, mass
> media, direct marketing, robocalls, press releases, blogs, websites or otherwise
> suggesting "copying" by HBL, suggesting HBL customers will be burdened as
> additional defendants in this or any lawsuit, or suggesting that HBL is a patent
> infringer.

Filing 26 at 36. The primary basis for such temporary relief was the Court's conclusion that Lite-

Netics's statements to customers on which HBL's tortious interference and defamation claims rely

were "baseless."  *See* Filing 26 at 17–24 (tortious interference), 25–26 (defamation). The Court

also determined that the threat of irreparable injury to HBL's reputation and goodwill was

sufficient and that HBL acted promptly to protect itself from such harm. Filing 26 at 27–30. The

Court also concluded that the balance of equities and the public interest tipped in favor of granting

the TRO. Filing 26 at 30–31.

There had been no mention of the doctrine of equivalents in Lite-Netics's original

Complaint, any pre-suit communications between the parties, or any of the pre-suit

communications to customers at issue here. Instead, the first mention of the doctrine of equivalents

in this case was HBL's statement in its brief in support of its September 30, 2022, Motion to

Dismiss that "Lite-Netics also did not plead Doctrine of Equivalents infringement." Filing 9 at 3;

*see also* Filing 9 at 15 (explaining that "Lite-Netics cannot make, and in fact has not made, any

plausible allegation of infringement under the doctrine of equivalents" for various reasons). HBL

13

did not mention the doctrine of equivalents in its brief in support of its Motion for TRO. Although Lite-Netics did not respond to HBL's Motion to Dismiss before the Court denied that Motion as moot, Lite-Netics did mention the doctrine of equivalents in its brief in opposition to the Motion for TRO. Specifically, Lite-Netics argued that "even if the Court does not adopt the construction to be advanced by Lite-Netics, [HBL's] products should be found to infringe under the doctrine of equivalents" because HBL "is simply cutting a component in half and using both pieces together." Filing 20 at 18. In a footnote, Lite-Netics asserted that "a plaintiff satisfies the pleading requirements for a doctrine of equivalents claim when it brings a claim for direct infringement." Filing 20 at 18 n.1.

In its TRO Order, the Court rejected Lite-Netics's argument that HBL's use of two magnets instead of one in its light fixture assembly in the Magnetic Cord falls within the scope of infringement under the doctrine of equivalents, and that the combined magnets in the Magnetic Cord have the required "pull strength" claimed in the Asserted Patents. The Court explained,

> Lite-Netics also is not saved by the doctrine of equivalents because Lite-Netics has cited no controlling authority—which in this instance means authority from the Federal Circuit Court of Appeals or the United States Supreme Court—that it is not required to plead "doctrine of equivalents" infringement and the Court has found none.

Filing 26 at 20. The Court then explained why the cases on which Lite-Netics relied did not demonstrate that Lite-Netics was not required to plead infringement under the doctrine of equivalents. Filing 26 at 20–21.[8] The Court continued,

---

[8] Lite-Netics cited a case from the Middle District of Alabama that, in turn, cites *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007), and *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010). As this Court explained in its TRO ruling, in *McZeal*, the plaintiff expressly pleaded "[t]he defendant's INTERNATIONAL WALKIE TALKIE machine physically have [sic] or perform all of the basic elements contained in the patent claims of the plaintiff and further infringes under the doctrine of equivalents." *McZeal*, 501 F.3d at 1357 (citing the Complaint at 14 and 56). The Court also explained that the decision in *Spansion* does not discuss pleading at all. Rather, it states, "To prove direct infringement, Tessera must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Spansion*, F.3d at 1349 (Fed. Cir. 2010) (internal quotation marks and citations omitted).

14

> [T]his Court believes that to assert a claim of infringement based on doctrine of equivalents under the prevailing *Twombley* and *Iqbal* pleading standard, the patent holder must plead a plausible factual basis for an equivalent of a claimed limitation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009); *see also Metricolor LLC v. L'Oreal S.A.*, 791 F. App'x 183 (Fed. Cir. 2019) (unpublished opinion) (affirming refusal to consider doctrine of equivalents mentioned for the first time in opposition to a motion to dismiss and not expressly pleaded). Lite-Netics has not done so. Its contention that a device with two magnets embedded in the base literally infringes a limitation stated in terms of a single magnet is baseless.

Filing 26 at 21.[9]

### 2. Filings in Anticipation of the Preliminary Injunction Hearing

On October 7, 2022, the Court entered a separate Order scheduling a hearing on HBL's Motion for Preliminary Injunction for October 17, 2022, as well as setting certain other requirements for the preliminary injunction hearing and setting a briefing schedule. Filing 27. Pursuant to a joint request from the parties, Filing 29, the Court reset the preliminary injunction hearing for October 24, 2022, and reset the briefing deadlines. Filing 30.

On October 16, 2022, the day before the deadline for supplemental briefs on the Motion for Preliminary Injunction, Lite-Netics filed its First Amended Complaint. Filing 31. As mentioned above, one of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both." Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42). Thus, Lite-Netics has now attempted to overcome the pleading deficiency in its original Complaint pointed out by HBL and the Court. HBL disputes the relevance of the belated allegations of infringement under the doctrine of equivalents, *see* Filing 34 at 2–3, but the Court will address that issue in due course.

---

[9] The Court also concluded that, assuming without deciding that Lite-Netics can legitimately assert that using two magnets infringes a claim expressly stated in terms of a single magnet under the doctrine of equivalents, the Magnetic Cord lacked other limitations set out in the Asserted Patents and that a TRO was appropriate on other grounds. Filing 26 at 21–24. Those grounds will be reiterated below.

15

Refocusing on procedural matters, Lite-Netics filed its lengthy Opposition to [HBL's] Motion for Preliminary Injunction shortly before the Court's deadline on October 17, 2022. Filing 32. Lite-Netics also filed an index of additional evidence. Filing 33. A few minutes later, HBL filed its concise Supplemental Brief in Support of Preliminary Injunction, Filing 34, and an index of additional evidence, Filing 35. On October 20, 2022, the parties filed reply briefs in the opposite order. HBL filed its Reply in Support of Counterclaim Plaintiff [HBL's] Motion For Preliminary Injunction shortly before the Court's deadline. Filing 37. A few minutes later, Lite-Netics filed its Reply Brief to [HBL's] Supplemental Brief in Support of Preliminary Injunction. Filing 38. Neither party filed additional evidence with its reply.

### 3. The Preliminary Injunction Hearing

No party informed the Court of its intent to present live testimony at the preliminary injunction hearing by the deadline set by the Court. Consequently, the hearing on the Motion for Preliminary Injunction on October 24, 2022, consisted of arguments of counsel. The parties also offered some of the evidence previously submitted to the record as exhibits to facilitate their arguments. HBL offered and the Court admitted as exhibits a Declaration of Richard Martini, Filing 14-1, as Exhibit 101; a declaration of Rich Firneno, a customer of HBL, Filing 35-1, as Exhibit 102; the '309 Patent, Filing 10-2, as Exhibit 103; the prosecution history of the '779 Patent, Filing 10-3, as Exhibit 104; and the prosecution history of the '264 Patent, Filing 10-4, as Exhibit 105. In addition, HBL offered a portion of Lite-Netics's magnetic light cord as Demonstrative Exhibit 106; a portion of HBL's Magnetic Cord as Demonstrative Exhibit 107; and one Magnetic Clip as Demonstrative Exhibit 108. Lite-Netics offered and the Court admitted as exhibits the two declarations of Shawn Genenbacher, Filing 21-1 and Filing 33-1, as Exhibits 1 and 2, respectively. Lite-Netics also offered and the Court admitted four prior art patents, consisting of Dougan, Filing

33-2, as Exhibit 3; Chou, Filing 33-3, as Exhibit 4; Hofer, Filing 33-4, as Exhibit 5; and Clement, Filing 33-5, as Exhibit 6.

The parties' arguments were spirited and informative. At the end of the hearing, the parties acknowledged that the order resetting the preliminary injunction hearing, Filing 30, had extended the TRO for a second fourteen-day period and that the TRO would continue for the second full fourteen-day period or until the Court filed this preliminary injunction ruling.

## II.  LEGAL ANALYSIS

### A.  Standards for a Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure provides, in part, "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Rule 65(a)(2) also provides for consolidation of the preliminary injunction hearing with trial on the merits. Fed. R. Civ. P. 65(a)(2). The adverse party here, Lite-Netics, has received notice of the request for a preliminary injunction; no party has suggested that the preliminary injunction hearing should be consolidated with trial on the merits; and the Court does not find such consolidation to be appropriate.[10]

Rule 65 does not identify the standard the Court must apply in deciding whether or not to grant a request for a preliminary injunction. The Eighth Circuit Court of Appeals has explained that "the standard for analyzing a motion for a temporary restraining order is the same as [the

---

[10] Lite-Netics suggested in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction, however, that it was inappropriate for the Court to decide whether allegations of infringement were in bad faith without ample discovery, briefing, and claim construction in a *Markman* hearing. Filing 20 at 17. The Court was not persuaded by that contention because such a rule would also mean that a court could never grant a patent holder a TRO to enjoin infringement by a competitor, which clearly is not the case. Filing 26 at 18–19. The Court also pointed out that the likelihood of success requirement for a TRO or preliminary injunction involves only demonstration of a "fair chance of prevailing," not a certainty of prevailing, and that a TRO is frequently granted before discovery and even without notice to the opposing party. Filing 26 at 19. Similarly, a preliminary injunction may be granted before discovery and the purpose of a preliminary injunction is to maintain the status quo pending litigation not to resolve finally any question presented in the litigation. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022).

17

standard for analyzing] a motion for a preliminary injunction." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey*, 27 F.4th at 664 (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[11] No single factor is dispositive. *Id.* at 665. Furthermore, a preliminary injunction is an extraordinary remedy never awarded as of right; the primary function of a preliminary injunction is preserving the status quo until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a preliminary injunction. *Id.* at 664. Lastly, the burden of establishing the propriety of a preliminary injunction is on the movant. *Id.*

The parties' briefing on the request for a preliminary injunction after the Court issued its TRO ruling focused more tightly on two issues: (1) whether Lite-Netics's allegations of infringement by HBL were "baseless," which relates to the first *Winter* factor concerning HBL's likelihood of success on the merits of its tort claims; and (2) whether HBL can show irreparable harm, rather than mere speculative harm, which relates to the second *Winter* factor. The parties' oral arguments at the preliminary injunction hearing were almost entirely devoted to the first issue.

---

[11] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), with *Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

The Court will address (and/or reassess) its prior findings on all the *Winter* factors in light of the parties' additional arguments and evidence relating to whether a preliminary injunction should now replace the TRO.[12]

### B. Likelihood of Success on the Merits

The Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). The likelihood of success is considered in light of the elements of the movant's claim or claims. *See, e.g., 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). The parties have not disputed this statement of the applicable standards. Indeed, HBL emphasized at the preliminary injunction hearing that the applicable standard considers whether the movant has a "fair chance of prevailing on the merits" not whether the movant finally prevails on the merits. The Court observed in its TRO ruling—and reiterates now—that it is not predetermining which party will prevail, only considering whether HBL's showing is sufficient to demonstrate that it has "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC*, 27 F.4th at 593.

---

[12] It is not altogether clear whether any appeal of this Court's decisions on the Motion for TRO and the Motion for a Preliminary Injunction would be to the Federal Circuit Court of Appeals or the Eighth Circuit Court of Appeals, despite certain patent law matters being at issue. Both parties acknowledged and applied Eighth Circuit standards for a TRO or preliminary injunction. *See, e.g.,* Filing 13 at 3–4; Filing 20 at 11–13. They also referred to the *Dataphase* and *Winter* factors in their oral arguments on the preliminary injunction.

    *1.   HBL has a Fair Chance of Prevailing on Its Tortious Interference Claim*

      a.   Applicable Law

In its TRO ruling, the Court pointed out that, under Nebraska law,

> To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. In order to be actionable, interference with a business relationship must be both intentional and unjustified.

*Dick v. Koski Pro. Grp., P.C.*, 950 N.W.2d 321, 377 (Neb. 2020) (citations omitted), *opinion modified on other grounds on denial of reh'g*, 953 N.W.2d 257 (Neb. 2021). A contractual relationship between HBL and its customers is not required. *Id.* (requiring "a business relationship or expectancy").

    In its TRO ruling, the Court found that the critical element was whether any interference by Lite-Netics was "improper" and "unjustified." *Koski Pro. Grp.*, 950 N.W.2d at 377 (third element). Lite-Netics is correct that "[s]tate tort claims based on enforcing a patent, including for tortious interference, are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018) (citing *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008)). In explaining this "bad faith" requirement, the Federal Circuit Court of Appeals explained that "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1332 (Fed. Cir. 2012) (quoting *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004)).

20

This Court previously concluded that this "bad faith" requirement was not an impediment to HBL's tortious interference claim in this case.

As to the "improper or unjustified" element of the tort claim, the Nebraska Supreme Court explained,

> Factors to consider in determining whether interference with a business relationship was unjustified include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. The issue is whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Koski Pro. Grp., P.C.*, 950 N.W.2d at 378 (citations omitted). Under Nebraska law, it is clear that "valid competition," involving truthful statements, cannot be the basis for a tortious interference claim. *Id.* Indeed, even communications that are malicious are not enough by themselves to impose liability, because "if the information provided is truthful, the interference is not unjustified." *Thompson v. Johnson*, 910 N.W.2d 800, 807–09 (Neb. 2018).

The parties have not disputed these statements of the applicable law. Therefore, the Court turns to HBL's likelihood of success on proving its tortious interference claim. In its TRO ruling, the Court found that HBL had made sufficiently plausible allegations that Lite-Netics's communications to HBL's customers were untruthful, known by Lite-Netics to be untruthful, and were made in bad faith (i.e., baseless), which takes those communications out of the realm of "valid competition," thus demonstrating a fair chance of prevailing on a tortious interference claim that is not preempted. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09; *Energy Heating, LLC*, 889 F.3d at 1304. Lite-Netics now asks the Court to reach the opposite conclusion at the preliminary injunction stage of the case.

21

> b. HBL is Likely to Succeed in Showing Lite-Netics Knew of
> HBL's Business Relationships

In its TRO ruling, the Court concluded that there are at least reasonable inferences that HBL had business relationships or expectancies with the companies to which Lite-Netics sent its allegedly tortious communications and that Lite-Netics knew of these business relationships. *Koski Pro. Grp.*, 950 N.W.2d at 377 (first and second elements). The inferences of relationships arise from evidence that the businesses provided information about Lite-Netics's communications to HBL, as well as evidence that customers have called HBL in response to Lite-Netics's communications to them expressing their worries and questioning whether HBL will be able to meet supply commitments for the named products as well as how the litigation would affect their orders and shipments. Filing 15-1 at 3 (Martini Decl., ¶ 11). At the TRO state, Lite-Netics professed not to know of such relationships because these companies were customers of Lite-Netics. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15).[13] Lite-Netics had not—and still has not—identified any exclusive relationship agreement it had with any of these customers, however, that would preclude them from having relationships with other vendors of similar products. At most, Lite-Netics reiterated its founder's belief that these were Lite-Netics's customers. At the TRO stage, the Court concluded that inferences that Lite-Netics knew of the relationships arising from its targeting of these businesses are sufficient to overcome Lite-Netics's denials. The Court observed that one does not ordinarily threaten one's own customers with a lawsuit, as the Court inferred Lite-Netics did in the September 2022 communications.

---

[13] As the Court observed in its TRO ruling, Lite-Netics's assertions that it did not know these companies were HBL's customers is rather disingenuous when retailers routinely offer similar products from various vendors. Also, all Lite-Netics would have to do to ascertain whether one of its customers was also selling products from another vendor is check the retailer's website or walk into its store.

Lite-Netics does not challenge these conclusions in its opposition to the Motion for Preliminary Injunction, and the Court reaffirms them now.

> ### c.  HBL is Likely to Succeed in Showing Lite-Netics's Allegations of Infringement Were Baseless
>
> > #### i.  Allegations of Literal Infringement are Likely Baseless
> >
> > > ##### (1) The Magnetic Clip Does Not Literally Infringe the Asserted Patents

In its TRO ruling, the Court found that in communications to HBL's customers, Lite-Netics accused HBL of tortious conduct—patent infringement—but HBL had plausibly shown that Lite-Netics knew that such a claim was baseless, thus not protected by its truth. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09. At least at the TRO stage of the litigation, the Court could not see how Lite-Netics could reasonably believe that HBL's Magnetic Clips infringe or copy the Asserted Patents.[14] The independent claims of both Asserted Patents are for "[a] light fixture assembly" with a magnet "embedded in the base," and in the '779 Patent, that base is "attached to the second end of the light bulb socket," and in the '264 Patent, that base is "integrally attached to the second end of the light bulb socket." Filing 1-1 at 7 ('779 Patent, 4:52–63 (Claim **1**)); Filing 1-2 at 8 ('264 Patent, 5:20–32 (Claim **1**)). In the TRO ruling, the Court found that the Magnetic Clips are not "light fixture assemblies" at all, but devices that clip onto light fixture assemblies. Furthermore, the Court found that the Magnetic Clips are neither "a base attached to the second end of the light bulb socket" nor "a base integrally attached to the second

---

[14] As a preliminary matter, in the TRO ruling, the Court observed that Lite-Netics used "designing around" a patent in its TRO briefing as if it were a bad thing. The Court explained that "designing around" a patent is not prohibited by statute or caselaw and, indeed, is encouraged by the patent law. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (explaining that a court "should bear in mind that the patent law encourages competitors to design or invent around existing patents" (citing *Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993)). Lite-Netics had not then and has not now identified any authority suggesting that "designing around" a patent is somehow tortious. Lite-Netics has not reiterated its use of "designing around" as somehow constituting misconduct in opposition to the Motion for Preliminary Injunction.

end of the light bulb socket" because they clip onto the outside of the light bulb socket base. Furthermore, the Court pointed out that the '779 Patent expressly distinguishes the claimed invention from and thus disclaims "clips." *See* Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights). Indeed, the Court pointed out that Mr. Genenbacher continues to maintain that the '779 Patent overcame the "cumbersome[ness]" of clips. Filing 21-1 at 2 (¶ 5).

In opposition to the Motion for Preliminary Injunction, Lite-Netics now clarifies that the Magnetic Clip does not "directly" infringe the '779 Patent but only "indirectly" infringes it, because it allows (induces and contributes to) end users' infringement of the '779 Patent. Filing 32 at 22. Lite-Netics argues that this is so because when the Magnetic Clip attaches to the base of a light fixture on a string of lights, the Magnetic Clip and base of the light fixture form a singular base. Filing 32 at 23. Furthermore, Lite-Netics argues that the Magnetic Clip literally infringes the '779 Patent, because it includes a neodymium magnet with sufficient pull force. Filing 32 at 23. Lite-Netics contends that the Magnetic Clip literally (but only indirectly) infringes the '264 Patent because when the Magnetic Clip attaches to a light fixture, the Magnetic Clip is part of the base of the light fixture, Filing 32 at 30, and its magnet is embedded into the base of the light fixture assembly and therefore does not protrude outside the base, Filing 32 at 32.[15]

At the preliminary injunction hearing, Lite-Netics developed this argument further. Lite-Netics argued that simply clipping the Magnetic Clip onto the base of an existing magnet is actually making the Magnetic Clip one and the same with the base. Lite-Netics argued that just because one element is claimed does not mean that that element has to be comprised of only one

---

[15] Lite-Netics also argues that the Magnetic Clip indirectly infringes claim **2** of the '264 Patent. Filing 32 at 33. However, infringement of claim **2**, a dependent claim, is irrelevant if the Magnetic Clip does not infringe the independent claim 1, on which claim **2** depends.

component, and when the clip is installed, the base becomes a two-component base. Lite-Netics also points to the description of an alternative embodiment in the specification of the '264 patent in which the light assembly can be separated into two components such that the magnet can be replaced without replacing the entire light assembly.

In support of its Motion for Preliminary Injunction, as to the Magnetic Clip, HBL argues that there is no inducement of or contribution to literal infringement because the Magnetic Clip does not form "a singular base" when it is put on the base of a light fixture because it "pockets" the base of the light fixture and clips onto the external electric cord. Filing 34 at 5. HBL points out that this is exactly the "attachment" structure disclaimed in the specifications of the Asserted Patents. Filing 34 at 5. At the preliminary injunction hearing, HBL contended that the Magnetic Clip does not become part of a two-component base, because it never attaches to the light fixture at all. Rather, HBL asserts, the arms on the Magnetic Clip attach to the electric cord.

Lite-Netics's new and renewed arguments do not convince the Court that it was wrong in its conclusion that HBL has a fair chance of prevailing on its claim that Lite-Netics's allegations of literal infringement by the Magnetic Clips are baseless. *See Wildhawk Invs., LLC*, 27 F.4th at 593. Even though Lite-Netics now focuses on the purported attachment of the Magnetic Clip to the base of the light fixture as the aspect that induces or contributes to infringement of the Asserted Patents, the Court remains unpersuaded. The Court reiterates that the Magnetic Clips are neither "a base attached to the second end of the light bulb socket" nor "a base integrally attached to the second end of the light bulb socket," as claimed in the Asserted Patents. Filing 1-1 at 7 ('779 Patent, 4:52–63 (Claim **1**)); Filing 1-2 at 8 ('264 Patent, 5:20–32 (Claim **1**)). As HBL argues, the Magnetic Clip does not "attach" to the base of the light fixture to form "a singular base," as Lite-Netics contends; instead, it "pockets" the base of the light fixture and is attached only to the

external electric cord. Filing 37 at 5. The Court corrects or clarifies its prior statement that the Magnetic Clips clip onto the outside of the light bulb socket base, because the illustrations—and the opportunity to examine the example of a Magnetic Clip provided as a demonstrative exhibit at the preliminary injunction hearing—make clear that the Magnetic Clips instead clip onto the electric cord not the light fixture or its base. *See, e.g.,* Filing 1 at 7 (¶ 21) (image); Filing 31 at 7 (¶ 21) (image), included above, page 5.

Furthermore, even if "integrally attached" means "discrete parts physically joined together as a unit without each part losing its own separate identity," *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015), something more than "touching" is indicated by "attached." *See, e.g., Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) (construing fixed, attached, and fastened as synonyms). The Court does not accept Lite-Netics's contention that the clip is "integrally attached" to the light fixture simply because it fits "snugly" to the bottom of the light fixture. Filing 32 at 32. There is no means of "attachment" at all to the bottom or base of the light fixture, only to the electrical cord. Nor does the Court accept Lite-Netics's contention at the preliminary injunction hearing that the Magnetic Clip is attached to the bottom of the light fixture or base, because "pressure" is applied to the base of the lamp when the Magnetic Clip is installed, so attachment to the wires makes no difference. No ordinary person or person of ordinary skill in the art would understand external "pressure" constitutes "attachment." Lite-Netics has pointed to nothing to suggest such a meaning is intended by "attached" or that a person of ordinary skill in the art would give "attached" such a meaning.

Indeed, Lite-Netics went so far at the preliminary injunction hearing as to argue that the electrical wires of the cord are actually part of the base at that point because they have been installed into the base or into the light fixture and so they're coming out of the base and become

26

part of it. Nowhere does the '264 explain or suggest that the electrical wires are part of the "base" of the light fixture. Instead, the summary of the invention discusses an embodiment "with electrical wires . . . inserted through the side of the socket," then describes a "base" that "includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor." Filing 1-2 at 6 ('264 Patent, 2:13–17). The wires are never described as part of or a component of the "base." *See also* Filing 1-2 at 7 (3:61–64) ("A molded wire clamp **4** in the base helps to hold the electrical wires **9** in contact with a copper conductor **10** in the socket **8** when the base **3** and socket **8** are assembled, as shown in FIG. 1."), (4:9–11) ("The conductors **10** provide electrical connection between the wires **9** and the base of the light bulb (not shown)[in Fig. 5]."); Filing 1-2 at 8 (Claim **1**) (5:20–27) (claiming a light fixture assembly comprising "a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places a light bulb inserted into the first end in electrical contact with said electrical wires" and "a base integrally attached to the second end of the light bulb socket"). Lite-Netics disputes HBL's contention that the Magnetic Clip does not infringe because it does not attach to the base when Lite-Netics does not even state a limitation in the claim about what it has to be attached to. This argument is simply contrary to the claim language of the '264 Patent, which expressly claims "a base integrally attached to the second end of the light bulb socket" and "a magnet embedded in the base." Filing 1-2 at 8 (5:26–28). The Magnetic Clip has a magnet that is not embedded in the base of the light bulb socket but embedded in a clip, and that clip is not attached to the light bulb socket but attached to the electrical cords.

The Court also reiterates that the '779 Patent (like the '264 Patent) expressly distinguishes the claimed invention from and thus disclaims external "clips" that attach to the electrical cord *See*

Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights); *see also* Filing 1-2 at 6 ('264 Patent, 139–2:4). Both Asserted Patents criticize the Dougan prior art that "provides a clip that is secured to the electrical cord that connects a string of lights." Filing 1-1 at 6 (1:36–38). The stated criticism is,

> Dougan requires a separate set of clips/wedges to be purchased and then added to the string of lights before mounting them. While the insertion and removal of the wedges from the fascia and soffit may seem simple in theory, it is likely the user will encounter some difficulties in this operation.

Filing 1-1 at 6 (1:47–52). They also criticize the Clement prior art that "provides a member that is clipped to the electrical cord of a string of decorative lights," but "uses a magnet to secure it to metal surfaces." Filing 1-2 at 6 (1:55–58). The stated criticism is,

> Clement still requires the user to purchase a separate set of members and then clip them onto the electrical cord of the light string before mounting the lights, requiring additional time and effort.

Filing 1-1 at 6 (1:60–64). The desire that the Asserted Patents claim to fulfill is for "a method for temporarily mounting a string of decorative lights to a metal surface without the need for damaging the surface and without the need to install additional items to the light string." Filing 1-1 at 6 (1:65–2:2). The Magnetic Clips like the Dougan and Clement prior art involve "a separate set of clips" (or "a separate set of members") that clip to the electrical cord of the string of lights and, thus, involve "the need to install additional items to the light string."

Finally, as to literal infringement by the Magnetic Clip, at the preliminary injunction hearing, Lite-Netics pointed to the description of an alternative embodiment in the specification of the '264 patent described as a light assembly that can be separated into two components such that the magnet can be replaced without replacing the entire light assembly. Lite-Netics argued this means that the Magnetic Clip contributes to literal infringement of the '264 Patent because it is a separate end piece. The pertinent part of the description is the following:

28

> In an alternative embodiment not shown in the drawings, the base of the light assembly can be separated into two components such that the magnet can be replaced without replacing the entire light assembly. A separate end piece for the base contains a magnet embedded as described above in reference to other embodiments. One end of the separate end can be removably joined to the main base of the light assembly. The manner of joining can be by threading the main base and the separate end piece to allow the end piece with magnet embedded to be screwed into the main base of the light assembly. Other means of attachment such as a quick disconnect type snap may be employed without departing from the scope and spirit of the invention. Should the magnet fail, or should it become dislodged from the separate end piece, the separate end piece can be removed and replaced with a new one.

Filing 1-2 at 7–8 (4:55–5:3). Lite-Netics described this part of the description as talking about clipping something onto the magnet or to the base of the lamp in the actual specifications, so Lite-Netics argued that to say that Lite-Netics disclaimed clipping the magnet onto the base of the lamp would be contrary to the '264 Patent's own specification. HBL argues that this alternative embodiment is talking about different bases, and in the context of the description, the base attaches to the socket for the light bulb. HBL contends that this embodiment does not describe a clip-on magnet.

Examining the description more carefully, it is apparent that what is described is a base with two components, in which a separate end piece for the base contains a magnet. Filing 1-2 at 7 (4:55–60). One end of the separate end piece can be "removably joined to the main base of the light assembly," for example, by threading the main base and the separate end piece together (*i.e.*, screwing together the two components of the base) or by using a "quick disconnect type snap." Filing 1-2 at 7 (4:60–66). It is clear, however, that the separate end piece must be "attached" to the "main base." Filing 1-2 at 7 (4:65) (referring to "means of attachment" of the separate end piece to the main base). Again, the Magnetic Clip is not "attached" to the base, let alone to any "main base" and/or "separate end piece," by screwing it into either of those components, snapping it into

either of those components, or by any "other means of attachment," for the reasons explained above as to the meaning of "attach." Rather, it attaches to the electrical cord.

Thus, HBL is likely to prevail on its claim that Lite-Netics's allegations that the Magnetic Clip infringes the Asserted Patents on a literal infringement theory is baseless.

(2) The Magnetic Cord Does Not Literally Infringe
the Asserted Patents

At the TRO stage of the litigation, the Court could not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes or copies the '779 Patent. This is so, the Court explained, where the Magnetic Cord has two magnets, each with a pull strength less than five pounds, contrary to the requirements of claim **1** of the '779 Patent. That claim of the '779 Patent claims "a [*i.e.* one] neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds." Filing 1-1 at 7 ('799 Patent at 4:62–63)). The Court observed that nowhere does the '779 Patent state or suggest that two or a plurality of magnets may be used in an embodiment of the Patent.

In its supplemental brief in opposition to HBL's Motion for a Preliminary Injunction, Lite-Netics argues that its claim that HBL's Magnetic Cord literally infringes the Asserted Patents is not baseless. Filing 32 at 14.[16] Lite-Netics relies on authority it had not previously cited and an argument that is best described as a repackaging of its prior argument that the use of two magnets does not avoid infringement. *See* Filing 20 at 17. Specifically, Lite-Netics now asserts that the Federal Circuit has repeatedly held that "a" or "an" means "one or more" when used in claims containing the open-ended transitional phrase "comprising." Filing 32 at 14. Thus, Lite-Netics argues that references to "a neodymium magnet" in the Asserted Patents should be read as "one or

---

[16] To be precise, Lite-Netics asserts more baldly that "[t]he Magnetic Cord literally infringes" elements of the '779 patent, Filing 32 at 14, and the '264 patent, Filing 32 at 26.

more neodymium magnets." Filing 32 at 15. Similarly, it argues that the "five-pound pull force"

limitation in the '779 Patent literally covers the aggregate pull force from one or more magnets.

Filing 32 at 15.

In its supplemental briefs, HBL relies on its prior briefing and the Court's reasoning in its

TRO ruling. Filing 34 at 1; Filing 37 at 2. Somewhat more specifically, in its reply, HBL asserts

that, notwithstanding the Court's analysis in its TRO ruling, Lite-Netics "brazenly doubles down

on its irrational 'two-is-one' argument, stating that the last element of claim 1 [of the '779 Patent]

requires 'one or more magnets' that have an aggregated pull strength of more than 5 pounds."

Filing 34 at 2. HBL asserts that this argument is inconsistent with plain English and common sense

because quantity of magnets is not the issue, the quality of the one magnet is. By "quality of the

one magnet," HBL means that unless one identifiable magnet in an HBL Magnetic Cord has the

right pull strength, there is no infringement. Filing 34 at 2. To put it another way, HBL argues that

the intrinsic record does not contemplate more than one magnet, let alone combined pull strength

of two side-by-side magnets. Filing 37 at 3. At the preliminary injunction hearing, HBL described

its interpretation as consistent with the "public notice function" of patents which says that a

competitor gets to rely on how a patent holder voluntarily wrote the patent claim.

Lite-Netics's belated argument is partially correct. As the Federal Circuit Court of Appeals

has explained, "This court has 'repeatedly emphasized that an indefinite article 'a' or 'an' in

patent parlance carries the meaning of "one or more" in open-ended claims containing the

transitional phrase "comprising.""" *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313,

1321 (Fed. Cir. 2016) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed.

Cir. 2000)). What Lite-Netics overlooked in its supplemental briefing is that there are exceptions

to this rule, although they are "extremely limited." *Id.*  The exceptions arise when a patentee

31

"'evince[s] a clear intent' to limit 'a' or 'an' to 'one.'" *Id.*  (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc*., 512 F.3d 1338, 1342 (Fed. Cir. 2008)). At the preliminary injunction hearing, Lite-Netics did acknowledge that the rule that "a" or "an" means "one or more" does have an exception when there is clear expression by the patentee that it has to be only one. Lite-Netics then argued that it never included such a clear expression in the Asserted Patents, because it never said one magnet could not be two. Lite-Netics asserted that anytime the specification is silent, as it is here, as to whether there are one or two of something, the courts "always" interpret the limitation broadly to mean "one or two," as in "one or two neodymium magnets." Thus, Lite-Netics argued at the preliminary injunction hearing that the Magnetic Cord literally infringes the Asserted Patents.

Lite-Netics overstates its case when it asserts that "silence" on the number of items when "a" or "an" is used is "always" interpreted to mean "one or more." In *Convolve*, the Federal Circuit explained, "absent a clear intent in the claims themselves, the specification, or the prosecution history, we interpret 'a processor' as 'one or more processors.'" *Convolve, Inc.*, 812 F.3d at 1321. In short, the context in which "a" or "an" is used is important. *See McRO, Inc. v. Bandai Namco Games Am. Inc*., 959 F.3d 1091, 1099 (Fed. Cir. 2020) (explaining "the word 'a' is hardly the only relevant textual evidence of meaning"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1342 (Fed. Cir. 2016) ("While we have held that the use of a singular indefinite article with a claim feature may support an interpretation of 'one or more' of those claim features, *see, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc*., 423 F.3d 1343, 1350 (Fed. Cir. 2005), the context of claim 31 shows that this is not such a case.").

The Federal Circuit Court of Appeals explained how the exception to the rule that "a" or "an" means "one or more" arises in *Insituform Technologies, Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098 (Fed. Cir. 1996). In that case, the Court explained,

> Looking first to the claim language, we note preliminarily that Insituform has conceded that claim 1 contains no terms that have a specialized or technical meaning. Furthermore, nothing in the text of claim 1 suggests the use of more than one cup. Specifically, claim 1 refers to "a cup" and "the cup" repeatedly, suggesting that only one cup is involved. Indeed, rather than describing the process in terms of more than one cup, claim 1 specifically describes using the same cup repeatedly. Also, claim 1 uses the phrase "region of vacuum application" in a manner indicating that only one such region exists at any given time. This use of the phrase "region of vacuum application" is thus inconsistent with the use of more than one cup at any given time, as each cup creates its own associated region of vacuum application. Likewise, it is also inconsistent with the creation of a continuous, rather than discontinuous, vacuum.

*Insituform Techs., Inc*., 99 F.3d at 1105–06. The court also found the text of the specification and the drawings did not disclose the use of more than one cup. *Id*. at 1106–07.

Similarly, in *Abtox, Inc. v. Exitron Corp*., 122 F.3d 1019 (Fed. Cir.), *opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997), on which HBL relies, the Federal Circuit acknowledged first that "patent claim parlance also recognizes that an article can carry the meaning of 'one or more,' for example in a claim using the transitional phrase 'comprising.'" 122 F.3d at 1023 (citing *North Am. Vaccine, Inc. v. American Cyanamid Co*., 7 F.3d 1571, 1575–76, 1336 (Fed. Cir. 1993), and Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* 531 (3d ed. 1990)). Nevertheless, the court explained,

> The terms used in claim 3 of the '261 patent to demarcate the regions of the apparatus—"gas-confining chamber," "microwave cavity," and "field free zone"— are defined in relation to each other. For example, microwave energy from the "microwave cavity" is brought "into said chamber." Therefore, this language separates the "microwave cavity" from the "gas-confining chamber." The claim continues to describe "a portion of the internal volume of said chamber ... providing a field free [sterilization] zone." This language places the sterilization zone within the "gas-confining chamber."
>
> Repeatedly the claim refers to "said chamber" as it describes various portions of the apparatus. This term itself, "said chamber," reinforces the singular nature of the chamber. The claim does not place the sterilization zone vaguely within "a chamber," but within "said chamber." This language clarifies that only one chamber is in question. Likewise, claim 1 of the '586 patent discloses a "field-free zone away from said [microwave] cavity." This language suggests some separation between

33

the sterilization zone and the microwave cavity. Even this language, however, contains no suggestion of separate gas-confining chambers.

*Abtox*, 122 F.3d at 1023–24. The court went even further, however, by "seek[ing] the meaning of the claim terms by examining their fuller context." *Id.* at 1024. Specifically, the court explained,

> The written description supplies additional context for understanding whether the claim language limits the patent scope to a single unitary chamber or extends to encompass a device with multiple gas-confining chambers. Figure 2, for instance, shows a single chamber. That chamber, as described in the claims, features a sterilizing zone separate and downstream from the plasma-generating zone. These zones denote regions and functions within the same chamber, rather than multiple chambers. Nothing in the written description suggests that the claim language encompasses a device with more than one gas-confining chamber. For example, to distinguish the RF sterilizer from the microwave sterilizer, the specification notes that the microwave plasma generator "cannot be mounted concentric about the long axis" shown in figure 2. Col. 7, ll. 57–58. The specification continues:
>
>> [T]he microwave cavity 16 is mounted at one end of chamber 11, and a perforated metallic shield 17 may be placed just beyond it toward the opposite end of the chamber, spanning the entire diameter cross section of the chamber, thus creating a field-free and glowless reactive zone immediately below it and away from the microwave cavity.
>
> Col 7., ll. 59–65. This explanation discloses a non-metallic sterilization zone separate from the metallic plasma-generating zone within the same chamber. While a Faraday shield lies between the zones, both zones are contained within the single chamber 11. MDT argues that these clearly separate zones disclosed in the specification evidence the district court's error in stating that the Jacob patents do not cover plasma generation "in *an enclosure* that is *in any way separate* from *the enclosure* in which the sterilization takes place." To the contrary, although a Faraday shield separates the zones to prevent free passage of particular particles, the zones remain within the same chamber, not in distinct gas-confining chambers.

*Abtox, Inc.*, 122 F.3d at 1024 (emphasis in the original). The court then found confirmation of its reading in the record of the administrative proceedings before the Patent and Trademark Office (PTO). *Id.* at 1024–27. The court explained,

> The district court misread the prosecution history, but nonetheless arrived at a correct single chamber limitation for microwave sterilizers. That reliance on the prosecution history was in error. Nevertheless, because the claim language, as interpreted in light of the specification, limits the microwave devices to a single gas-confining chamber, this court affirms the district court's grant of summary judgment.

34

*Abtox, Inc.*, 122 F.3d at 1027. Thus, *Abtox*, like *Insituform* confirm that an exception to the rule that "a" or "an" means "one or more" when the claim language and specification demonstrate otherwise.

Consideration of the intrinsic record of the Asserted Patents leads to the same conclusion in this case. That intrinsic record does not contemplate more than one magnet, let alone combined pull strength of two side-by-side magnets. Filing 37 at 3. In other words, the specification indicates a "clear intent" that "a neodymium magnet" means "one neodymium magnet," not "one or more." *See Convolve*, 812 F.3d at 1321; *Abtox, Inc.*, 122 F.3d at 1023–27; *Insituform Techs., Inc.*, 99 F.3d at 1105–06. The summary of the invention of the Asserted Patents refers to "a neodymium magnet" and "the neodymium magnet." Filing 1-1 at 6 (2:20–23). The detailed description of the Asserted Patents likewise repeatedly refers not just to "a neodymium magnet" but to "the neodymium magnet" and "said magnet," meaning "that one." Filing 31-1 at 7 (3:15–15) ("The assembly base 3 is constructed of plastic or similar material and has an embedded neodymium magnet 1."), (3:33–34) ("As shown, the magnet 1 is embedded flush with the surface of the assembly base 3. . . ."), (Claim **1**) (4:61–63) (claiming "a neodymium magnet embedded in the base wherein said magnet has a pull strength of a least five pounds"). Indeed, there is not one reference to the possibility of more than one magnet embedded in the base to be found in the detailed description or the claims of the '779 patent, despite acknowledgements that "the magnet" may be of "[o]ther shapes, sizes and thicknesses," not just a disc magnet ½ inch in diameter and 1/8 inch thick, *see* Filing 31-1 at 7 (3:15–17); or may be "samarium-cobalt" rather than "neodymium," *see* Filing 31-1 at 7 (3:22–23); may have "[o]ther strength" than a 16 pound pull force, *see* Filing 31-1 at 7 (3:29-30); and may be embedded in various ways, including "flush with the surface of the base facing away from the light bulb," *see* Filing 31-1 at 8 (Claim **10**) (5:19–20). The same is true of the summary of the

invention, the detailed description, and the claims of the '264 Patent. *See* Filing 31-2 at 6 (2:22–34), 7 (3:25–57, 4:23, 4:55–67), 8 (5:27–35). It is also obvious that where only one magnet was ever contemplated in the Asserted Patents, the combined pull strength of multiple magnets to meet the minimum pull force claimed also was never contemplated.

The decision of the Federal Circuit Court of Appeals in *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), on which Lite-Netics relies, is not to the contrary. In that case, the court explained,

> The dispute reduces to whether the "channel" must be formed in a unitary structure. The claim requires that the anchor seat means have "an anchor seat portion spaced apart from said bone interface including a channel to receive said rod," '555 patent, col. 8, ll. 41–42, and that the "securing means ... cause[s] said rod to bear against said channel," id., ll. 51–54. The claim does not state that the anchor seat portion forming the channel is unitary. Although the sole embodiment described in the specification depicts a unitary structure, id., col. 5, ll. 20–21, the mere depiction of a structural claim feature as unitary in an embodiment, without more, does not mandate that the structural limitation be unitary. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed.Cir.2002) (holding that "member" encompassed a multi-component structure where the preferred embodiment showed a single-component structure, but the specification did not otherwise require a certain number of components). There is nothing in the written description or prosecution history that limits the channel to being formed in a single-component structure. Thus, the district court correctly concluded that the "bear against said channel" language of claim 5 does not exclude an "anchor seat portion" composed of multiple components.

*Cross Med. Prod., Inc.*, 424 F.3d at 1309. Unlike the situation in *Cross Medical Products*, not only was every depiction of "a neodymium magnet" of one magnet, the written description and claims in the Asserted Patents repeatedly limit the structure in question to "a neodymium" magnet, meaning "one," as explained above.

Thus, the Court reiterates its prior conclusion that it does not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes or copies the '779 Patent, and its claim that the Magnetic Cord literally infringes or copies the '779 Patent is likely baseless.

36

Additionally, in its TRO ruling, the Court stated that it could not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes the '264 Patent. This is so, the Court explained, because the Magnetic Cord has magnets protruding from the base, contrary to the requirements of claim **1** of the '264 Patent, which claims "a magnet embedded in the base such that said magnet does not protrude outside of said base." Filing 1-2 at 5 ('264 Patent at 5:27–28)). The Court was not persuaded by Lite-Netics's argument that HBL has imported from the specification a definition of lack of protrusion as meaning only that the magnet does not stick out of the base and that the limitation would require that the sides of the magnet are not exposed. Filing 20 at 20–21. This Court concluded that a person of ordinary skill in the art would presumably understand that "a magnet embedded in the base such that said magnet does not protrude outside of said base" means the magnet does not protrude from the base in any direction, whether from the base in the direction opposite the bulb or beyond the perimeter of the base, *i.e.*, perpendicular to the bulb. Thus, the Court concluded that a magnet that extends beyond the end of the base does not fall within this limitation and alleging that it does is not only false but baseless.

Lite-Netics now argues in opposition to the Motion for Preliminary Injunction that claim differentiation prevents acceptance of HBL's broad interpretation of "does not protrude." Filing 32 at 27. This is so, Lite-Netics contends, because Claims **4** and **23** expressly require the magnet to be "flush" with the base, but that language would be superfluous, if the independent claims, Claims **1** and **17**, already required such a limitation. Filing 32 at 27. Lite-Netics also argues that the "does not protrude" limitation was added to distinguish Chou (with a fixing seat for the light fixture) and Hofer (with an external magnet attached to the light fixture) prior art devices. Filing 32 at 27–28. Specifically, Lite-Netic's explains that Hofer's magnet was not embedded in the base of the lamp; instead, Hofer's device utilized a magnet affixed to an attachment mechanism that

37

attached to the base of the light fixture. Filing 32 at 27. Thus, Lite-Netics argues, Hofer's magnet was located completely outside of the base. Filing 32 at 28. Lite-Netics points out that, unlike Hofer's device, HBL's Magnetic Cord has a magnet embedded into the base of the light fixture, and the magnet forms a part of the base of the light fixture, so the magnet is not hanging off the side or end of the base, and it does not protrude wholly outside of the base. Filing 32 at 28. Thus, Lite-Netics appears to argue that "does not protrude" covers any magnet that is not located completely outside of the base. Filing 32 at 29.

HBL contends that under the independent claims of the '264 Patent, the magnet could be "sunken" into or "flush" with the base, while the dependent claims are limited to magnets that are "flush." Filing 37 at 6–7. Thus, HBL argues that claim differentiation does not save Lite-Netics's construction. Moreover, HBL argues that claim differentiation cannot overcome a contrary construction dictated by the written description or prosecution history. Filing 37 at 6. HBL argues that the unequivocal language of the independent claims at issue here requires a "non-protruding magnet," not just one that is not completely outside the base. Filing 37 at 6.

The parties did not address the "does not protrude" limitation in their arguments at the preliminary injunction hearing beyond one argument by HBL. That argument was in relation to infringement under the doctrine of equivalents, however, so it will be addressed when the Court turns to infringement under that doctrine.

The Court agrees with HBL that "does not protrude" cannot reasonably be understood to mean "not completely outside of the base." Rather, "does not protrude" may mean the magnet is either "flush" with the end of the base or "sunken" into the base. The ordinary meaning of "protrude" to a person of ordinary skill in the art—or anyone else—is "to jut out beyond the surrounding surface or context." *See* https://unabridged.merriam-

38

webster.com/unabridged/protrude. In contrast, "outside" means "beyond the limits of." *See* https://unabridged.merriam-webster.com/unabridged/outside. Indeed, if the Court were to accept Lite-Netics's construction of "does not protrude" as meaning "not outside," part of the claimed limitation in Claim **1** becomes entirely superfluous. That is because the limitation states not just "does not protrude," which in Lite-Netics's construction means "is not entirely outside," but adds "outside of said base." *See* Filing 1-2 at 8 (Claim 1) (5:28–29) (limitation stating "a magnet embedded in the base such that said magnet does not protrude outside of said base"). To put it another way, reiteration of "outside of said base" is redundant of Lite-Netics's construction of "does not protrude" as "not outside of the base." The Court also agrees with HBL's contention that, in the independent claims of the '264 Patent, the magnet that is "embedded in the base such that said magnet does not protrude outside of said base" could be "sunken" into the base or "flush" with the surface of the base. *See* Filing 1-2 at 8 (Claim **1**) (5:28–29), (Claim **17**) (6:27–28). Thus, the dependent claims select one of those options because they are limited to magnets that are "flush." Filing 1-2 at 8 (Claim **4**) (5:41–42), (Claim **23**) (6:50–51). That language is not superfluous as it does differentiate the dependent claims from the independent claims. Therefore, claim differentiation does not save Lite-Netics's construction.

Thus, the Court now reiterates its prior conclusion that Lite-Netics's claim that HBL's Magnetic Cord literally infringes or copies the '264 Patent is likely baseless.

ii.  New Allegations of Equivalents Infringement

In opposition to the Motion for Preliminary Injunction, Lite-Netics makes wholly new arguments that its claims of infringement were not baseless because HBL's products infringe the Asserted Patents under the doctrine of equivalents. Before considering these new allegations, however, the Court concludes that it should briefly discuss doctrine of equivalents law.

39

(1) The Doctrine of Equivalents and Limitations on
It

Over three decades ago, the United States Supreme Court summarized the doctrine of

equivalents this way:

> Under [the doctrine of equivalents], a product or process that does not literally
> infringe upon the express terms of a patent claim may nonetheless be found to
> infringe if there is "equivalence" between the elements of the accused product or
> process and the claimed elements of the patented invention.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co*., 520 U.S. 17, 21 (1997). More recently, the

Federal Circuit Court of Appeals reiterated that "[e]quivalents remain a firmly entrenched part of

the settled rights protected by the patent." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc*., 967 F.3d

1353, 1363 (Fed. Cir. 2020) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535

U.S. 722, 733 (2002) ("*Festo I*")). Further,

> [t]he doctrine of equivalents prevents "the unscrupulous copyist [from] mak[ing]
> unimportant and insubstantial changes and substitutions in the patent which, though
> adding nothing, would be enough to take the copied matter outside the claim, and
> hence outside the reach of law." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co*.,
> 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The central question for
> infringement under the doctrine of equivalents is whether "the accused product or
> process contain[s] elements identical or equivalent to each claimed element of the
> patented invention." *Warner-Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040.

*Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020). As to

application of the doctrine,

> "A finding of infringement under the doctrine of equivalents requires a
> showing that the difference between the claimed invention and the accused product
> or method was insubstantial or that the accused product or method performs the
> substantially same function in substantially the same way with substantially the
> same result as each claim limitation of the patented product or method." *AquaTex
> Indus., Inc. v. Techniche Sols*., 479 F.3d 1320, 1326 (Fed. Cir. 2007). "The function,
> way, result inquiry focuses on an examination of the claim and the explanation of
> it found in the written description of the patent." *Id.* (internal quotations omitted).

*Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc*., 943 F.3d 929, 938 (Fed. Cir.

2019).

40

One limitation on the doctrine of equivalents is that "[i]f a patentee surrenders some scope

during prosecution, that territory isn't available later as a doctrine-of-equivalents battleground."

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1145 (Fed. Cir. 2021) (citing

*Amgen Inc. v. Coherus BioSciences Inc*., 931 F.3d 1154, 1159 (Fed. Cir. 2019)). More specifically,

> Scope surrender often occurs through a claim amendment, but it can also result
> from arguments—that is, if the prosecution history "evince[s] a clear and
> unmistakable surrender of subject matter." *Id*. The relevant inquiry is "whether a
> competitor would reasonably believe that the movant had surrendered the relevant
> subject matter." *Id*. at 1159–60 (quoting *PODS, Inc. v. Porta Stor, Inc*., 484 F.3d
> 1359, 1368 (Fed. Cir. 2007)). Whether prosecution-history estoppel applies is a
> question of law. *Id*. at 1159.

*Traxcell Techs*., 15 F.4th at 1146. A further limitation is "claim vitiation":

> "Under the doctrine of equivalents, an infringement theory ... fails if it renders a
> claim limitation inconsequential or ineffective." *Akzo Nobel Coatings, Inc. v. Dow
> Chem. Co*., 811 F.3d 1334, 1342 (Fed. Cir. 2016). This vitiation doctrine ensures
> the application of the doctrine of equivalents does not "effectively eliminate [a
> claim] element in its entirety." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem.
> Co*., 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Claim vitiation is a
> legal determination that "the evidence is such that no reasonable jury could
> determine two elements to be equivalent." *Deere & Co. v. Bush Hog, LLC*, 703
> F.3d 1349, 1356–57 (Fed. Cir. 2012); *see also UCB, Inc. v. Watson Labs. Inc*., 927
> F.3d 1272, 1283 (Fed. Cir. 2019) (Vitiation "is not an exception or threshold
> determination that forecloses resort to the doctrine of equivalents, but is instead a
> legal conclusion of a lack of equivalence based on the evidence presented and the
> theory of equivalence asserted.").

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc*., 998 F.3d 917, 923 (Fed. Cir. 2021).

This Court finds that another limitation—of particular relevance here—is "specification

estoppel." *See* Timothy R. Holbrook, *Equivalency and Patent Law's Possession Paradox*, 23 Harv.

J.L. & Tech. 1, 21 (2009) (Holbrook, *Equivalency*) (listing "specification estoppel" with the

doctrines of prosecution history estoppel and public dedication as principles that "preclude the

application of the doctrine of equivalents unless the asserted equivalent was unforeseeable.").

Applying this principle, "[a] patentee can also lose the ability to assert equivalency if she has

surrendered the relevant subject matter in the specification itself." *Id.* at 26.[17] Prof. Holbrook

explained,

> If an applicant distinguishes the prior art or asserts why her invention is better than the prior art [in the specification itself], she cannot use the doctrine of equivalents to recapture that surrendered subject matter. This surrender operates in an estoppel-like fashion, although without the constraints found within prosecution history estoppel, such as a requirement that the surrender be due to an argument or amendment made for reasons related to patentability.

Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26.

"Specification estoppel" appears to the Court to be essentially the same as what HBL calls

"specific exclusion," as explained in *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326 (Fed. Cir.

2014):

> While we have recognized that literal failure to meet a claim limitation does not necessarily constitute a "specific exclusion," *see Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed.Cir.1998), we have found "specific exclusion" where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation. *See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346–47 (Fed.Cir.2001). Because the Augme patents make clear that embedded and linked code are opposites, we agree with the district court that they "cannot possess only insubstantial differences." *Summary Judgment Order* at *12.

*Augme Techs., Inc.*, 755 F.3d at 1335. HBL explained "specific exclusion" at the preliminary

injunction hearing as a rule that a patent holder cannot have a claim that says "not x" and have it

read via the doctrine of equivalents on a product that has "x." This explanation appears to the Court

to be an accurate characterization in light of *Augme*.

---

[17] Prof. Holbrook cites the following cases as examples of application of this principle: *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-46 (Fed. Cir. 2001) (precluding equivalency as a result of disclaimers made in the specification); *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1378 (Fed. Cir. 2000) (per curiam) (affirming a grant of summary judgment of non-infringement because the accused device failed to perform back-up function found in the specification but not in the claims); *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1091 (Fed. Cir. 1998) (vacating a grant of a preliminary injunction for the same reason). Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26 n.119.

As an initial matter, HBL argues that Lite-Netics cannot properly rely on the doctrine of equivalents now, even if it has belatedly pleaded it in the First Amended Complaint, because the doctrine cannot be applied "retroactively" to alter Lite-Netics's allegations of infringement in the marketplace that are at issue here. Filing 34 at 2. Lite-Netics counters that it did not share only "literal infringement" allegations with its customers, and that "[t]he recipients likely wouldn't know the difference between the two [theories of infringement]." Filing 38 at 2. Thus, it appears that Lite-Netics argues that its allegations of "infringement" to its customers included both literal and equivalence theories, so both must be evaluated to determine whether Lite-Netics's allegations of infringement were baseless. The Court doubts that Lite-Netics meant "doctrine of equivalents infringement" in its communications to customers—or for that matter in its communications with HBL prior to suit—where there is no hint that Lite-Netics considered the doctrine of equivalents until HBL mentioned the doctrine in its Motion to Dismiss. Nevertheless, the Court will assume without deciding that Lite-Netics can rely on its after-the-fact assertions of doctrine of equivalents infringement to show that its allegations of infringement in its communications to customers were not "baseless." The Court may reconsider this issue in the course of litigation of this case, but the Court finds it is not dispositive of the Motion for Preliminary Injunction.

(2) The Magnetic Clip Does Not Infringe under the
Doctrine of Equivalents

Starting with the Magnetic Clip, Lite-Netics asserts equivalents infringement, because the Magnetic Clip performs the same function as the base (securing the magnet) in the same way (embedding the magnet into the Magnetic Clip) and achieves the same result (affixing the light fixture to a metal surface). Filing 32 at 23, 24–25.[18] At the preliminary injunction hearing, Lite-

---

[18] Lite-Netics makes the nonsensical assertion that "[t]he Magnetic Clip literally infringes at least element [2.1] under the doctrine of equivalents." Filing 32 at 33. A product might infringe a patent literally, under the doctrine of

Netics offered no additional argument as to infringement by the Magnetic Clip under the doctrine of equivalents. HBL argues that equivalence of the Magnetic Clips was expressly disclaimed in the specifications of the Asserted Patents. Filing 37 at 5. HBL argues that Lite-Netics expressly distinguished prior art that utilized clips that attached only to the cord of the light fixture, but that is exactly what the Magnetic Clip does. Filing 37 at 5 (citing Filing 32 at 19). To the extent the parties offered additional arguments on the doctrine of equivalents in their supplemental briefing or at the preliminary injunction hearing, the Court does not find them dispositive at this point in the litigation.

As the Court indicated just above, the principle that it finds dispositive of Lite-Netics's claim that the Magnetic Cord infringes the Asserted Patents is "specification estoppel." *See* Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26; *see also Augme Techs., Inc.*, 755 F.3d at 1335 (describing essentially the same principle as "specific exclusion"). This is precisely what Lite-Netics did as to "clips" in the Asserted Patents. Specifically, the '779 Patent and the '264 Patent both expressly distinguish the claimed invention from and thus disclaim "clips" in the Dougan and Clement prior art. *See* Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights). Thus, the Asserted Patents "distinguish[ ] the prior art or assert[ ] why [the patented] invention is better than the prior art," so that the patent holder "cannot use the doctrine of equivalents to recapture the surrendered subject matter" of magnetic clips that attach to the electrical cord. Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26. In other words, by claiming the invention was not magnetic clips that attach to the electrical cord (*i.e.*, claiming "not x"), Lite-

---

equivalents, or both literally and under the doctrine of equivalents, but a product cannot infringe a patent "literally . . . under the doctrine of equivalents." The Court assumes Lite-Netics made a typographical error, perhaps meaning "directly infringes" rather than "literally infringes." Also, the Court is dubious of Lite-Netics's formulation of the parts of the function-way-result test as applied to the Magnetic Clip. However, the Court need not address that issue at this point in the litigation, as it finds "specification estoppel" likely bars the alleged equivalence.

Netics cannot assert that a product that is a magnetic clip that attaches to the electrical cord (*i.e.*, "x") is an equivalent. *See Augme Techs., Inc*., 755 F.3d at 1335. Indeed, Genenbacher continues to maintain that the '779 Patent overcame the "cumbersome[ness]" of clips. Filing 21-1 at 2 (¶ 5). HBL's Magnetic Clips do exactly what the '779 Patent (and the '264 Patent) describes as a flaw to be overcome: As shown in the illustration, they are separate members that clip onto the electric cord; they do not attach to the light fixture base. *See, e.g.,* Filing 1 at 7 (¶ 21) (image); Filing 31 at 7 (¶ 21) (image), included above, page 5.

    In short, Lite-Netics's contention that HBL's Magnetic Clips infringe or copy the Asserted Patents under the doctrine of equivalents is likely baseless because the doctrine is unavailable here.

### (3) The Magnetic Cord Does Not Infringe under the Doctrine of Equivalents

    As to the Magnetic Cord, Lite-Netics argues in its supplemental briefing that there is no presumption that HBL's Magnetic Cord is non-infringing because it has patentable features, where the '309 Patent provides a right to exclude others but does not bar a finding of infringement by a dominant patent, in this case, either or both the '779 Patent and the '264 Patent. Filing 32 at 17. Indeed, Lite-Netics points out that the '309 Patent acknowledges that the light fixture in question could use a single magnet. Filing 32 at 17 (citing Filing 10-2 at 7 (2:30–33)). More specifically, Lite-Netics argues that the two semicircular magnets in the Magnetic Cord light fixture base are equivalent to the one magnet in the Asserted Patents. Filing 32 at 17. HBL responds that this "two are one" theory of infringement under the doctrine of equivalents is foreclosed by prosecution history estoppel and would vitiate the language of the patent claims. Filing 34 at 2–3.

    At the preliminary injunction hearing, Lite-Netics explained that its argument about equivalents was not based on equivalence to magnets with less than five pounds of pull force, but about the structure of the magnet. Lite-Netics argued that there was no limitation in the Asserted

Patents regarding whether the structure of a magnet could be round, square, how many there could be, or where they are located. Rather, Lite-Netics argued, the only limitation was that the magnet be embedded in the base. With the focus on structure, Lite-Netics argues that two magnets are the equivalent of one. Lite-Netics pointed out that the patentable feature of the '309 Patent was not the presence of two magnets, but the moisture abatement structures. Lite-Netics did not offer any argument about equivalents of "not protruding outside the base."

At the preliminary injunction hearing, HBL argued that Lite-Netics's doctrine of equivalents argument as to the '779 patent conflates a magnet with less than five pounds of pull force with a magnet that is required in the claims of the '779 Patent to have more than five pounds of strength. As to the '264 patent, HBL argues that Lite-Netics's doctrine of equivalents argument conflates protrusion outside the base with no protrusion outside the base. HBL argued that Lite-Netics's arguments are precluded by "specific exclusion." HBL also reiterated its contention that the '309 Patent was allowed on top of the Asserted Patents, which means that the Patent and Trademark Office thought that it was a substantially different improvement from the Asserted Patents. However, HBL also stated, "It's the moisture abatement that we claim in the '309 Patent."

The Court must first reject HBL's argument that the '309 Patent demonstrates that the Magnetic Cord with two magnets is not equivalent to the Asserted Patents with one magnet. Lite-Netics is correct that there is no presumption that HBL's Magnetic Cord is non-infringing because it has patentable features. *See Tex. Instruments, Inc. v. United States ITC*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent"). Thus, the '309 Patent provides a right to exclude others but does not bar a finding of infringement by a dominant patent, in this case, either or both the '779 Patent and the '264 Patent. *TransCore, LP v. Elec. Transaction*

*Consultants Corp*., 563 F.3d 1271, 1275 (Fed. Cir. 2009). Second, Lite-Netics argues, and HBL concedes, that the patentable improvement in the '309 Patent is not the presence of two magnets, but the moisture abatement provided by two weep holes.

Instead, the Court's analysis of the likelihood that allegations the Magnetic Cord infringes the Asserted Patents under the doctrine of equivalents are baseless is similar but not identical to the Court's analysis of the application of the doctrine of equivalents to the Magnetic Clips. The Court finds that the principle of "specification estoppel" also forecloses allegations of infringement by the Magnetic Cord under the doctrine of equivalents. "Specification estoppel" is akin to the exception to the rule that "a" or "an" means "one or more" when the specification or claims of a patent demonstrate a clear intent to limit "a" or "an" to "one." *See Convolve*, 812 F.3d at 1321. Indeed, it seems logical to the Court that where a patent holder clearly limits the meaning of "a" or "an" to "one" in the specification or claims for purposes of literal infringement, the patent holder should not be able to recapture "one or more" for purposes of infringement under the doctrine of equivalents. This is so, because the specification indicates intent to distinguish and surrender the scope of foreseeable equivalents by focusing on a specified scope. *See* Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26; *Augme Techs., Inc*., 755 F.3d at 1335; *but see Insituform Techs., Inc.*, 99 F.3d at 1107–09 (notwithstanding a finding that literal infringement required "one vacuum cup" remanding for consideration of multiple vacuum cups as an equivalent based on the correct claim construction where the district court had used different constructions for literal and equivalents infringement). Such a recapture of surrendered claim scope is contrary to the clear intent of the patent holder at the time of patenting—whatever benefit the patent holder may now wish to derive from asserting a different scope when alleging infringement.

47

At this preliminary stage of the proceedings, the Court finds that application of "specification estoppel" provides sufficient likelihood that Lite-Netics's allegations that the Magnetic Cord infringes the Asserted Patents under the doctrine of equivalents are baseless. As explained in some detail above, in reference to literal infringement, the specification indicates a "clear intent" that "a neodymium magnet" means "one neodymium magnet," not "one or more." *Convolve*, 812 F.3d at 1321; *Augme Techs., Inc.*, 755 F.3d at 1335; *Insituform Techs., Inc.*, 99 F.3d at 1105–06). The Court will not repeat the language of the specifications leading the Court to this conclusion. It is enough to direct the parties again to the pertinent parts of the specifications. *See* Filing 1-1 at 6–7 (2:20–3:34), (Claim 1) (4::61-63); Filing 1-2 at 6 (2:22–34), 7 (3:25–57, 4:23, 4:55–67), 8 (5:27–35). Also, it is obvious that where only one magnet is ever contemplated in the Asserted Patents, the combined pull strength of multiple magnets to meet the minimum pull force claimed also was never contemplated.[19] These equivalents cannot be recaptured under the doctrine of equivalents, so allegations of infringement under the doctrine of equivalents are likely baseless.

This determination concerning baseless allegations of infringement is not only sufficient to weigh heavily in favor a preliminary injunction, but also supports a further basis for finding likelihood of success on the merits, as explained in the next section.

> d. HBL is Likely to Succeed in Showing Threats to Customers
> Were Improper

In its TRO ruling, the Court concluded that another substantial ground for finding that HBL had a fair chance of succeeding on its claim of tortious interference for purposes of a TRO was that Lite-Netics's communications to HBL's customers in September 2022 threatened to "includ[e]

---

[19] This conclusion makes it unnecessary to address Lite-Netics's argument in both its briefing and its arguments at the preliminary injunction hearing, based on *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1304 (Fed. Cir. 2005), that the aggregated pull strength of two magnets infringes the specified pull strength of a single magnet in the Asserted Patents.

any known company using or reselling the HBL products as co-defendants in this lawsuit." *Filing 11-7 at 2*. The Court pointed out that the Federal Circuit Court of Appeals explained in *In re Nintendo of Am., Inc*., *756 F.3d 1363 (Fed. Cir. 2014)*, that a manufacturer's liability for patent infringement is a predicate to recovery from any defendant who is merely a customer or retailer of the manufacturer's product. Thus, the suit against the manufacturer must proceed first and separate from the suit against the customers or retailers, because if the manufacturer prevails, the claims against its customers and retailers are moot. *756 F.3d at 1366*. The Court was not persuaded by Lite-Netics's attempt to read a "customer suit rule" as only a defense that customers can assert to stay the litigation until the suit against the manufacturer has been resolved, but that it does not prevent a suit from immediately commencing against the customer. The *Ninetendo* case involved the severance and the stay of a case brought against a manufacturer and its retailers at the same time, in the same lawsuit, in the same district. *Id.*

Nevertheless, the Court concluded that Lite-Netics is correct that the *Nintendo* decision does not preclude Lite-Netics from suing customers for infringement of its patents for selling HBL's products in this suit or a separate action—although any such suit would be subject to an immediate stay pending the outcome of the patent infringement suit against HBL.[20] The Court concluded that what made Lite-Netics's threats to sue customers improper is that the claim that HBL's products infringe Lite-Netics's Asserted Patents is untrue and baseless in light of the record then in front of this Court. It is on that ground that the Court temporarily enjoined Lite-Netics from threatening to sue HBL's customers. The Court opined that if Lite-Netics can subsequently show

---

[20] The Court recognized in its TRO ruling that it is possible that this Court would lack personal jurisdiction over some of HBL's customers, which might bar adding them to this lawsuit and require separate litigation in a different district, or the customers might be able to demonstrate that another district was more convenient. *Cf. Nintendo*, 756 F.3d at 1366 (considering the convenience of the district for suits against customers). The Court concluded that was not the basis for a TRO restraining threats to sue customers, however.

that its infringement claims are not baseless, upon a fuller record, then its communications to customers, including its threat to sue customers for infringement, would be permissible.

The Court also viewed Lite-Netics's conduct through the lens of the factors for determining "improper" or "unjustified" interference, *see Koski Pro. Grp., P.C.*, 950 N.W.2d at 378, leading it to conclude in its TRO ruling that the impropriety of Lite-Netics's conduct appeared obvious at that early point in the litigation. The Court concluded it was likely that Lite-Netics's conduct was baseless and asserted improper threats against customers or retailers of HBL's products. *See id.* (first factor is the nature of the actor's conduct). Furthermore, where Lite-Netics's conduct was baseless, it would be reasonable to infer a motive to injure HBL apart from the merits of any allegation of patent infringement. *See id.* (second factor is actor's motive). The Court also concluded that HBL could likely show it had a reasonable expectation or interest in retaining customers, particularly as the height of the sales season for its products approached. *See id.* (third factor is the interest of the other with which the actor's conduct interferes). The Court observed that a mere interest in competition may be worthy, but Lite-Netics cannot legitimately advance that interest by making baseless accusations or threats. *See id.* (fourth, fifth, and seventh factors are the interests the actor seeks to advance, the relative social interests, and the relations of the parties). Finally, the Court concluded that the threats and accusations were directly and "proximate[ly]" related to interference in HBL's relationship with its customers. *See id.* (sixth factor is the proximity or remoteness of the actor's conduct to the interference).

For these reasons, the Court concluded in its TRO ruling that HBL has a fair chance of prevailing on its tortious interference claim.

Lite-Netics reiterates in opposition to the Motion for Preliminary Injunction that its communications to customers notifying them of infringement are proper because they were as

50

"innocuous" as the patent holder's actions in *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed. Cir. 1998), and were not baseless. Filing 32 at 12. In *Mikohn*, the Federal Circuit Court of Appeals recognized that "[c]ommunication of accurate information about patent rights, whether by direct notice to potential infringers or by publicity release," is permissible. 165 F.3d at 898. However, as the Court explained in its TRO ruling, the Federal Circuit did so with the caveats that apply to tortious interference claims: the information must be accurate and not in bad faith. *Id.* Not to belabor the point, but the Court has found that the allegations that Lite-Netics communicated to HBL's customers were baseless.

Thus, the Court concludes once again that HBL is likely to prevail on its tortious interference claim. See *Wildhawk Invs., LLC*, 27 F.4th at 593.

### 2. HBL has a Fair Chance of Prevailing on its Defamation Claim

#### a.   Applicable Law

In its TRO ruling, the Court explained that, under Nebraska law,

> [a] defamation claim has four elements: (1) a false and defamatory statement concerning the claimant, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. By statute, truth in and of itself is made a complete defense unless the plaintiff proves the statements were made with actual malice.

*Choice Homes, LLC v. Donner*, 976 N.W.2d 187, 202–03 (Neb. 2022) (citations omitted). The Court concluded that, as with HBL's tortious interference claim, the only debatable elements on this claim were falsity and lack of privilege of Lite-Netics's communications to HBL's customers. *Id.* ("The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion."); *id.* (identifying "an unprivileged publication to a third party" as element two of a defamation claim). The same appears to be true at the preliminary injunction stage of the proceedings.

b.  HBL is Likely to Succeed in Showing that Lite-Netics Made
    Unprivileged False Statements

In its TRO ruling, the Court concluded that HBL has at least a fair chance of demonstrating that Lite-Netics's statements that HBL copied and was infringing Lite-Netics's Asserted Patents and that Lite-Netics could add customers and retailers to this lawsuit were untrue, thus robbing Lite-Netics of a defense based on truth. First, for essentially the reasons the Court had stated with respect to the tortious interference claim, the Court concluded that Lite-Netics's statements were false.

Turning to the question of whether the statements were privileged, the Court was not persuaded by Lite-Netics's assertion that the "litigation privilege" defeats HBL's defamation claim. Filing 20 at 22. The Court observed that the Nebraska Supreme Court does not appear to have addressed the "litigation privilege" as a bar to a defamation claim. Furthermore, to the extent that this Court recognized the existence of "litigation privilege" in *Jenkins v. Gen. Collection Co.*, 538 F. Supp. 2d 1165 (D. Neb. 2008), a case on which Lite-Netics relies, the Court found that the privilege extended only to actions that parties asserting the privilege took in the judicial proceedings. 538 F. Supp. 2d at 1172 (denying defendants' motion for summary judgment based on the litigation privilege).

The Court concluded that another case on which Lite-Netics relies, *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015 (8th Cir. 2020), does not mention a "litigation privilege" at all, although it discussed the *Noerr-Pennington* doctrine, which immunizes acts related to the constitutional right to petition the court for grievances, unless the act is a mere sham. 962 F.3d at 1028. That decision held that the party claiming the other brought a sham patent infringement lawsuit could not meet the requirement to show the lawsuit was objectively baseless. *Id.* at 1029. Here, the Court determined in the TRO ruling—at least preliminarily—that Lite-

52

Netics's patent infringement claims are baseless, but more importantly, the *Inline Packaging* decision discussed validity of the lawsuit, not whether there was any protection for statements made by a litigant to a third party about the litigation. *Id.*

Finally, the Court addressed Lite-Netics's assertion that the Federal Circuit has established that communicating potential infringement to customers is not improper if the patent owner has a good faith belief that the claims are accurate. Filing 20 at 14 (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc*., 165 F.3d 891, 898 (Fed. Cir. 1998)). Again, in *Mikohn*, the Federal Circuit Court of Appeals recognized that the information communicated must be accurate and not in bad faith. *Id.* Again, the Court has found that the information Lite-Netics communicated to HBL's customers was untrue and baseless and therefore in bad faith.

The Court found no basis for application of any "litigation privilege" or patent holder's privilege protecting Lite-Netics's communications about its lawsuit against HBL to any stranger to the litigation. Therefore, the Court concluded that HBL has at least a fair chance—and perhaps a substantial likelihood—of succeeding on its defamation claim, as well as its tortious interference claim, so this *Winter* factor weighed heavily in favor of a TRO.

In opposition to the Motion for Preliminary Injunction, Lite-Netics reiterates that the Federal Circuit has held that federal patent law preempts state law tort claims based on allegations of patent infringement. Filing 32 at 34. The Court has already acknowledged that principle above. *See Energy Heating, LLC*, 889 F.3d at 1304. Lite-Netics also now asserts that federal law bars HBL's defamation claim unless HBL can demonstrate that Lite-Netics's allegedly defamatory communications to customers were baseless. Filing 32 at 35. Again, the Court has pointed out this exception to preemption. *See Energy Heating, LLC*, 889 F.3d at 1304. Moreover, the Court has

found that there is at least a likelihood that Lite-Netics's allegedly defamatory communications to customers were baseless.

In opposition to the Motion for Preliminary Injunction, Lite-Netics also resurrects its argument that HBL's reliance on *In re Nintendo of America, Inc.*, 756 F.3d 1363 (Fed. Cir. 2014), as supporting its allegations of bad faith is misplaced, because the customer suit exception would only provide a stay that would be lifted when the manufacturer is found liable. Filing 32 at 36–37. The Court has already acknowledged that the *Nintendo* decision does not preclude Lite-Netics from suing customers for infringement of its patents for selling HBL's products in this suit or a separate action—although any such suit would be subject to an immediate stay pending the outcome of the patent infringement suit against HBL. In its opposition to the Motion for Preliminary Injunction Lite-Netics appears to overlook the Court's conclusion that what made Lite-Netics's threats to sue customers improper is that the claim that HBL's products infringe Lite-Netics's Asserted Patents is untrue and baseless in light of the record before the Court, both at the TRO stage of the proceedings and now at the preliminary injunction stage. It is on that ground that the Court temporarily enjoined Lite-Netics from threatening to sue HBL's customers, and it is on that ground that the Court will preliminarily enjoin Lite-Netics from doing so during the pendency of this litigation.

Thus, Lite-Netics offers no new arguments to support its challenge to HBL's likelihood of success on the defamation claim. Indeed, Lite-Netics did not separately address the defamation claim at the preliminary injunction hearing. The Court now reiterates its conclusion that HBL has a fair chance of prevailing on its defamation claim, which weighs in favor of issuing a preliminary injunction. *See Wildhawk Invs., LLC*, 27 F.4th at 593.

3.  *HBL Faces a Threat of Irreparable Harm*

a.  Loss of Reputation and Goodwill is sufficient harm

The second *Winter* factor the Court must consider is whether it is likely that HBL will suffer irreparable harm in the absence of a TRO. *Tumey*, 27 F.4th at 664. In its TRO ruling, the Court explained that the movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Tumey*, 27 F.4th at 664–65 (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The parties do not dispute these standards in their arguments concerning the Motion for Preliminary Injunction.

In its TRO ruling, the Court found that HBL can show irreparable harm is likely in the absence of a TRO. *Tumey*, 27 F.4th at 664. The Court found that loss of reputation and goodwill is a potentially viable theory of irreparable harm. *See Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (citing *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). Also, "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.* Thus, such injury may suffice to satisfy the "irreparable harm" prong of the TRO analysis. *Id.*

In its supplemental briefing, Lite-Netics does not appear to dispute that loss of reputation or goodwill can be sufficient irreparable harm. Rather, Lite-Netics disputes the sufficiency of HBL's evidence that it has suffered such harm. *See, e.g.,* Filing 32 at 38–39. The Court will address that contention below.

55

b.   There was No Fatal Delay in HBL's Request for Relief

As the Court also explained in its TRO ruling, the claimant must diligently pursue injunctive relief to avoid alleged reputational harm. *See Wildhawk Invs., LLC*, 27 F.4th at 597 (concluding that the claimant's assertion of irreparable harm from injury to its business reputation and goodwill was "undermined by its decision to wait more than a year to bring th[e] lawsuit despite knowing [defendants] intended to produce the [products at issue] themselves."). At the same time, the claimant must present the court with something more than speculation that it will suffer reputational injury. *See MPAY Inc. v. Erie Custom Computer Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (rejecting irreparable harm based on goodwill and reputation where, without citing to anything in the record, the claimant asserted that harm to its goodwill and reputation was "inevitable," because "[s]peculative harm does not support a preliminary injunction." (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist*., 696 F.3d 771, 779 (8th Cir. 2012)).

In its TRO ruling, the Court concluded that HBL had not delayed in seeking relief, which might undermine its assertion of irreparable harm to reputation and injury. *See Wildhawk Invs., LLC*, 27 F.4th at 597. HBL sought such relief within the same month in which Lite-Netics made the allegedly tortious communications to HBL's customers accusing HBL by name of "copying" and patent infringement. *See* Filing 11 at 6–7 (¶ 26) (alleging that Lite-Netics sent HBL's customers communications accusing HBL of "copying" and infringement in September 2022); Filing 20 at 23 (admitting that it made such communications in September 2022). It is the September 2022 communications by Lite-Netics that the Court concludes are actionable, at least preliminarily. Thus, HBL acted within a few weeks of actionable misconduct by Lite-Netics, which is well inside the timeframes that were too long in cases cited by Lite-Netics. Filing 20 at 13. It is also far shorter than the fatal delay of a year between learning of the defendants' intent to

56

produce the plaintiff's products themselves and the filing of the lawsuit in *Wildhawk Investments.*
*See* 27 F.4th at 597-98.

   In opposition to the Motion for Preliminary Injunction, Lite-Netics reiterates its contention
that HBL's delay was not weeks but months. Filing 32 at 37. Lite-Netics argues that the situation
in September was no different than it was in May, and that in HBL's pleadings HBL asserted that
both the May and September communications to customers were detrimental to its business and
reputation. Filing 32 at 37. Lite-Netics argues that it was only in HBL's original reply brief, Filing
22, that HBL departed from that position. Filing 32 at 37. Lite-Netics also argues now that the
small community in the holiday lights industry means that news travels fast, so HBL should have
been immediately aware of the May correspondence, but its delay in seeking relief for four months
after that demonstrates the lack of an emergency. Filing 32 at 38.

   There is some merit to Lite-Netics's contention that HBL alleged injury from both the May
and the September communications, which indicates that HBL could have sought emergency relief
based on the May communications. Nevertheless, that argument overlooks the material difference
between the two communications: It was only in the September communications that Lite-Netics
accused HBL by name of "copying" and patent infringement. *See* Filing 11 at 6–7 (¶ 26) (alleging
that Lite-Netics sent HBL's customers communications accusing HBL by name of "copying" and
infringement in September 2022); Filing 20 at 23 (admitting that it made such communications in
September 2022). Furthermore, in May and June, HBL and Lite-Netics were still in direct
communication with each other apparently pursuing negotiations, even if without much hope of
success. *See* Filing 11-2 (Counterclaim, Exhibit B) (April 12, 2022, letter from Lite-Netics to
HBL); Filing 11-3 (Counterclaim Exhibit C) (April 19, 2022, letter from HBL to Lite-Netics);
Filing 11-5 at 2–3 (Counterclaim, Exhibit E) (May 27, 2022, letter from Lite-Netics to HBL);

Filing 11-6 at 2 (Counterclaim, Exhibit F) (June 21, 2022, letter from HBL to Lite-Netics). A reasonable fact finder could conclude that HBL was not sure of the complete breakdown of those negotiations until Lite-Netics filed its lawsuit on August 31, 2022, and that it was only when Lite-Netics sent the September communications to HBL's customers expressly identifying HBL as an infringer, *see* Filing 11-7 (Counterclaim, Exhibit G), that the need for judicial intervention was reasonably apparent. Thus, the Court now reiterates its conclusion that HBL acted within a few weeks of actionable misconduct by Lite-Netics and gaining a reasonable belief that negotiations with Lite-Netics had broken down, which is well inside the timeframes that were too long in cases cited by Lite-Netics. Filing 20 at 13. It is also far shorter than the fatal delay of a year between learning of the defendants' intent to produce the plaintiff's products themselves and the filing of the lawsuit in *Wildhawk Investments. See* 27 F.4th at 597-98.

> c.   The Irreparable Injury is Not Too Speculative

In its TRO ruling, the Court also found HBL's evidence of injury to its reputation and goodwill is not merely speculative. HBL offered the affidavit of Richard Martini, its president, in which Mr. Martini avers worried customers have called him asking whether HBL will be able to meet supply commitments for the accused products and how the litigation would affect their orders and shipments. Filing 15-1 at 3 (Martini Decl., ¶ 11). Furthermore, the Court found that HBL's Magnetic Cord accused product is also patented. In the patent context, the Federal Circuit Court of Appeals has recognized that "impaired goodwill and competitive position" can "justify injunctions to prevent them before they occur (precisely because they are hard to quantify later)." *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1331 (Fed. Cir. 2018). Finally, the Court concluded, the timing of Lite-Netics's communications to HBL's customers at the height of the sales season for retailers to be purchasing stocks of holiday lights is reasonably likely to exacerbate the impact on HBL's reputation and goodwill, as customers may

58

reasonably be expected to choose a different vendor if they have questions about HBL's ability to perform and if they are unaware that Lite-Netics's threat to add them to this lawsuit is an empty one under the applicable law.

In opposition to the Motion for Preliminary Injunction, however, Lite-Netics reiterates its contention that HBL has shown nothing more than speculative harms. Filing 32 at 38. Lite-Netics argues Federal Circuit decisions make clear that potential loss of business is too speculative to warrant injunctive relief without evidence of actual losses. Filing 32 at 38–39. Lite-Netics argues that HBL has shown no evidence of lost customers, delayed purchases, or struggling to acquire new business because of the ongoing proceedings and instead merely speculates that customers might be put off by accusations against HBL. Filing 32 at 39; *see also* Filing 38 at 4–5. In further support of its request for a preliminary injunction, HBL has now provided the declaration of a manager for one of its customers corroborating his October 4, 2022, conversation with HBL's Richard Martini. Filing 34 at 1. HBL argues this declaration confirms that its customers felt very intimidated by Lite-Netics's threats, demonstrating the need for intervention by the Court. Filing 34 at 1–2. In reply, Lite-Netics disputes the sufficiency of the additional declaration to demonstrate irreparable harm, where HBL still has not shown that it lost any customers or struggled to acquire new ones. Filing 38 at 4–5.

Lite-Netics relies on the decision of the Federal Circuit Court of Appeals in *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377 (Fed. Cir. 2022). In *Philips*, the Federal Circuit acknowledged that "[a] party seeking a preliminary injunction must establish that it is *likely* to suffer irreparable harm without an injunction. 39 F.4th at 1380 (emphasis in the original) (citing *Winter*, 555 U.S. at 22). The court then upheld that district court's conclusion that the movant for a preliminary injunction had failed to show likely irreparable harm, because it "did not present any

59

evidence that it lost customers, had customers delay purchases, or struggled to acquire new business because of the ongoing [International Trade Commission (ITC)] proceedings." *Id.* It observed that the movant's evidence indicated only that "the threat of an ITC exclusion order caused several customers to 'voice concerns' and express doubt regarding [the movant's] ability to deliver products," and the movant argued that it was living under the "cloud on the business" of a potential exclusion order and the potential loss of business. *Id.*

This Court believes that there are at least two reasons the analysis in *Philips* is problematic. First, notwithstanding purported acknowledgement that *Winter* requires only the *likelihood* of irreparable harm, the court in *Philips* required proof of *actual* harm in the form of customers actually lost and customer purchases actually delayed. Second, there is no indication that the court in *Philips* considered the intangible value of goodwill, where that is not even mentioned in the decision.

In contrast, both the Eighth Circuit Court of Appeals and the Federal Circuit Court of Appeals have expressly recognized that injury to reputation and goodwill are intangible injuries that may support a finding of irreparable harm for purposes of a TRO or a preliminary injunction. *See Mgmt. Registry, Inc.*, 920 F.3d at 1183; *see also Texas Advanced Optoelectronic Sols., Inc.*, 895 F.3d at 1331. Furthermore, as the Eighth Circuit Court of Appeals has explained,

> We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). While a district court may choose to require more than a loss of goodwill to demonstrate irreparable harm, the district court ultimately has discretion to determine "whether an alleged harm requires more substantial proof." *Gen. Motors [Corp. v. Harry Brown's, LLC]*, 563 F.3d [312,] 319–20 [(8th Cir. 2009)].

*Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010). In *Rogers*, the court found no clear error in the district court's finding of a threat of irreparable harm from loss of goodwill based on evidence that the ordinance the movant sought to enjoin would prevent the

60

business from expanding, bidding on larger projects, and accepting projects on short notice; that the ability to grow and accommodate its customers was critical to its commercial viability; that the ordinance restrictions would drive customers away; and that even if the movant ultimately prevailed, the lost customers would be unlikely to return. 629 F.3d at 790. The Eighth Circuit Court of Appeals has also recognized that "it might take months for a loss of goodwill to become manifest." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742 (8th Cir. 2002). Waiting months for such evidence to materialize would then leave a movant facing complaints of undue delay or lack of diligence in seeking emergency relief, which Lite-Netics has also made here. *See Wildhawk Invs., LLC*, 27 F.4th at 597.

In contrast, in *General Motors*, when considering intangible injuries to goodwill and reputation, the district court was faced with conflicting opinions about the likely response of consumers to the circumstance sought to be enjoined, and the court found that the movant had failed to carry its burden. 563 F.3d at 319. The court explained that it had previously acknowledged that it had affirmed a preliminary injunction based on nothing more to support a claim of intangible harm than arguments from general business principles. *Id*. (citing *Med. Shoppe Int'l, Inc.*, 336 F.3d at 805, and *United Healthcare Ins. Co.*, 316 F.3d at 741). The court explained, however, that the standard of review "ma[de] it acceptable for a district court to find a likelihood of irreparable harm based on general principles, but it does not mean that it is error for the district court to require additional evidence in other cases." *Id*. at 320. Thus, the court concluded that the district court's discretion included whether to require more substantial proof of irreparable harm. *Id.*

In a situation like this involving the sale of a particularly seasonal product, this Court finds that waiting possibly months for evidence of loss of goodwill to materialize is not appropriate. *See United Healthcare Ins. Co.*, 316 F.3d at 742. Thus, HBL's reliance to some extent on business

61

principles—and the Court adds common sense—to demonstrate intangible and irreparable harm to its business reputation and goodwill is not fatal to its request for a preliminary injunction. *Cf. Gen. Motors*, 563 F.3d at 319 (explaining that it may be enough for a court to rely on general business principles, but the court is not prohibited from requiring more substantial evidence). Moreover, the Court concludes that there is more substantial evidence of injury to HBL's goodwill and reputation, in additional to the evidence the Court identified in its TRO ruling. As HBL argues, Rich Firneno, the Merchandising Manager for Jabo's Ace Hardware in Texas, has submitted a declaration that substantiates the likelihood of a threat to HBL's goodwill and reputation and customer orders in the absence of injunctive relief. *See* Filing 35-1 at 1–2. Not only does Mr. Firneno explain the impact of Lite-Netics's communications to customers on his own business decisions and the concerns about the impact of those communications on his own customers, Mr. Firneno points out that these concerns on his part were alleviated by the Court's entry of a TRO. Filing 35-1 at 1–2. The Court reiterates its prior conclusion that HBL has presented more than mere speculation to support its claim of a likelihood of a threat of irreparable harm. Lite-Netics did not supplement its argument on this point at the preliminary injunction hearing.

Thus, the Court reiterates its prior conclusion that the second *Winter* factor requiring irreparable harm in the absence of injunctive relief has been met in this case. *See Tumey*, 27 F.4th at 665.

### 4. The Balance of Equities and the Public Interest also Tip in Favor of a Preliminary Injunction

The last two *Winter* factors are the balance of equities and whether an injunction is in the public interest. *Tumey*, 27 F.4th at 664. These factors were not discussed at the preliminary injunction hearing. The Court finds that these factors also weigh in favor of a preliminary injunction in this case, for essentially the same reasons they weighed in favor of a TRO.

a.   The Balance of Equities Still Favors a Preliminary Injunction

In its TRO ruling, the Court explained that the "balance of equities" factor balances the irreparable harm to the claimant if a TRO or preliminary injunction is not granted against the harm to the other party or others if the TRO or preliminary injunction is granted. *Wildhawk Inv., LLC.*, 27 F.4th at 593. In this case, the Court concluded that Lite-Netics has no countervailing harm if it is enjoined from making statements in various media suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. Indeed, the Court made a preliminary finding that Lite-Netics has forfeited any privilege to make these communications. The Court concluded that, as HBL contended, Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means. On the other hand, the Court concluded, HBL has established that it will suffer irreparable harm in the absence of a TRO, for all the reasons the Court has explained above. Thus, the Court concluded that the balance of equities weighed in favor of a TRO.

In its opposition to the Motion for Preliminary Injunction, Lite-Netics argues that the Court must balance Lite-Netics's loss of its statutory right to publicize and defend its patents by informing customers that it is pursuing infringers, as a result of HBL's "overbroad" injunction, against HBL's "non-existent" harm. Filing 32 at 39. Lite-Netics reiterates its contention that a preliminary injunction would have the effect of disturbing the status quo in favor of HBL poaching Lite-Netics's customers. Filing 32 at 39–40.

The Court is no more persuaded by Lite-Netics's arguments on this *Winter* factor at this stage of the proceedings than it was at the TRO stage. Any strength to Lite-Netics's arguments stems from its belief that its allegations of infringement are not "baseless." However, the Court has reiterated its conclusion that Lite-Netics's allegations are "baseless," meaning that Lite-Netics

has forfeited the privilege to make them. Also, Lite-Netics has come forward with nothing to demonstrate that HBL is illegitimately "poaching" Lite-Netics's customers or that the TRO will allow HBL to do so. Again, Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means. In contrast, the Court has reiterated its conclusion that HBL faces a likelihood of a threat of irreparable harm in the absence of injunctive relief.

This factor continues to weigh in favor of injunctive relief, at this point a preliminary injunction, while the lawsuit is pending.

> b.  The Public Interest Still Favors a Preliminary Injunction

In its TRO ruling, the Court explained that, in the context of litigation between private entities, the public interest considers such things as the public's interest in preventing fraud and enforcing contracts. *See, e.g., Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020) (public interest in preventing fraud); *Medicine Shoppe Int'l., Inc.*, 336 F.3d at 805 ("[W]e agree that the public interest would not be served by permitting a party to avoid contractual obligations."). The public interest is also served by maintaining consumer choice and convenience in the marketplace. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009). Finally, the public interest favors enjoining false statements in marketing. *United Indus. Corp. v. Clorox Co*., 140 F.3d 1175, 1184 (8th Cir. 1998). The Court reiterated that it had determined that HBL has at least a fair chance of succeeding on its claims that Lite-Netics tortiously interfered with HBL's business relations and defamed HBL by making false and baseless statements to customers. The Court concluded that, in such circumstances, the public interest favors enjoining such conduct, *see id.*, and not inhibiting choice in the marketplace, *see Gen. Motors Corp.*, 563 F.3d at 321, just as it favors enjoining other kinds of conduct that would distort the marketplace. *See, e.g. Jet Midwest Int'l Co., Ltd.*, 953 F.3d at 1046 (the public interest favors

preventing fraud). Thus, the Court concluded that the public interest also weighed in favor of a TRO.

In opposition to the Motion for Preliminary Injunction, Lite-Netics argues that a preliminary injunction in this case provides not benefit to the public interest. Filing 32 at 40. The crux of Lite-Netics's argument appears to be that the public interest would not be served by discouraging patent holders from pursuing their right to exclude others from practicing their inventions and their right to communicate to others about their patents. Filing 32 at 40.

The Court is not persuaded by these arguments at this juncture in the litigation. No public interest is served by allowing a patent holder to make baseless allegations of infringement against a competitor, which is what the Court finds—at least preliminarily—is what Lite-Netics is doing. *See Clorox Co.*, 140 F.3d at 1184 (finding that the public interest favors enjoining false statements in marketing). The Court also reiterates that the public interest favors not inhibiting choice in the marketplace, *see Gen. Motors Corp.*, 563 F.3d at 321, just as it favors enjoining other kinds of conduct that would distort the marketplace. *See, e.g. Jet Midwest Int'l Co., Ltd.*, 953 F.3d at 1046 (the public interest favors preventing fraud). Thus, the Court now concludes that the public interest also weighs in favor of a preliminary injunction.

In summary, HBL has now satisfied all the *Winter* factors for issuance of a preliminary injunction.

### C.  Scope of the Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65(d)(1), "[e]very order granting an injunction and every restraining order must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." Fed. R. Civ. P. 65(d). Thus, the preliminary injunction in this case—like the prior TRO—must meet these requirements.

65

As to the reasons for issuing the preliminary injunction, the Court will summarize its findings set out above. Fed. R. Civ. P. 65(d)(1)(A). As to the terms of the preliminary injunction and the acts it restrains, *id.* at 65(d)(1)(B), HBL states:

> HBL respectfully requests that this Court issue a temporary restraining order and preliminary injunction that restrains Lite-Netics, along with its officers, directors, shareholders, and other agents from making statements via letters, emails, Facebook, Twitter, or on any other social media, mass media, direct marketing, robocalls, press releases, blogs, or websites suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. The Court should also require Lite-Netics to publicize this Court's Order to that effect, and to provide complete discovery to HBL of all relevant marketplace statements.

Filing 13 at 11. The Court reiterates its prior conclusion that this statement meets the requirements of Rule 65(d) and that the relief requested is appropriate in the circumstances of this case, adjusted as necessary for a preliminary injunction rather than a TRO.

On the other hand, the Court rejected HBL's suggestion in its Proposed Order that Lite-Netics be enjoined to disclose to HBL all documents and things related to Lite-Netics's marketplace communications concerning HBL's alleged "copying" and "infringement" of its patents, or an entity's risk of being sued as an HBL customer, within two days from the date of the TRO. The Court found such a request was beyond the appropriate scope of a TRO—and now reiterates that it is beyond the scope of a preliminary injunction—in this case, where it requires affirmative action. *See Tumey*, 27 F.4th at 665. Also, the relief was neither requested nor briefed in HBL's filed submissions. HBL has not reiterated a request for such language, and the Court finds no reason to revisit the issue *sua sponte*.

In its opposition to the Motion for Preliminary Injunction, Lite-Netics asserts baldly that the requested injunction is "overbroad." Filing 32 at 39. It does not explain in what respect this is so, except possibly by reiterating its contention that any injunction is improper because Lite-Netics has the right to take action to protect its patents and to inform customers that it is doing so. The

66

Court concludes that a preliminary injunction in the terms stated above is not "overbroad" where Lite-Netics has forfeited its right to inform customers of alleged infringement by making baseless allegations.

Thus, apart from certain terms that distinguish a TRO from a preliminary injunction, such as duration of the preliminary injunction, the Court will not change the terms of the injunctive relief.

### D.  The Bond Requirement

As the Court explained in its TRO ruling, Rule 65(c) provides, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (also excepting the United States, its officers, and its agencies from this requirement). "[T]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.'" *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)). HBL argued that the small threat of harm to Lite-Netics justified the Court requiring only a minimal security bond, which it suggested in its Proposed Order should be $100. The Court agreed a minimal security bond was appropriate in this case, in light of the balance of the harms as the Court has measured them above, but it imposed a bond requirement of $1,000. No party argues that this bond is either excessive or inadequate at the preliminary injunction stage of the proceedings.

In its TRO ruling, the Court also observed that HBL's Proposed Order suggested that HBL should have fourteen days to post such a security or bond. This Court explained that it reads Rule 65(c) to require the posting of the bond as a prerequisite to the issuance of the TRO, however. *See*

67

Fed. R. Civ. P. 65(c) (stating that the court may issue a TRO "only if the movant gives security");

Wright & Miller, 11 *Federal Practice and Procedure* § 2954, p. 525 (describing the posting of a

bond by a successful movant as "a prerequisite to the issuance of injunctive relief."). Thus,

issuance of the TRO was be made contingent upon the posting of the required security. The Court

now concludes that the bond previously imposed and provided is sufficient to allow immediate

issuance of a preliminary injunction, provided that bond does not expire by its own terms if the

TRO is replaced by a preliminary injunction.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that HBL's September 30, 2022, Motion for Preliminary Injunction,

Filing 12, is granted on the terms and conditions set out in the attached Preliminary Injunction.


Dated this 27th day of October, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge

68

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LITE-NETICS, LLC,

        Plaintiff/Counter-Defendant,

    vs.

NU TSAI CAPITAL LLC, d/b/a HOLIDAY
BRIGHT LIGHTS,

        Defendant/Counterclaimant.

**NO. 8:22CV314**

**PRELIMINARY INJUNCTION**

The Court having considered the parties' written submission on the September 30, 2022, Motion for Preliminary Injunction by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL), and the arguments of the parties at the preliminary injunction hearing,

THE COURT FINDS, for preliminary purposes,

- that defendant/counterclaimant HBL has made sufficient showing that plaintiff/counter-defendant Lite-Netics, LLC (Lite-Netics) has engaged in tortious interference with business relations and prospective business relations, as claimed in Count IV of HBL's Counterclaim in this action, and has engaged in defamation, as claimed in Count V of HBL's Counterclaim, by sending false, baseless, and defamatory communications to businesses that Lite-Netics knew had business relationships with HBL, falsely accusing HBL of tortious conduct, that is, patent infringement and "copying" of Lite-Netics's products; threatening to include any known company using or reselling the HBL products as co-defendants in this lawsuit contrary to applicable law; and defaming HBL with false and baseless accusations of patent infringement and copying;

1

- that HBL has shown a threat of irreparable harm to its reputation and goodwill caused by Lite-Netics's conduct that is not merely speculative;

- that the balance of harms favor issuance of a preliminary injunction, because Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means, while HBL has established that it will suffer irreparable harm in the absence of a preliminary injunction; and

- that the public interest favors enjoining false statements to customers and not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace.

IT IS THEREFORE ORDERED that, pending disposition of this case or subsequent court order, Lite-Netics, along with its officers, directors, shareholders, and other agents, is preliminarily enjoined from making statements via letters, emails, Facebook, Twitter, or any other social media, mass media, direct marketing, robocalls, press releases, blogs, websites or otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer.

IT IS FURTHER ORDERED that Lite-Netics shall send this Order to all persons who in the past have received the marketplace communications identified above;

AND IT IS FURTHER ORDERED that, under Federal Rule of Civil Procedure 65(c), this Preliminary Injunction shall issue immediately, where HBL has previously posted a security or bond in accordance with NECivR 65.1.1 in the amount of $1,000 as security for the payment of such costs and damages as may be incurred or suffered by any party who is subsequently found to be wrongfully enjoined or restrained hereby.

2

Dated this 27th day of October, 2022.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LITE-NETICS, LLC,

                  Plaintiff/Counter-Defendant,

vs.

NU TSAI CAPITAL LLC, d/b/a HOLIDAY
BRIGHT LIGHTS,

                  Defendant/Counterclaimant.

**NO. 8:22CV314**

**AMENDED
PRELIMINARY INJUNCTION**

The Court having considered the parties' written submission on the September 30, 2022, Motion for Preliminary Injunction by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL), and the arguments of the parties at the preliminary injunction hearing,

THE COURT FINDS, for preliminary purposes,

- that defendant/counterclaimant HBL has made sufficient showing that plaintiff/counter-defendant Lite-Netics, LLC (Lite-Netics) has engaged in tortious interference with business relations and prospective business relations, as claimed in Count IV of HBL's Counterclaim in this action, and has engaged in defamation, as claimed in Count V of HBL's Counterclaim, by sending false, baseless, and defamatory communications to businesses that Lite-Netics knew had business relationships with HBL, falsely accusing HBL of tortious conduct, that is, patent infringement and "copying" of Lite-Netics's products; threatening to include any known company using or reselling the HBL products as co-defendants in this lawsuit contrary to applicable law; and defaming HBL with false and baseless accusations of patent infringement and copying;

1

- that HBL has shown a threat of irreparable harm to its reputation and goodwill caused by Lite-Netics's conduct that is not merely speculative;

- that the balance of harms favors issuance of a preliminary injunction, because Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means, while HBL has established that it will suffer irreparable harm in the absence of a preliminary injunction; and

- that the public interest favors enjoining false statements to customers and not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace.

IT IS THEREFORE ORDERED that, pending disposition of this case or subsequent court order, Lite-Netics, along with its officers, directors, shareholders, and other agents, is preliminarily enjoined from making statements via letters, emails, Facebook, Twitter, or any other social media, mass media, direct marketing, robocalls, press releases, blogs, websites or otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer.

AND IT IS FURTHER ORDERED that, under Federal Rule of Civil Procedure 65(c), this Preliminary Injunction shall issue immediately, where HBL has previously posted a security or bond in accordance with NECivR 65.1.1 in the amount of $1,000 as security for the payment of such costs and damages as may be incurred or suffered by any party who is subsequently found to be wrongfully enjoined or restrained hereby.

Dated this 8th day of November, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LITE-NETICS, LLC,

      Plaintiff/Counter-Defendant,

    vs.

NU TSAI CAPITAL LLC, d/b/a HOLIDAY
BRIGHT LIGHTS,

      Defendant/Counterclaimant.

**NO. 8:22CV314**

**MEMORANDUM AND ORDER
REGARDING PLAINTIFF/COUNTER-
DEFENDANT'S MOTION TO STAY
PRELIMINARY INJUNCTION PENDING
APPEAL**

On October 7, 2022, this Court issued its Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Temporary Restraining Order and Temporary Restraining Order, Filing 26, which plaintiff/counter-defendant Lite-Netics vigorously resisted.[1] On October 27, 2022, this Court issued its Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Preliminary Injunction and Preliminary Injunction, Filing 43, which Lite-Netics again vigorously resisted.[2] This case is now before the Court on Lite-Netics's third attempt to forestall preliminary injunctive relief in this case, in the form of its November 3, 2022, Motion to Stay Preliminary Injunction. Filing 52. Defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL) filed its Brief in Opposition, Filing 56, on November 4, 2022. Lite-Netics filed a Reply, Filing 58, on November 8, 2022. The Court now concludes that Lite-Netics's Motion to Stay rehashes arguments the Court has already rejected, asserts arguments Lite-Netics has waived by failing to raise them sooner, and fails to satisfy the applicable standard for a stay pending appeal. For these reasons, as set forth in more detail below, Lite-Netics's November 3, 2022, Motion to Stay Preliminary Injunction, Filing 52, is denied.

---

[1] *See Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 6151898 (D. Neb. Oct. 7, 2022).

[2] *See Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 15523245 (D. Neb. Oct. 27, 2022).

## I.  INTRODUCTION

The Court has twice already addressed in considerable detail the background to the issue of preliminary injunctive relief in this case. Thus, the Court will set out here only enough of the factual and procedural background necessary to put the present Motion in context.

Both Lite-Netics and HBL are manufacturers of holiday lights with magnets for mounting light strings to metallic surfaces. In its original Complaint filed August 31, 2022, Lite-Netics asserted direct infringement, inducing infringement, and contributing to infringement of one or more claims of its patents (the Asserted Patents) by HBL. Filing 1. In its Counterclaim filed September 30, 2022, HBL asserted, *inter alia*, claims of tortious interference with business relations and prospective business relations and defamation, based on communications by Lite-Netics to HBL customers accusing HBL of infringement and copying its patents, notifying the customers of this lawsuit against HBL, and threatening customers with being added to this lawsuit if they used or sold HBL's products. Filing 11.

On HBL's motion, and after expedited briefing, the Court entered a temporary restraining order (TRO) on October 7, 2022, enjoining Lite-Netics pending a hearing on HBL's request for a preliminary injunction from making statements in various media and otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. Filing 26 at 36. The Court required HBL to post a security or bond in the amount of $1,000. Filing 26 at 36. After the issuance of the TRO, Lite-Netics filed its First Amended Complaint for Willful Patent Infringement on October 16, 2022. Filing 31. One of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both." Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42).

2

After further briefing on HBL's request for a preliminary injunction and a hearing on that request, the Court issued a Preliminary Injunction on October 27, 2022. Filing 43. The Preliminary Injunction again enjoined Lite-Netics—this time pending disposition of the case or subsequent court order—from making statements in various media and otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. Filing 43 at 70. The Court ordered that the Preliminary Injunction would issue immediately, where HBL had previously posted a security or bond in the amount of $1,000, Filing 43 at 70, and no party had argued that this bond was either excessive or inadequate at the preliminary injunction stage of the proceedings. Filing 43 at 67.

On October 31, 2022, Lite-Netics filed its Notice of [Interlocutory] Appeal to the Federal Circuit Court of Appeals from this Court's Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Preliminary Injunction and Preliminary Injunction. Filing 44. On November 3, 2022, Lite-Netics filed the Motion to Stay Preliminary Injunction now before the Court. Filing 52. HBL filed its Brief in Opposition to Plaintiff/Counter-Defendant's Motion to Stay on November 4, 2022. Filing 56. Lite-Netics filed its Reply Brief on November 8, 2022. Filing 58.

Due to clerical error, the October 27, 2022, Preliminary Injunction included a requirement "that Lite-Netics shall send this Order to all persons who in the past have received the marketplace communications identified above." Filing 43 at 70. That language had been requested in a proposed TRO provided by HBL, but the Court removed it from the TRO that was actually issued on the ground that it was beyond the appropriate scope of a TRO in this case, where it requires affirmative action. Filing 26 at 32. Upon learning of the erroneous insertion of this HBL proposed language in the Preliminary Injunction from Lite-Netics's brief in support of its current Motion,

Filing 53, the Court entered an Order, Filing 59, on November 8, 2022, striking the language inadvertently included and directing the filing of an Amended Preliminary Injunction. The Amended Preliminary Injunction, Filing 60, was also filed November 8, 2022.

## II. LEGAL ANALYSIS

Lite-Netics asserts that there are several grounds on which the Court should now stay the Preliminary Injunction pending appeal to the Federal Circuit Court of Appeals. Before considering those grounds in turn, the Court will summarize the standards applicable to a request for a stay pending appeal.

### A. Applicable Standards

As the Eighth Circuit Court of Appeals has explained,

> In determining whether to issue a stay pending appeal, we consider four factors: (1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits; (2) whether the party seeking the stay will be irreparably injured without a stay; (3) whether a stay would substantially injure other parties; and (4) the public's interest. *Brakebill v. Jaeger*, 905 F.3d 553, 557 (8th Cir. 2018) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." *Id.*

*Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020); *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020).[3]

Although it is "the most important factor," *id.*, the Eighth Circuit Court of Appeals has not specifically clarified what constitutes a "strong likelihood of success on the merits." However, the Eighth Circuit Court of Appeals has explained that the court's "analysis of whether a stay is warranted overlaps almost completely with [its] analysis of whether a permanent injunction was merited." *Miller v. Thurston*, 967 F.3d 727, 736 n.4 (8th Cir. 2020). The court recognized that

---

[3] Again, although this is a dispute that involves patents to a substantial extent, and Lite-Netics has appealed the Court's preliminary injunction ruling to the Federal Circuit Court of Appeals, Lite-Netics cited only Eighth Circuit standards for a stay pending appeal.

there is a slightly different legal and evidentiary standard, acknowledging that while a stay requires "a strong likelihood of success on the merits," a permanent injunction requires the movant "to prove actual success on the merits," so the permanent injunction standard is "more demanding." *Id.* In contrast, a preliminary injunction requires only "likelihood of success on the merits," *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 665 (8th Cir. 2022), further defined as "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). Therefore, this Court concludes that a "strong likelihood of success" required for a stay is a more demanding standard than "a likelihood of success" or "fair chance of prevailing" required for a preliminary injunction.

### B. Lite-Netics's Lacks a "Strong Likelihood of Success"

The first factor the Court must consider is whether the party seeking the stay, Lite-Netics, has demonstrated a strong likelihood of success on the merits. *Org. for Black Struggle*, 978 F.3d at 607. Here that means whether Lite-Netics has a strong likelihood of defeating HBL's tortious interference and defamation claims, not whether it has a strong likelihood of success on its own infringement claims. Nevertheless, the two things are intertwined, as the Court found—on the preliminary record—that the baselessness of Lite-Netics's infringement claims weighed in favor of the Preliminary Injunction.

#### 1. *The Court has Removed Lite-Netics's "Improper Affirmative Action" Ground with the Amended Preliminary Injunction*

Lite-Netics's first—and indeed central—ground for a stay of the Preliminary Injunction is that the Preliminary Injunction "requires Lite-Netics to take the affirmative action of sending the Order to 'all persons who in the past have received the marketplace communications identified [in the order],'" which Lite-Netics argued requires affirmative relief that exceeds the purpose of a

preliminary injunction to maintain the *status quo*. Filing 53 at 2 (quoting Filing 43 at 70). Lite-Netics argues this flaw alone is sufficient to require a stay of the Preliminary Injunction. Filing 53 at 2; *see also* Filing 53 at 3–4. Lite-Netics also argues that this provision of the Preliminary Injunction is the cause of much of the harm to its reputation and goodwill on which its argument concerning irreparable harm relies. Filing 53 at 5–7. Lite-Netics argues that, in the alternative to staying or vacating the Preliminary Injunction in its entirety on this ground, the Court should "modify the Preliminary Injunction Order to remove the order requiring affirmative action." Filing 53.

The Court pointed out in its Order to Amend Preliminary Injunction that the language Lite-Netics now challenges was not only inadvertently included in the Preliminary Injunction, but that the Court had previously excluded such language requested by HBL in a Proposed TRO. Filing 59 at 1. The Court did so, because that language was "beyond the appropriate scope of a TRO in this case, where it requires affirmative action." Filing 59 at 1 (quoting Filing 32 at 37, in turn citing *Tumey*, 27 F.4th at 665). The Court then struck the inadvertently included language from the Preliminary Injunction and directed the filing of an Amended Preliminary Injunction. Filing 59 at 1–2. The Amended Preliminary Injunction was subsequently filed. Filing 60. Thus, the Court in effect has granted Lite-Netics's alternative request for modification of the Preliminary Injunction to remove the order requiring affirmative action. That language plays no further part in analysis of whether the Preliminary Injunction, as now amended, should be stayed pending appeal.

*2. Lite-Netics does not Have a Strong Likelihood of Showing Its Communications to Customers were not Objectively Baseless*

Next, Lite-Netics argues that it has a strong likelihood of showing that its allegations of infringement were not objectively baseless. Filing 53 at 4.[4] Lite-Netics challenges the Court's reliance on "specification estoppel" as demonstrating that Lite-Netics's infringement allegations were baseless by reiterating its contention that the specification does not need to disclose multiple elements for a claim stating "a[n] element" to cover "one or more elements." Filing 53 at 4 (citing *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016)). Lite-Netics also reiterates its contention that merely depicting a structural claim as "unitary" in an embodiment, without more, does not mandate that the structural limitation must be "unitary." Filing 53 at 5 (citing, *e.g.*, *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309 (Fed. Cir. 2005)). Lite-Netics then reiterates its position that it has demonstrated that HBL's products infringe the Asserted Patents, either literally or under the doctrine of equivalents. Filing 53 at 5. HBL points out that Lite-Netics fails to address all the Court's findings of baseless allegations of infringement. Filing 56 at 2. HBL contends that at most Lite-Netics has addressed only two of eight allegations of literal and equivalents infringement that the Court found were baseless. Filing 56 at 3. HBL points out that Lite-Netics also repeats arguments that the Court has already rejected concerning whether "one" means "at least one" in this case. Filing 56 at 3–4.

These arguments by Lite-Netics are rehashes of arguments that the Court already rejected, at least in the context of a preliminary injunction. In the preliminary injunction ruling, the Court pointed out that Lite-Netics only belatedly argued that in patent parlance the indefinite article "a" or "an" carries the meaning of "one or more" in open-ended claims containing the transitional

---

[4] To be precise, Lite-Netics asserts more baldly that its "infringement claims against [HBL] are not objectively baseless." Filing 53 at 4.

phrase "comprising." Filing 43 at 31 (citing *Convolve, Inc.*, 812 F.3d at 1321, on which Lite-Netics again relies). However, as the Court pointed out, there are exceptions to that rule, and the Court found certain exceptions applicable in this case. *See* Filing 43 at 32–36. The Court also concluded that *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), on which Lite-Netics again relies, was not to the contrary, because the written descriptions in the Asserted Patents repeatedly limited the structure in question to "a neodymium" magnet, meaning "one." Filing 43 at 36. Lite-Netics has pointed to nothing that suggests that it has any likelihood of success—let alone a "strong likelihood of success"—on the merits of its argument that the Asserted Patents are infringed on the basis of principles set out in *Convolve* and *Medtronic*. As HBL points out, Lite-Netics has made no attempt to demonstrate that it has a "strong likelihood of success" on the merits of its contention that its other claims of infringement are not baseless.

Thus, Lite-Netics cannot make the necessary showing of a "strong likelihood of success" on these grounds to warrant a stay of the Preliminary Injunction pending appeal.

### 3. *Lite-Netics does not have a Strong Likelihood of Success on its Assertion of* Noerr-Pennington *immunity*

Lite-Netics argument that its allegations of infringement are not baseless is the first part of a larger argument that it has a strong likelihood of success on the merits because it is immune from HBL's state tort claims under the *Noerr-Pennington* doctrine. Lite-Netics argues that HBL's implicit concessions that its products infringe at least some elements of the claims of the Asserted Patents show that Lite-Netics's lawsuit is an attempt to obtain a justifiable legal remedy and that it pursued this action and notified customers that it was doing so in subjective good faith. Filing 53 at 4. Lite-Netics argues that to demonstrate bad faith sufficient to overcome *Noerr-Pennington* immunity, an infringement suit must be objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than to obtain judicial relief. Filing

53 at 6. Lite-Netics argues that HBL has offered no evidence that Lite-Netics subjectively brought suit in bad faith, which Lite-Netics argues is sufficient to give Lite-Netics *Noerr-Pennington* immunity. Filing 53 at 6.

HBL responds that Lite-Netics's contention that its subjective motives in bringing suit were in good faith is at best a misdirection. Filing 56 at 4. HBL argues that the Preliminary Injunction does not address the propriety of bringing suit but the propriety of marketplace communications, so that the *Noerr-Pennington* doctrine is only relevant by analogy. Filing 56 at 4. HBL argues that, in this context, the subjective good faith component for marketplace communications asks whether the baseless activity conceals an attempt to interfere directly with the business relationships of a competitor. Filing 56 at 4. HBL argues that Lite-Netics's "smears" were quintessentially bad faith attempts to injure HBL's business. Filing 56 at 4. HBL contends that Lite-Netics's pleas of subjective good faith merely rehash already-rejected arguments and do not support a stay of any part of the Preliminary Injunction. Filing 56 at 5.

In reply, Lite-Netics argues that *Noerr-Pennington* immunity does apply to marketplace communications. Filing 58 at 5. Thus, Lite-Netics argues that *Noerr-Pennington* immunity applies to a patent holder's good-faith communications to its customers. Filing 58 at 6. It appears that Lite-Netics is implying that nothing undermines its strong likelihood of showing good faith motives for its allegations of infringement in communications to the public.

The Court points out, first, that the *Noerr-Pennington* doctrine is mentioned once in Lite-Netics's brief on the Motion for Preliminary Injunction, in the context of sending good-faith infringement letters. Filing 32 at 40. It is also mentioned only once in passing in the conclusion of Lite-Netics's reply brief concerning the Preliminary Injunction. Filing 38 at 5. Thus, Lite-Netics's full-blown reliance on *Noerr-Pennington* immunity in its Motion to Stay is an entirely new

argument that could have been made previously. Likewise, Lite-Netics made only passing references to its subjective good faith or bad faith in any of its preliminary injunction briefing. *See* Filing 32 at 35, 38; Filing 38 at 4. Thus, Lite-Netics appears, once again, to be making an argument in support of a stay of the Preliminary Injunction that it wishes it had made in response to the Motion for Preliminary Injunction. However, the Court deems this argument waived.

Even so, Lite-Netics's belated arguments do not demonstrate a "strong likelihood of success on the merits." First, assuming that HBL conceded that its products infringe some elements of claims of the Asserted Patents, such a concession is not enough to show a "strong likelihood" that a patent holder's allegations of infringement were in subjective good faith. "An accused product infringes a [patent] claim if it embodies each claim element or its equivalent." *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 784–85 (Fed. Cir. 2019) (citing *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000)). Thus, if any element of a claim is obviously missing from the accused product, either literally or by equivalence, the patent holder could not have a good faith belief that its patent was infringed. That is the situation the Court found here.

Furthermore, in its preliminary injunction ruling, this Court observed that "[s]tate tort claims based on enforcing a patent, including for tortious interference, are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." Filing 43 at 20 (quoting *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018), in turn citing *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008)). This Court also observed that, "[i]n explaining this 'bad faith' requirement, the Federal Circuit Court of Appeals explained that '[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement

10

Appx83

were objectively baseless.'" Filing 43 at 20 (quoting *Matthews Int'l Corp. v. Biosafe Eng'g, LLC,* 695 F.3d 1322, 1332 (Fed. Cir. 2012), in turn quoting *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.,* 362 F.3d 1367, 1374 (Fed. Cir. 2004)). In this case, this Court found such bad faith based on obviously baseless allegations of infringement, so that Lite-Netics does not have a "strong likelihood" of showing its allegations of infringement were in good faith and the baselessness of the allegations suggested intent to harm HBL in its business. *See, e.g.,* Filing 43 at 50 ("[W]here Lite-Netics's conduct was baseless, it would be reasonable to infer a motive to injure HBL apart from the merits of any allegation of patent infringement.").

In short, Lite-Netics has not shown the required "strong likelihood of success" that would warrant a stay of the Preliminary Injunction, as now amended, in this case. This conclusion is likely sufficient to deny Lite-Netics's Motion. *See Org. for Black Struggle*, 978 F.3d at 607 (strong likelihood of success is the most important factor in obtaining a stay pending appeal). Nevertheless, the Court will consider the other factors in the analysis.

### C. Lite-Netics Cannot Show Irreparable Harm

The second factor the Court must consider is whether Lite-Netics will be irreparably injured without a stay. *Org. for Black Struggle*, 978 F.3d at 607. Lite-Netics contends that it will suffer such irreparable harm. Filing 53 at 6. First, Lite-Netics argues that restricting its free speech will cause irreparable harm because it is unable to communicate its patent rights in the marketplace where the Preliminary Injunction both bars its communications about those rights and forces it to state that HBL does not infringe the Asserted Patents. Filing 53 at 6. Only the former bar is still at issue, however, because the Court has eliminated from the Amended Preliminary Injunction the requirement that Lite-Netics affirmatively notify customers of the Preliminary Injunction.

Notwithstanding its prior position that loss of reputation and goodwill to HBL is not a viable theory of irreparable harm, Lite-Netics now argues that it will suffer such harm to its

reputation and goodwill because of the timing of the Preliminary Injunction forcing it to notify customers of the Preliminary Injunction at the height of the sales season for its products. Filing 53 at 7. However, that argument is again based on Lite-Netics being forced to notify its customers of the Preliminary Injunction, which is no longer the case. Lite-Netics also reiterates is prior argument that the Preliminary Injunction will allow HBL to "poach" Lite-Netics's customers, where it claims customers indicated that they would stop purchasing from Lite-Netics if it did not assert its patent rights. Filing 53 at 7–8.

In response, HBL argues that any harm to Lite-Netics from the Preliminary Injunction is self-inflicted. Filing 56 at 5 n.1. HBL explains that Lite-Netics deliberately chose to send objectively baseless infringement allegations to HBL's customers, so Lite-Netics cannot now assert that it is somehow "harmed" by the Preliminary Injunction putting a stop to its misconduct. Filing 56 at 5 n.1.

In reply, Lite-Netics "reminds the Court that it is [HBL] that is infringing Lite-Netics' patents and taking its customers by offering infringing products at a lower price," so that Lite-Netics contends that it is the only party being injured. Filing 58 at 1. Lite-Netics also speculates that HBL is "undoubtedly" declaring to Lite-Netics's customers that its products have been found non-infringing by the Court. Filing 58 at 1. Indeed, Lite-Netics contends that the Preliminary Injunction "upended the status quo" and gave HBL and its customers the belief that they have prevailed on the merits. Filing 58 at 1; *see also* Filing 58 at 7.

This is another instance of Lite-Netics rehashing arguments the Court already rejected. The Court acknowledged in its preliminary injunction ruling that in *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed. Cir. 1998), the Federal Circuit Court of Appeals permitted "[c]ommunication of accurate information about patent rights, whether by direct notice to potential

infringers or by publicity release." Filing 43 at 51 (quoting *Mikohn*, 165 F.3d at 898). However, as the Court also explained, the Federal Circuit did so with the caveat that the information must be accurate and not in bad faith. Filing 43 at 51 (citing *Mikohn*, 165 F.3d at 898). Not to belabor the point, but the Court has found that the allegations that Lite-Netics communicated to HBL's customers alleging infringement by HBL were baseless, so Lite-Netics has no free speech right that is being impaired by the Preliminary Injunction's prohibition on such baseless communications. Also, once again, Lite-Netics has come forward with nothing to demonstrate that HBL is illegitimately "poaching" Lite-Netics's customers or that the Preliminary Injunction will allow HBL to do so. *See* Filing 43 at 64. Even if some customers have threatened to leave Lite-Netics if it does not protect its patents, no law allows Lite-Netics to protect its patents by unfair and baseless communications. Because Lite-Netics is free to pursue the marketing of its products and to protect its patents by any other means, just not by such deceptive means, no irreparable harm stems from the Preliminary Injunction.

Lite-Netics's speculation that HBL is telling Lite-Netics's customers that its products have been found non-infringing by the Court is just that, speculation. Moreover, the Court made pains in both the TRO and the Preliminary Injunction to point out that its conclusions were "preliminary," based on the record then before the Court, and HBL undoubtedly knows that. Also, rather than "upending the status quo," the Court reinstated the *status quo* of fair competition by barring Lite-Netics from making what the Court at least preliminarily concluded were baseless accusations of infringement.

Lack of irreparable harm, particularly when coupled with lack of a strong likelihood of success on the merits, is sufficient to defeat Lite-Netics's request for a stay pending appeal. *See Org. for Black Struggle*, 978 F.3d at 607 (explaining that in addition to a strong likelihood of

success, "a showing of irreparable injury without a stay is also required."). Nevertheless, the Court will complete its consideration of the pertinent factors.

### D.  The Parties do not Argue that a Stay Would Substantially Injure Other Parties

The third factor the Court must consider on a motion for a stay pending appeal is whether a stay would substantially injure other parties. *Org. for Black Struggle*, 978 F.3d at 607. However, Lite-Netics frames the issue as whether a stay of the Preliminary Injunction will harm HBL, contending that it will not. Filing 53 at 8. HBL responds to Lite-Netics argument by asserting that harm to HBL's reputation and goodwill constitute irreparable harm. Filing 56 at 5. Lite-Netics's first argument that HBL will not be harmed by a stay of the Preliminary Injunction—because concerns of customers do not show likelihood of irreparable harm—is a rehash of Lite-Netics's first argument that HBL would suffer no irreparable harm without the Preliminary Injunction. Filing 53 at 8. The Court reiterates its reasons for rejecting Lite-Netics's reiterated argument. Filing 43 at 58–62. Lite-Netics adds that HBL will suffer no harm because it cannot defeat Lite-Netics's *Noerr-Pennington* immunity to HBL's state tort claims. Filing 53 at 8–9. For the reasons stated above, the Court also rejects that argument. Because the parties have not identified the interests of any non-parties that are implicated—let alone injured—by the Preliminary Injunction, the interests of such other persons do not appear to impact the analysis. Thus, this factor weighs in favor of maintaining the stay to protect HBL from irreparable harm.

### E.  The Public's Interest is Served by the Preliminary Injunction

The last factor that the Court must consider on a motion for a stay pending appeal is the public's interest. *Org. for Black Struggle*, 978 F.3d at 607. Lite-Netics argues that the Federal Circuit has established that the public interest favors enforcing valid patents, especially when the patentee is practicing the claimed subject matter. Filing 53 at 9. It contends further that it has

demonstrated that it is practicing the claimed subject matter of the Asserted Patents and that the Court has not found the Asserted Patents are invalid. Filing 53 at 9. Lite-Netics also argues that the Preliminary Injunction will not serve the public interest because it will discourage patentees from pursuing their right to exclude others from practicing their inventions and discourage patent holders from communicating their patent rights to others. Filing 53 at 9. HBL does not appear to respond to these arguments.

The Court rejects Lite-Netics's rehashed argument that the public interest favors enforcement of valid patents and is not served by discouraging patent holders from pursuing their right to exclude others from practicing their inventions. As the Court explained in the preliminary injunction ruling, the right to make communications to protect patent rights extends only so far as such communications are accurate and not baseless. Filing 43 at 51 (citing *Mikohn*, 165 F.3d at 898). As the Court also explained in its preliminary injunction ruling, no public interest is served by allowing a patent holder to make baseless allegations of infringement against a competitor, which is what the Court found—at least preliminarily—is what Lite-Netics is doing. Filing 43 at 65 (citing *United Indus. Corp. v. Clorox Co*., 140 F.3d 1175, 1184 (8th Cir. 1998), which found that the public interest favors enjoining false statements in marketing). The Court also reiterates that the public interest favors not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace. Filing 43 at 65 (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009), for the interest in consumer choice, and *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp*., LLC, 953 F.3d 1041, 1046 (8th Cir. 2020), for the public interest in preventing fraud). Thus, the Court now concludes that the public interest would not be served by staying the Preliminary Injunction.

15

### F.  Lite-Netics has Waived any Request to Increase the Bond

Finally, if the Court does not stay the Preliminary Injunction, Lite-Netics argues that the Court should increase the bond requirement for the Preliminary Injunction because the Court previously set the current amount as the bond for the TRO and because the Preliminary Injunction requires Lite-Netics to take affirmative action. Filing 53 at 9. Lite-Netics also argues that the bond here is a fraction of the bond imposed for a TRO of only fourteen days duration in *Canning Logistics Servs., LLC v. Baxter Bailey & Assocs., Inc.*, No. 8:17CV116, 2017 WL 2178350, at *1 (D. Neb. May 16, 2017) (Smith Camp, J.), but the bond in this case will be in place indefinitely. Filing 53 at 10.

First, Lite-Netics is in essence seeking reconsideration of the amount of the bond. As the Eighth Circuit Court of Appeals has explained,

> "A motion for reconsideration is not a vehicle to identify facts or legal arguments that could have been, but were not, raised at the time the relevant motion was pending." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 923 (8th Cir. 2015). Nor may a motion for reconsideration serve to introduce evidence that the movant could have produced before the district court decided the prior motion. *Id.* at 922; *see also Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (stating that motions for reconsideration cannot be used to introduce new evidence or legal theories that "could have been adduced during pendency of the summary judgment motion" (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987))). A district court does not abuse its discretion in denying a motion for reconsideration used for such an "impermissible purpose." *Julianello*, 791 F.3d at 923.

*SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1111–12 (8th Cir. 2019). As in *Transamerica Life*, "[t]his is precisely the situation [the Court] find[s] here." *Id.* Lite-Netics failed to challenge the amount of the bond after the TRO issued, in the subsequent briefing of the Motion for Preliminary Injunction, or during the hearing on the Motion for Preliminary Injunction. It is simply too late for Lite-Netics to reconsideration of the bond amount now in the guise of a motion for a stay pending appeal.

16

Also, even considering this belated argument, it is unpersuasive. Again, there is no longer any requirement for Lite-Netics to take affirmative action under the Amended Preliminary Injunction. Thus, there is no reason to revisit the bond amount where that difference between the TRO and Preliminary Injunction no longer exists.

Finally, the circumstances in *Canning Logistics* on which Lite-Netics relies were substantially different from the circumstances presented here. That case involved attempts by Baxter to collect debts allegedly owed by Canning Logistics to Cyclone, a freight carrier, based on oral agreements between Canning and Cyclone. 2017 WL 2178350, at *1. Although the court did not explain the precise reasons for the amount of the bond in that case, the bond was to protect Baxter, the enjoined party, from the potential loss on a debt assigned to it arising from a significant business contract, if an eventual preliminary injunction lasted past the limitations period for Baxter to collect the debt. *Id.* at *3. Thus, at the very least, the party enjoined had a cognizable and determinable potential financial harm from being wrongly enjoined. In contrast, as the Court explained in the TRO ruling, a minimal security bond was appropriate in this case in light of the balance of harms, as the Court had measured the harms to each party. Filing 26 at 33. Moreover, the Court rejected above Lite-Netics's attempt to demonstrate that it would suffer significant harm. *See, supra*, § II.C.

The Court will not now increase the bond for the Preliminary Injunction.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Lite-Netics's November 3, 2022, Motion to Stay Preliminary Injunction, Filing 52, is denied.

17

Dated this 10th day of November, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge

US007549779B2

(12) **United States Patent**      (10) **Patent No.:**      **US 7,549,779 B2**

Genenbacher                         (45) **Date of Patent:**      **Jun. 23, 2009**

(54) **MAGNETIC LIGHT FIXTURE**

(76) Inventor:   **Shawn Michael Genenbacher**, P.O. Box
                 65467, Lubbock, TX (US) 79464

( * ) Notice:   Subject to any disclaimer, the term of this
                patent is extended or adjusted under 35
                U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/676,146**

(22) Filed:   **Feb. 16, 2007**

(65)            **Prior Publication Data**

        US 2008/0198610 A1      Aug. 21, 2008

(51) **Int. Cl.**
     *F21V 21/08*        (2006.01)
(52) **U.S. Cl.** ......................... **362/398**; 362/249; 362/808
(58) **Field of Classification Search** ................. 362/249,
                            362/252, 398, 806, 808
     See application file for complete search history.

(56)              **References Cited**

              U.S. PATENT DOCUMENTS

        2,474,942  A  *  7/1949  Hawkins ...................... 439/40
        3,038,139  A  *  6/1962  Bonanno ...................... 439/40

        5,388,802  A     2/1995  Dougan
        5,788,362  A  *  8/1998  Chou .......................... 362/249
        5,873,651  A  *  2/1999  Hofer et al. ................. 362/396
        2006/0138293 A1   6/2006  Clement

        * cited by examiner

        *Primary Examiner*—John A Ward
        (74) *Attorney, Agent, or Firm*—Carstens & Cahoon LLP;
        Vincent J. Allen

(57)              **ABSTRACT**

The present invention provides a light fixture assembly. The
assembly includes a light bulb socket with an opening at one
end for accommodating C7/C9 light bulbs and at least one
opening at the second end. The socket includes a conductor
that places a light bulb into electrical contact with electrical
wires inserted through the side of the socket. The assembly
also includes a base attached to the second end of the socket.
The base includes a wire clamp that fits through the opening
in the second end of the socket and holds the electrical wires
in contact with the conductor. Retaining clips on the base
apply a retaining force against the socket to hold the base in
place. A neodymium disc magnet is embedded in the base,
thereby allowing the assembly to be mounted magnetically to
metal surfaces.

**15 Claims, 3 Drawing Sheets**



**U.S. Patent**          Jun. 23, 2009          Sheet 1 of 3          **US 7,549,779 B2**



**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 4**



**FIG. 5**

**U.S. Patent**      Jun. 23, 2009      Sheet 2 of 3      US 7,549,779 B2



**FIG. 6**



**FIG. 7**



**FIG. 8**

8:22-cv-00314   Doc # 1-1   Filed: 08/31/22   Page 5 of 8 - Page ID # 18

**U.S. Patent**      Jun. 23, 2009      Sheet 3 of 3      **US 7,549,779 B2**



**FIG. 9A**



**FIG. 9B**

US 7,549,779 B2

**1**

# MAGNETIC LIGHT FIXTURE

## TECHNICAL FIELD

The present invention relates generally to decorative lights. More specifically the invention relates to decorative lights that are mounted to metal surfaces by means of imbedded magnets.

## BACKGROUND OF THE INVENTION

Decorative lights typically do not come provided with means for mounting them to display surfaces such as housing sides or poles. The traditional means of attaching such decorative lights is by stapling them to the sides of houses or trees or wrapping them around poles and trees. However, stapling has several potential drawbacks including damage to the mounting surface (which increases with repeated mounting and dismounting of the lights), potential damage to the electrical cord from the staples, as well as potential injury to the user during the stapling process. Stapling also turns the light mounting process into a two-handed operation, requiring one hand to hold the lights and wires in place and the other to work the stapler. Stapling is also unsatisfactory in cases where houses have metal siding.

In the case of metal poles or similar objects, simply wrapping the light wires may not properly secure them in position and prevent them from falling. In such situations, securing methods such as tape might not provide sufficient long term adherence, especially outdoors, and might be visually unappealing.

Several methods have been proposed in the prior art for overcoming the above disadvantages. One solution is provided by Dougan et al. (U.S. Pat. No. 5,388,802) This approach provides a clip that is secured to the electric cord that connects a string of lights. The main body of the clip is a flexible, V-shaped member which is compressed and wedged between the fascia and soffit of a house. When installed, the lights protrude perpendicularly below the fascia and are clearly visible, while the wedge shaped members are substantially hidden from view by the fascia. While the Dougan invention offers substantial improvements over simply stapling the lights in place, it is limited to mounting lights on the eaves on a house. Furthermore, Dougan requires a separate set of clips/wedges to be purchased and then added to the string of lights before mounting them. While the insertion and removal of the wedges from the fascia and soffit may seem simple in theory, it is likely the user will encounter some difficulties in this operation.

Another proposed solution to mounting decorative lights is that of Clement (U.S. Patent Application Ser. No. 2006/0138293). Similar to Dougan, Clement provides a member that is clipped to the electrical cord of a string of decorative lights. Unlike Dougan, the member taught in Clement uses a magnet to secure it to metal surfaces. This approach provides more flexibility in mounting options as well as greater ease of mounting than the Dougan invention. However, Clement still requires the user to purchase a separate set of members and then clip them onto the electrical cord of the light string before mounting the lights, requiring additional time and effort.

Therefore, it would be desirable to have a method for temporarily mounting a string of decorative lights to a metal

**2**

surface without the need for damaging the surface and without the need to install additional items to the light string.

## SUMMARY OF THE INVENTION

The present invention provides a light fixture assembly. The assembly includes a light bulb socket with an opening at one end for accommodating C7/C9 light bulbs and at least one opening at the second end. The socket includes a conductor that places a light bulb into electrical contact with electrical wires inserted through the side of the socket. The assembly also includes a base attached to the second end of the socket. The base includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor. Retaining clips on the base apply a retaining force against the socket to hold the base in place. The retaining clips may be molded from the sides of the wire clamp or independent from the clamp and inserted through separate holes in the end of the socket. An N40 neodymium disc magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces. In the preferred embodiment, the neodymium magnet is ½ inch diameter and ⅛ inch thick and mounted flush with the surface of the base, with a pull strength of 16 pounds. In an alternate embodiment, the light assembly may also include an external clip on the side of either the base or the socket.

## BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as a preferred mode of use, further objects and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a cross section view of a light assembly in accordance with the preferred embodiment of the present invention;

FIG. 2 is a detailed cross section view of the assembly base containing a magnet in accordance with the present invention;

FIG. 3 is a plan view of the assembly base in accordance with the present invention;

FIG. 4 is a bottom plan view of the assembly base showing the ends of retaining clip in accordance with the present invention;

FIG. 5 is a detailed cross section view of the light socket in accordance with the present invention;

FIG. 6 is a detailed cross section view of the assembly base containing the magnet in accordance with an alternate embodiment of the present invention;

FIG. 7 is a bottom plan view of the alternate assembly base showing the bottom end of the wire clamp and side retaining clips in accordance with the alternate embodiment of thre present invention.

FIG. 8 is a detailed cross section view of the light socket in accordance with the alternate embodiment of the present invention;

FIG. 9A is an exploded perspective view of the light assembly in Accordance with a preferred embodiment of the present invention; and

FIG. 9B is an exploded perspective view of the assembly in Accordance with an alternate embodiment of the present invention.

US 7,549,779 B2

**3**

### DETAILED DESCRIPTION

The present invention provides a magnetic base for decorative lights that are strung together by an electrical cord. The invention works with standard C7/C9 light bulbs.

FIG. **1** is a cross section view of a light assembly in accordance with the preferred embodiment of the present invention. The light assembly is comprised of three major components. The first is the light bulb **7**, which is depicted is dashed outline. The second major component is the light bulb socket **8**. The third component is the assembly base **3**.

FIG. **2** is a detailed cross section view of the assembly base containing a magnet in accordance with the present invention. The assembly base **3** is constructed of plastic or similar material and has an embedded neodymium magnet **1**. In the preferred embodiment, the magnet **1** is a disc ½ inch diameter× ⅛ inch thick. Other shapes, sizes and thicknesses can be used, but the dimensions of the disc magnet in the preferred embodiment tend to be best suited for use with a C7/C9 light socket.

A neodymium magnet is made from a combination of neodymium, iron, and boron (Nd₂Fe₁₄B). Neodymium magnets have replaced the marginally weaker samarium-cobalt magnets in most applications, due mainly to lower cost. These magnets are very strong in comparison to their mass and are graded in strength from N24 to the strongest N54. The number after the N represents the magnetic energy product, in megagauss-oersteds (MGOe). In the preferred embodiment, the neodymium magnet is N40 with a pull force of 16 pounds. Other strength magnets may be used, but ideally, the magnet pull force should be sufficient to hold the light assembly in place in normal outdoor conditions including wind.

As shown, the magnet **1** is embedded flush with the surface of the assembly base **3**, allowing only the face of the magnet to be exposed. The exposed face of the magnet **1** is illustrated in the plan view of the base in FIG. **3**. A plastic protection coating **2** is placed over the face of the magnet **3**.

The base **3** also includes two retaining clips **5** for engaging the light socket **8** and holding the base in place. A molded wire clamp **4** in the base helps to hold the electrical wires **9** in contact with a copper conductor **10** in the socket **8** when the base **3** and socket **8** are assembled, as shown in FIG. **1**.

FIG. **4** is a bottom plan view of the assembly base showing the ends of retaining clips **5** in accordance with the present invention.

The assembly base **3** may optionally include a side clip **6** which may be used to mount the light on a nonmetallic structure or may be used to mount additional decorations to the light.

FIG. **5** is a detailed cross section view of the light socket in accordance with the present invention. Like the base **3**, the socket **8** can be made from plastic or similar material. On the inside of the socket are two copper conductors **10** (only one which is illustrated in FIG. **5**). The conductors **10** provide electrical connection between the wires **9** and the base of the light bulb (not pictured).

The socket **8** includes two slots **11**, which accommodate the retaining clips **5** on the base **3**. Inside the socket **8** is a retaining tab **12**. The retaining tab **12** applies a retaining force against the ends of the retaining clips **5** when the assembly base **3** is mounted to the bottom of the socket **8**. The retaining tab **12** also helps hold the electric wires **9** in place by acting as the opposing surface to the wire clamp **4** when the base and socket are assembled, as illustrated in FIG. **1**.

In the preferred embodiment, the base **3** and socket **8** are both ¾ inch diameter (see FIG. **3**).

**4**

FIG. **6** is a detailed cross section view of the assembly base containing the magnet in accordance with an alternate embodiment of the present invention. The alternate embodiment of the assembly base **23** is very similar the assembly base **3** depicted in FIG. **2**, the primary difference being the shape of the retaining clips **25** and the wire clamp **24**. In this embodiment, the retaining clips **25** are molded from the sides of the wire clamp **24**, as shown.

Unlike the assembly base **3** depicted in FIG. **2**, the example depicted in FIG. **6** does not include a side clip **6**. However, it should be noted that a side clip can be added to either version of the assembly base or alternately to the side of the light bulb socket, as shown in FIG. **9B**.

FIG. **7** is a bottom plan view of the alternate assembly base showing the bottom end of the wire clamp **24** and side retaining clips **25** in accordance with the alternate embodiment of the present invention.

FIG. **8** is a detailed cross section view of the light socket in accordance with the alternate embodiment of the present invention. In this embodiment, the socket **28** has a single, central slot **27** to accommodate the wire clamp **24**. The retaining clips **25** engage the inside surface of the socket **29** when inserted through the slot **27**.

FIG. **9A** is an exploded perspective view of the light assembly in accordance with a preferred embodiment of the present invention. This example comprises the componet embodiments depicted in FIGS. **2-5**.

FIG. **9B** is an exploded perspective view of the light assembly in accordance with an alternate embodiment of the present invention. This example comprises the component embodiments depicted in FIGS. **6-8**. As mentioned above, FIG. **9B** also shows an embodiment in which an optional side clip **26** is added to the socket **28** instead of the assembly base **23**.

The description of the present invention has been presented for purposes of illustration and description, and is not intended to be exhaustive or limited to the invention in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art. The embodiment was chosen and described in order to best explain the principles of the invention, the practical application, and to enable others of ordinary skill in the art to understand the invention for various embodiments with various modifications as are suited to the particular use contemplated. It will be understood by one of ordinary skill in the art that numerous variations will be possible to the disclosed embodiments without going outside the scope of the invention as disclosed in the claims.

I claim:

**1**. A light fixture assembly, comprising:

(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;

(b) a base attached to the second end of the light bulb socket; and

(c) a neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds.

**2**. The light fixture assembly according to claim **1**, wherein the socket accommodates C7 light bulbs.

**3**. The light fixture assembly according to claim **1**, wherein the socket accommodates C9 light bulbs.

US 7,549,779 B2

5

**4**. The light fixture assembly according to claim **1**, wherein the retaining clips on the base are molded into the sides of the wire clamp and fit through the same hole in the second end of the socket as the wire clamp.

**5**. The light fixture assembly according to claim **1**, wherein the retaining clips on the base are separate from the wire clamp and fit through separate holes in the second end of the socket.

**6**. The light fixture assembly according to claim **1**, wherein the magnet is a neodymium magnet.

**7**. The light fixture assembly according to claim **6**, wherein the magnet has a pull strength of 16 pounds.

**8**. The light fixture assembly according to claim **6**, wherein the magnet has an N40 rating.

**9**. The light fixture assembly according to claim **1**, wherein the magnet is a disc one half inch in diameter and one eighth inch thick.

**10**. The light fixture assembly according to claim **1**, wherein the magnet is embedded flush with the surface of the base facing away from the light bulb.

6

**11**. The light fixture assembly according to claim **10**, wherein the exposed face of the magnet is covered with a protective plastic coating.

**12**. The light fixture assembly according to claim **1**, wherein the socket and base are three quarter inch diameter.

**13**. The light fixture assembly according to claim **1**, further comprising an external clip on the side of the base.

**14**. The light fixture assembly according to claim **1**, further comprising an external clip on the side of the socket.

**15**. The light fixture assembly of claim **1** wherein said base comprises:

   (i) a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor; and

   (ii) retaining clips that apply a retaining force against the socket to hold the base in place.

\* \* \* \* \*

8:22-cv-00314   Doc # 1-2   Filed: 00/01/00   Page 0 of 0   Page ID #00

US008128264B2

## (12) United States Patent
### Genenbacher

(10) **Patent No.:** **US 8,128,264 B2**
(45) **Date of Patent:** *Mar. 6, 2012

(54) **MAGNETIC LIGHT FIXTURE**

(76) Inventor: **Shawn Michael Genenbacher**, Lubbock, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/463,129**

(22) Filed: **May 8, 2009**

(65) **Prior Publication Data**

US 2010/0290240 A1    Nov. 18, 2010

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/676,146, filed on Feb. 16, 2007, now Pat. No. 7,549,779.

(51) **Int. Cl.**
*F21V 21/08*    (2006.01)

(52) **U.S. Cl.** .................... 362/398; 362/249.01; 362/808

(58) **Field of Classification Search** ............. 362/249.01, 362/249.14, 398, 808
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,474,942 A | 7/1949 | Hawkins | |
| 3,038,139 A | 6/1962 | Bonanno | |
| 5,388,802 A | 2/1995 | Dougan | |
| 5,788,362 A * | 8/1998 | Chou ...................... 362/249.01 |
| 5,873,651 A * | 2/1999 | Hofer et al. ................. 362/396 |
| 2006/0138293 A1 | 6/2006 | Raymond | |

* cited by examiner

*Primary Examiner* — John A Ward

(74) *Attorney, Agent, or Firm* — Carstens & Cahoon, LLP; Vincent J. Allen

(57) **ABSTRACT**

The present invention provides a light fixture assembly. In one embodiment, the assembly includes a light bulb socket with an opening at one end for accommodating C7/C9 light bulbs and at least one opening at the second end. The socket includes a conductor that places a light bulb into electrical contact with electrical wires inserted through the side of the socket. The assembly also includes a base attached to the second end of the socket. The base includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor. Retaining clips on the base apply a retaining force against the socket to hold the base in place. A strong magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces.

26 Claims, 3 Drawing Sheets



**U.S. Patent**          Mar. 6, 2012          Sheet 1 of 3          **US 8,128,264 B2**



*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*

**U.S. Patent**          Mar. 6, 2012          Sheet 2 of 3          US 8,128,264 B2



**FIG. 6**



**FIG. 7**



**FIG. 8**

8:22-cv-00314   Doc # 1-2   Filed: 08/31/22   Page 5 of 8 - Page ID # 26

**U.S. Patent**          Mar. 6, 2012          Sheet 3 of 3          US 8,128,264 B2



**FIG. 9A**



**FIG. 9B**

US 8,128,264 B2

1

# MAGNETIC LIGHT FIXTURE

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part patent application of a pending application of U.S. Ser. No. 11/676,146 filed on Feb. 16, 2007, now U.S. Pat. No. 7,549,779 entitled "Magnetic Light Fixture," the technical disclosure of which is hereby incorporated herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates generally to decorative lights. More specifically the invention relates to decorative lights that are mounted to metal surfaces by means of imbedded magnets.

Decorative lights typically do not come provided with means for mounting them to display surfaces such as housing sides or poles. The traditional means of attaching such decorative lights is by stapling them to the sides of houses or trees or wrapping them around poles and trees. However, stapling has several potential drawbacks including damage to the mounting surface (which increases with repeated mounting and dismounting of the lights), potential damage to the electrical cord from the staples, as well as potential injury to the user during the stapling process. Stapling also turns the light mounting process into a two-handed operation, requiring one hand to hold the lights and wires in place and the other to work the stapler. Stapling is also unsatisfactory in cases where houses have metal siding.

In the case of metal poles or similar objects, simply wrapping the light wires may not properly secure them in position and prevent them from falling. In such situations, securing methods such as tape might not provide sufficient long term adherence, especially outdoors, and might be visually unappealing.

Several methods have been proposed in the prior art for overcoming the above disadvantages. One solution is provided by Dougan et al. (U.S. Pat. No. 5,388,802). This approach provides a clip that is secured to the electric cord that connects a string of lights. The main body of the clip is a flexible, V-shaped member which is compressed and wedged between the fascia and soffit of a house. When installed, the lights protrude perpendicularly below the fascia and are clearly visible, while the wedge shaped members are substantially hidden from view by the fascia. While the Dougan invention offers substantial improvements over simply stapling the lights in place, it is limited to mounting lights on the eaves on a house. Furthermore, Dougan requires a separate set of clips/wedges to be purchased and then added to the string of lights before mounting them. While the insertion and removal of the wedges from the fascia and soffit may seem simple in theory, it is likely the user will encounter some difficulties in this operation.

Another proposed solution to mounting decorative lights is that of Clement (U.S. Patent Application No. 2006/0138293). Similar to Dougan, Clement provides a member that is clipped to the electrical cord of a string of decorative lights. Unlike Dougan, the member taught in Clement uses a magnet to secure it to metal surfaces. This approach provides more flexibility in mounting options as well as greater ease of mounting than the Dougan invention. However, Clement still requires the user to purchase a separate set of members and then clip them onto the electrical cord of the light sting before mounting the lights, requiring additional time and effort.

2

Therefore, it would be desirable to have a method for temporarily mounting a string of decorative lights to a metal surface without the need for damaging the surface and without the need to install additional items to the light string.

## SUMMARY OF THE INVENTION

The present invention provides a light fixture assembly. In one embodiment of the invention, the assembly includes a light bulb socket with an opening at one end for accommodating C7/C9 light bulbs and at least one opening at the second end. The socket includes a conductor that places a light bulb into electrical contact with electrical wires inserted through the side of the socket. The assembly also includes a base attached to the second end of the socket. The base includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor. Retaining clips on the base apply a retaining force against the socket to hold the base in place. The retaining clips may be molded from the sides of the wire clamp or independent from the clamp and inserted through separate holes in the end of the socket. In one embodiment, an N40 neodymium disc magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces. Although neodymium magnets have been selected as the best choice for this invention given the cost, weight, and strength of such magnets, other types of magnets such as samarium cobalt and alnico may be used without departing from the scope and spirit of the invention. In an embodiment, the neodymium magnet is ½ inch diameter and ⅛ inch thick and mounted flush with the surface of the base, with a pull strength of approximately 16 pounds. In an alternate embodiment, the light assembly may also include an external clip on the side of either the base or the socket. In an alternative embodiment, the magnet may be embedded into a separate component to allow for removable attachment to the base of the light fixture assembly such that damaged or lost magnets can be easily replaced without replacing the entire light fixture assembly.

## BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as a preferred mode of use, further objects and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a cross section view of a light assembly in accordance with an embodiment of the present invention;

FIG. 2 is a detailed cross section view of the assembly base containing a magnet in accordance with an embodiment of the present invention;

FIG. 3 is a plan view of the assembly base in accordance with an embodiment of the present invention;

FIG. 4 is a bottom plan view of the assembly base showing the ends of retaining clip in accordance with an embodiment of the present invention;

FIG. 5 is a detailed cross section view of the light socket in accordance with an embodiment of the present invention;

FIG. 6 is a detailed cross section view of the assembly base containing the magnet in accordance with an alternate embodiment of the present invention;

FIG. 7 is a bottom plan view of the alternate assembly base showing the bottom end of the wire clamp and side retaining clips in accordance with the alternate embodiment of the present invention.

US 8,128,264 B2

3

FIG. **8** is a detailed cross section view of the light socket in accordance with the alternate embodiment of the present invention;

FIG. **9**A is an exploded perspective view of the light assembly in accordance with an embodiment of the present invention; and

FIG. **9**B is an exploded perspective view of the light assembly in accordance with an alternate embodiment of the present invention.

DETAILED DESCRIPTION

The present invention provides a magnetic base for decorative lights that are strung together by an electrical cord. The invention works with standard C7/C9 light bulbs and other light bulbs known in the art.

FIG. **1** is a cross section view of a light assembly in accordance with an embodiment of the present invention. The light assembly is comprised of three major components. The first is the light bulb **7**, which is depicted in dashed outline. The second major component is the light bulb socket **8**. The third component is the assembly base **3**.

FIG. **2** is a detailed cross section view of the assembly base containing a magnet in accordance with an embodiment of the invention. The assembly base **3** is constructed of plastic or similar material and has an embedded neodymium magnet **1**. In an embodiment, the magnet **1** is a disc ½ inch diameter×⅛ inch thick. Other shapes, sizes and thicknesses can be used, but the dimensions of the disc magnet disclosed may be used with a C7/C9 light socket.

A neodymium magnet can be made from a combination of neodymium, iron, and boron ($Nd_2Fe_{14}B$). Neodymium magnets have replaced the marginally weaker samarium-cobalt magnets in most applications, due mainly to lower cost. These magnets are very strong in comparison to their mass and are graded in strength from N24 to the strongest N54. The number after the N represents the magnetic energy product, in megagauss-oersteds (MGOe). In an embodiment, the neodymium magnet is an N40 type with a pull force of 16 pounds. Other types of magnets such as samarium-cobalt and alnico with various strengths and dimensions may be used, but ideally, the magnet pull force should be sufficient to hold the light assembly in place in normal outdoor conditions including wind. A pull force of 5 pounds for a typical C7/C9 assembly may be sufficient in most cases, but a higher pull force as is provided with the neodymium magnet is preferred to provide sufficient margin to avoid detachment by wind forces. For lighter assemblies, less force is required to prevent detachment. As mentioned, however, other magnets of sufficient strength can be used without departing from the scope and spirit of the invention.

As shown, the magnet **1** is embedded flush with the surface of the assembly base **3**, allowing only the face of the magnet to be exposed. The exposed face of the magnet **1** is illustrated in the plan view of the base in FIG. **3**. A plastic protection coating **2** is placed over the face of the magnet **3**.

The base **3** also includes two retaining clips **5** for engaging the light socket **8** and holding the base in place. A molded wire clamp **4** in the base helps to hold the electrical wires **9** in contact with a copper conductor **10** in the socket **8** when the base **3** and socket **8** are assembled, as shown in FIG. **1**.

FIG. **4** is a bottom plan view of the assembly base showing the ends of retaining clips **5** in accordance with an embodiment of the present invention.

4

The assembly base **3** may optionally include a side clip **6** which may be used to mount the light on a nonmetallic structure or may be used to mount additional decorations to the light.

FIG. **5** is a detailed cross section view of the light socket in accordance with an embodiment of the present invention. Like the base **3**, the socket **8** can be made from plastic or similar material. On the inside of the socket are two copper conductors **10** (only one which is illustrated in FIG. **5**). The conductors **10** provide electrical connection between the wires **9** and the base of the light bulb (not pictured).

The socket **8** includes two slots **11**, which accommodate the retaining clips **5** on the base **3**. Inside the socket **8** is a retaining tab **12**. The retaining tab **12** applies a retaining force against the ends of the retaining clips **5** when the assembly base **3** is mounted to the bottom of the socket **8**. The retaining tab **12** also helps hold the electric wires **9** in place by acting as the opposing surface to the wire clamp **4** when the base and socket are assembled, as illustrated in FIG. **1**. In an embodiment, the base **3** and socket **8** are both ¾ inch diameter (see FIG. **3**).

FIG. **6** is a detailed cross section view of the assembly base containing the magnet in accordance with the alternate embodiment. The alternate embodiment of the assembly base **23** is very similar the assembly base **3** depicted in FIG. **2**, the primary difference being the shape of the retaining clips **25** and the wire clamp **24**. In this embodiment, the retaining clips **25** are molded from the sides of the wire clamp **24**, as shown.

Unlike the assembly base **3** depicted in FIG. **2**, the example depicted in FIG. **6** does not include a side clip **6**. However, it should be noted that a side clip can be added to either version of the assembly base or alternatively to the side of the light bulb socket, as shown in FIG. **9**B.

FIG. **7** is a bottom plan view of the alternate assembly base showing the bottom end of the wire clamp **24** and side retaining clips **25** in accordance with the alternate embodiment of the present invention.

FIG. **8** is a detailed cross section view of the light socket in accordance with the alternate embodiment of the present invention. In this embodiment, the socket **28** has a single, central slot **27** to accommodate the wire clamp **24**. The retaining clips **25** engage the inside surface of the socket **29** when inserted through the slot **27**.

FIG. **9**A is an exploded perspective view of the light assembly in accordance with a preferred embodiment of the present invention. This example comprises the component embodiments depicted in FIGS. **2**-**5**.

FIG. **9**B is an exploded perspective view of the light assembly in accordance with an alternate embodiment of the present invention. This example comprises the component embodiments depicted in FIGS. **6**-**8**. As mentioned above, FIG. **9**B also shows an embodiment in which an optional side clip **26** is added to the socket **28** instead of the assembly base **23**.

In an alternative embodiment not shown in the drawings, the base of the light assembly can be separated into two components such that the magnet can be replaced without replacing the entire light assembly. A separate end piece for the base contains a magnet embedded as described above in reference to other embodiments. One end of the separate end can be removably joined to the main base of the light assembly. The manner of joining can be by threading the main base and the separate end piece to allow the end piece with magnet embedded to be screwed into the main base of the light assembly. Other means of attachment such as a quick disconnect type snap may be employed without departing from the scope and spirit of the invention. Should the magnet fail, or

US 8,128,264 B2

5

should it become dislodged from the separate end piece, the separate end piece can be removed and replaced with a new one.

The description of the present invention has been presented for purposes of illustration and description, and is not intended to be exhaustive or limited to the invention in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art. The embodiment was chosen and described in order to best explain the principles of the invention, the practical application, and to enable others of ordinary skill in the art to understand the invention for various embodiments with various modifications as are suited to the particular use contemplated. It will be understood by one of ordinary skill in the art that numerous variations will be possible to the disclosed embodiments without going outside the scope of the invention as disclosed in the claims.

I claim:

1. A light fixture assembly, comprising:
a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places a light bulb inserted into the first end in electrical contact with said electrical wires;
a base integrally attached to the second end of the light bulb socket; and
a magnet embedded in the base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.

2. The light fixture assembly of claim 1, wherein said base comprises a removable end piece within which said magnet is embedded.

3. The light fixture of claim 2, wherein said removable end piece comprises a first end with a threaded portion for mating with a threaded portion of said base for removably attaching said removable end piece to said base.

4. The light fixture of claim 3, wherein said magnet is substantially cylindrical and wherein said magnet is substantially flush with a second end of said removable end piece.

5. The light fixture of claim 4, further comprising a protective cover placed over said magnet.

6. The light fixture assembly of claim 1, wherein said base comprises:
a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors; and
retaining clips that apply a retaining force against the socket to hold the base in place.

7. The light fixture assembly according to claim 6, wherein the retaining clips on the base are molded into the sides of the wire clamp and fit through the same hole in the second end of the socket as the wire clamp.

8. The light fixture assembly according to claim 6, wherein the retaining clips on the base are separate from the wire clamp and fit through separate holes in the second end of the socket.

6

9. The light fixture assembly according to claim 1, wherein the socket accommodates C7 light bulbs.

10. The light fixture assembly according to claim 1, wherein the socket accommodates C9 light bulbs.

11. The light fixture assembly according to claim 1, wherein the magnet is chosen from the following group: neodymium, samarium-cobalt and alnico.

12. The light fixture assembly according to claim 1, wherein the magnet has a pull strength of at least 16 pounds.

13. The light fixture assembly according to claim 1, wherein the magnet is a disc one half inch in diameter and one eighth inch thick.

14. The light fixture assembly according to claim 13, wherein the socket and the base are three quarter inch diameter.

15. The light fixture assembly according to claim 1, further comprising an external clip on the side of the base.

16. The light fixture assembly according to claim 1, further comprising an external clip on the side of the socket.

17. A method for installing a string of light fixture assemblies, said method comprising the steps:
selecting a location containing a ferrous metal surface; and
attaching at least one of said light fixture assemblies to said ferrous metal surface by touching a base of said at least one of said light fixture assemblies to said ferrous metal surface, wherein said base is integrally attached to an end of the light bulb socket and wherein a magnet is embedded in said base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said at least one of said light fixture assemblies to said ferrous metal surface while said at least one of said light fixture assemblies is connected to said string of other light fixture assemblies.

18. The method of claim 17, wherein said magnet is chosen from the following group:
neodymium, samarium-cobalt and alnico.

19. The method of claim 17, wherein said at least one of said light fixture assemblies may be removed by hand from said ferrous metal surface by tugging on said light fixture assembly.

20. The method of claim 17, wherein said at least one of said light fixtures comprises a C9 type bulb.

21. The method of claim 17, wherein said base comprises a removable end piece within which said magnet is embedded.

22. The method of claim 21, wherein said removable end piece comprises a first end with a threaded portion for mating with a threaded portion of said base for removably attaching said removable end piece to said base.

23. The method of claim 22, wherein said magnet is substantially cylindrical and wherein said magnet is substantially flush with a second end of said removable end piece.

24. The method of claim 23, wherein a protective cover is placed over said magnet.

25. The method of claim 17, wherein said magnet has a pull strength of at least 16 pounds.

26. The method of claim 17, wherein said magnet is a disc one half inch in diameter and one eighth inch thick.

* * * * *

# Certificate of Compliance

1.    This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because:

- this document contains 9,395 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

*/s/Vincent J. Allen*
Vincent J. Allen