**Appeal No. 2023-1146**

# In the
# United States Court of Appeals
# for the Federal Circuit

LITE-NETICS, LLC,

*Plaintiff-Appellant,*

v.

NU TSAI CAPITAL LLC, dba Holiday Bright Lights,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Nebraska, No. 8:22-cv-00314-BCB-CRZ.
The Honorable **Brian C. Buescher**, Judge Presiding.

## CORRECTED BRIEF OF DEFENDANT-APPELLEE NU TSAI CAPITAL LLC

ROBERT P. GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

*Counsel for Defendant-Appellee*
*Nu Tsai Capital LLC*

COUNSEL PRESS · (866) 703-9373 PRINTED ON RECYCLED PAPER

**PATENT CLAIMS:**

7549779:

1. A light fixture assembly, comprising:

(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;

(b) a base attached to the second end of the light bulb socket; and

(c) a neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds.

8128264:

1. A light fixture assembly, comprising:

a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places a light bulb inserted into the first end in electrical contact with said electrical wires;

a base integrally attached to the second end of the light bulb socket; and

a magnet embedded in the base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1146

**Short Case Caption** Lite-Netics, LLC v. Nu Tsai Capital LLC

**Filing Party/Entity** Nu Tsai Capital LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/17/2022

Signature: /s/Robert Greenspoon

Name: Robert Greenspoon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Nu Tsai Capital LLC | N/A | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Brian T. McKernan | McGrath North Mullin & Kratz, PC | First National Tower, Suite 3700, Omaha, NE 68102 |
| Luke Holst | McGrath North Mullin & Kratz, PC | First National Tower, Suite 3700, Omaha, NE 68102 |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED CASES ........ x

INTRODUCTORY STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 4

I. OVERVIEW OF THE PATENTS AND HBL'S PRODUCTS ........ 4

II. LITE-NETICS' PRE-SUIT ALLEGATIONS OF INFRINGEMENT ........ 5

III. LITE-NETICS' MARKETPLACE COMMUNICATIONS AND COMPLAINT ........ 7

IV. THE DISTRICT COURT'S ORDERS ........ 8

V. LITE-NETICS' MOTION TO STAY PRELIMINARY INJUNCTION DURING PENDENCY OF APPEAL ........ 10

SUMMARY OF THE ARGUMENT ........ 11

ARGUMENT ........ 13

I. STANDARD OF REVIEW ........ 13

II. LITE-NETICS' BRIEF IS FACIALLY NON-RESPONSIVE TO MOST OF THE GROUNDS UPON WHICH THE DISTRICT COURT BASED ITS DECISION, PERMITTING SUMMARY AFFIRMANCE ........ 14

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE REMAINING LITE-NETICS MARKETPLACE STATEMENTS OF INFRINGEMENT WERE OBJECTIVELY BASELESS ........ 17

1. The District Court Correctly Found That Lite-Netics' Allegations of Infringement Regarding the Magnetic Cord and the '779 Patent are Objectively Baseless ........ 18

a. The claim limitation of "a neodymium magnet . . . wherein said magnet has a pull strength of at least five pounds" does not cover multiple magnets with an aggregated pull strength greater than five pounds, but no single magnet of that strength ........ 18

b. The Magnetic Cord obviously does not infringe the '779 Patent under the Doctrine of Equivalents ........ 34

2. The District Court Correctly Found That Lite-Netics' Allegations of Both Literal and Equivalents Infringement Regarding the Magnetic Clip are Objectively Baseless ........ 39

3. Lite-Netics' Continuously Shifting Arguments Confirm Its Bad Faith ........ 45

IV. THE DISTRICT COURT RECOGNIZED THAT DESIGNING AROUND OLDER PATENTS SUPPORTS INNOVATION, AND DID NOT JUSTIFY LITE-NETICS' RETALIATORY MARKETPLACE FALSEHOODS ........ 49

CONCLUSION ........ 50

## TABLE OF AUTHORITIES

*AbTox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) ....................29, 30, 31, 33

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
567 F.3d 1366 (Fed. Cir. 2009) ....................28, 29

*Augme Techs., Inc. v. Yahoo! Inc.*,
755 F.3d 1326 (Fed. Cir. 2014) ....................34

*Baldwin Graphics Systems v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ....................30

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
423 F.3d 1296 (Fed. Cir. 2005) ....................25, 26, 36

*Brakebill v. Jaeger*,
932 F.3d 671 (8th Cir. 2019) ....................13

*Calle v. INS*,
22 Fed. Appx. 757 (9th Cir. 2001)....................15

*Canon Computer Sys. v. Nu-Kote Int'l¸Inc.*,
134 F.3d 1085 (Fed. Cir. 1998) ....................19, 21, 22

*CCS Fitness, Inc. v. Brunswick Corp*.
288 F.3d 1359 (Fed. Cir. 2002) ....................19, 21

*Chimie v. PPG Indus.*,
402 F.3d 1371 (Fed. Cir. 2005) ....................37

*Comair Rotron, Inc. v. Matsushita Elec. Corp. of Am.*,
No. 93-1410, 1994 U.S. App. LEXIS 18325 (Fed. Cir. July 19, 1994)....................22

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ....................19, 20

*Deere & Co. v. Bush Hog, LLC*,
703 F.3d 1349 (Fed. Cir. 2012) ....................42

*Dellew Corp. v. United States*,
855 F.3d 1375 (Fed. Cir. 2017) ....................30

*Douglas Dynamics, LLC v. Buyers Prods. Co*,
717 F.3d 1336 (Fed. Cir. 2013) ....................42

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....................27, 28

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) ....................45

*Hariri v. Lee*,
656 F.3d 1331 (Fed. Cir. 2011) ....................28

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ....................41, 42

*In re Motupalli*,
791 Fed. Appx. 895 (Fed. Cir. 2019)....................14

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016) ....................27, 28

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
734 F.3d 1352 (Fed. Cir. 2013) ....................37

*Joy Technologies, Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993) ....................13

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ....................31

*LabMD Inc. v. Boback*,
47 F.4th 164 (3d Cir. 2022) ....................15

*London v. Carson Pirie Scott & Co.*,
946 F.2d 1534 (Fed. Cir. 1991) ....................49

*Macom Tech. Sols. Holdings, Inc. v. Infineon Techs.*,
881 F.3d 1323 (Fed. Cir. 2018) ....................13

*North American Vaccine, Inc. v. American Cyanamid Co.*,
7 F.3d 1571 (Fed. Cir. 1993) ....................27, 28

*Ortho Pharmaceutical Corp. v. Smith*,
959 F.2d 936 (Fed. Cir. 1992) ....................13

*Quezada-Duarte v. Holder*,
418 Fed. Appx. 754 (10th Cir. 2011)....................15

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
No. 07-CV-4732 (PJS/LIB), 2011 U.S. Dist. LEXIS 615
(D. Minn. Jan. 4, 2011) ............................................................38, 41

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ............................................................42

*Retractable Techs., Inc. v. Becton*,
653 F.3d 1296 (Fed. Cir. 2011) ............................................................44

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ............................................................13, 14

*Salazar v. AT&T Mobility LLC*,
No. 2:20-cv-00004-JRG, 2020 U.S. Dist. LEXIS 171135 (Sept. 18, 2020) .......23

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014) ............................................................15

*Sleep Number Corp. v. Young*,
33 F.4th 1012 (8th Cir. 2022) ............................................................14

*Southco, Inc. v. Fivetech Technology, Inc.*
611 F. App'x 681 (Fed. Cir. 2015) ............................................................42

*State Indus., Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985) ............................................................50

*Stewart v. IHT Ins. Agency Grp., LLC*,
990 F.3d 455 (6th Cir. 2021) ............................................................1

*Takeda Chem. Indus. v. Mylan Labs.*,
549 F.3d 1381 (Fed. Cir. 2008) ............................................................48

*Textron Innovations Inc. v. Am. Eurocopter Corp.*,
498 F. App'x 23 (Fed. Cir. 2012) ............................................................19, 20

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) ............................................................41

*TiVo, Inc. v. EchoStar Communications Corp.*,
516 F.3d 1290 (Fed. Cir. 2008) ............................................................29

*Turtle Island Foods, SPC v. Thompson*,
992 F.3d 694 (8th Cir. 2021) ............................................................14

*United States v. Wells*,
38 F.4th 1246 (10th Cir. 2022) ........................................................................15

*Utica Enters., Inc. v. Fed. Broach & Mach. Co.*,
109 F. App'x 403 (Fed. Cir. 2004) ..............................................................19, 21

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)..........................................................................................38

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ......................................................................49

**Statutes & Other Authorities:**

35 U.S.C. § 103 ..........................................................................................36

# STATEMENT OF RELATED CASES

There are no related cases.

## INTRODUCTORY STATEMENT

This is an appeal of a preliminary injunction that does not stop a single sale, nor prevent any good faith marketing or sales activities. Instead, it protects the marketplace and fair competition from dishonest and misleading statements. Now before the Court (on expedited briefing) is a challenge to the exercise of that equitable discretion. But this challenge is incomplete, non-responsive and wrong.

The Sixth Circuit aptly summarizes Appellant Lite-Netics, LLC's ("Lite-Netics'") faulty appeal strategy: "It does no good for a track-and-field hurdler to clear just the first hurdle in a race and then sit down on the track." *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) (appeal fails when appellant addresses only one of multiple grounds for appealed judgment). Here, Lite-Netics "sits down on the track" because it does not try to appeal all Nebraska tort grounds for likely defamation and interference with contract, nor all "bad faith" findings that pierce any applicable federal patent privilege.

Lite-Netics made hurtful and false marketplace statements (Appx542-543) that Appellee Nu Tsai Capital LLC d/b/a Holiday Bright Lights ("HBL") "copied" Lite-Netics, and that HBL's customers would be burdened as added defendants in this lawsuit if they keep buying from HBL. These particular statements are not protected by any federal privilege. The injunction preventing such statements must stand because Lite-Netics fails to address them in this appeal.

Likewise, concerning marketplace "infringement" allegations (arguably protected by the federal patent privilege), Lite-Netics waived any appeal that one of its two marketplace patent assertions against the Magnetic Cord was in "bad faith" (*i.e.*, under U.S. Patent No. 8,128,264, which requires non-protrusion of magnets). The finding that '264 Patent infringement assertions against the Magnetic Cord were in "bad faith" must stand because Lite-Netics lodges no appeal against it. The district court found that this '264 Patent assertion was objectively unreasonable and subjectively motivated by desire to do competitive harm. (Appx21, Appx50, Appx53, Appx81-84). Lite-Netics does not appeal these findings, either.

Thus, Lite-Netics pins all its hopes on just two myopic and incomplete arguments. For this appeal, it argues that its marketplace statements had some supposed merit when naming a different patent (U.S. Patent No. 7,549,779, asserted against the Magnetic Cord), and an accessory product (the Magnetic Clip, alleged to infringe both patents). Lite-Netics seeks to challenge the "bad faith" findings as to those. But that is not enough. A defamatory email or letter containing falsehoods does not escape liability when sprinkled with a few truths, nor does interference with business relations become justified when additional non-tortious actions might accompany the tortious ones.

Nor can Lite-Netics' appeal of equitable relief make any headway anyway, insofar as it also ignores key parts of the standards governing emergency equitable

relief. Lite-Netics makes no argument against conclusions on irreparable harm, balance of the harms, or the public interest. Based on omissions and half-measures, this appeal is ripe for summary affirmance.

Even within its myopic and incomplete scope, this appeal fails. The ’779 Patent infringement assertions against the Magnetic Cord were in bad faith because it was always undisputed that no single HBL magnet has a pull strength of greater than five pounds—a requirement of that patent, notwithstanding breathy efforts to manufacture a claim construction dispute. And all assertions against the Magnetic Clip fail because that part has each of the characteristics that Lite-Netics’ patent specifications identified as distinguishing when disclaiming prior art, foreclosing such clips from having a claimed “base” that is “attached” to a light socket. Nothing Lite-Netics argues undermines the district court’s “bad faith” findings on these issues—the only ones placed before this Court.

In a 71-page preliminary injunction opinion, bolstered by an 18-page denial of a motion to stay pending appeal, the district court applied Nebraska common law through the lens of Eighth Circuit preliminary injunction standards to stop unfair competition before it could do even more harm to HBL. That decision was correct, and effectively unchallenged in this proceeding. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether Lite-Netics' opening brief is facially non-responsive to the multiple independent grounds upon which the district court issued the Preliminary Injunction, thus permitting summary affirmance.
2. Whether Lite-Netics showed an abuse of discretion by the district court issuing the Preliminary Injunction, in light of this appeal's limited and weak challenge to some underlying findings.

## STATEMENT OF THE CASE

### I. OVERVIEW OF THE PATENTS AND HBL'S PRODUCTS

On August 31, 2022, Lite-Netics sued HBL, asserting infringement of the '779 Patent and the '264 Patent (collectively, the "Asserted Patents"). These cover magnetic light strings used to illuminate homes and businesses during the holidays. (Appx103; Appx111; Appx118). Lite-Netics was displeased that HBL had begun selling improved light strings that designed around these Asserted Patents.

HBL had learned of complaints in the marketplace about Lite-Netics' light fixtures tending to fail in use because of moisture build-up when the lights were used outdoors as intended. (Appx510; Appx562-563). Accordingly, HBL set out to improve on that design, using two weaker magnets (not one), protruding them outside the base to leave room for moisture flow, and separating them to permit a channel that includes weep holes. The USPTO awarded HBL its own patent, U.S.

Patent No. 11,333,309 (the '309 Patent) for its improved Magnetic Cord design. (Appx170-176). The '309 Patent identified the '779 Patent as prior art, and discussed the '779 Patent in the patent specification.

A second HBL product is relevant, but it is not a cord. It is an accessory clip. HBL has also been marketing and selling its Magnetic Clip product since before 2017. (Appx510; Appx563). This product is not a light string, but has arms that "hug" the electric cord while pocketing a conventional light socket. (Appx510, Appx150-151). Lite-Netics' inventor confirmed the Magnetic Clip "is pressed against" a light socket's base (*i.e.*, does not attach to the socket's end, but merely touches the preexisting base that is already attached to the socket's end). (Appx771). Each Magnetic Clip includes one magnet, to add magnetic capability to an otherwise conventional light string when used multiple times within a string, one on each light socket.

## II. LITE-NETICS' PRE-SUIT ALLEGATIONS OF INFRINGEMENT

In 2017, HBL received a cease-and-desist letter from Lite-Netics, which alleged that its Magnetic Clip product infringed upon the Asserted Patents and demanded that HBL stop selling them. (Appx510; Appx525-526). This communication was facially incorrect since clips like the Magnetic Clip were expressly disclaimed by the inventor as inferior prior art in columns 1 and 2 of the Asserted Patents. (Appx107, at 1:34 to 2:2; Appx116, at 1:39 to 2:4; Appx563). HBL

did not respond (it did not need to), and Lite-Netics "went away." (Appx563). HBL did not receive any further communications about its Magnetic Clip from Lite-Netics for five years, until 2022 with the filing of the Complaint. (Appx510; Appx563). HBL relied on that silence and continued to sell its Magnetic Clip. (Appx510; Appx563).

On April 12, 2022, Lite-Netics sent another cease-and-desist letter, through counsel, this time accusing HBL's Magnetic Cord product of infringing the Asserted Patents (but making no mention of the Magnetic Clip). (Appx511; Appx528-529). HBL's counsel subsequently responded on April 19, 2022, pointing out several reasons why the Magnetic Cord did not infringe the Asserted Patents and questioning whether the claims of the '779 Patent were invalid as indefinite. (Appx512; Appx531).

On May 27, 2022, Lite-Netics responded and repeated accusations that HBL's Magnetic Cord infringes the Asserted Patents. (Appx512; Appx533-534). HBL responded to this communication by email on June 21, 2022, reaffirming its position that the Magnetic Cord did not infringe the Asserted Patents, and its position on '779 Patent indefiniteness (stating specific reasons for each point). (Appx539). Significantly, HBL's June 21, 2022 reasons were exactly the reasons later invoked by the district court.

## III. LITE-NETICS' MARKETPLACE COMMUNICATIONS AND COMPLAINT

In May 2022, Lite-Netics' counsel sent over 30 letters to industry participants, including HBL's customers, "alerting" them of activities allegedly infringing the Asserted Patents. (Appx123 ¶ 20; Appx512). Among these customers were Decorator's Warehouse, Novelty Lights, and Jabo's Ace Hardware. (Appx563). Those communications did not name HBL. A few months later, on August 31, 2022, Lite-Netics filed the underlying suit, accusing HBL of infringing "one or more" claims of the Asserted Patents through HBL's marketing and sale of the Magnetic Cord and Magnetic Clip. (Appx118-130).

It should go without saying that companies should not litigate their disputes in the marketplace, but in the courts. And companies should not use the federal courts to drive sales to themselves, as if the courts were their own sales and marketing arm. Lite-Netics did not follow these principles. In the days after filing this lawsuit, Lite-Netics sent additional letters or emails (including to HBL's clients and customers) accusing HBL by name of infringing the Asserted Patents, attaching the first page of the Complaint. (Appx542-543). These September 2022 communications accused HBL of "copying" Lite-Netics, and threatened to add any purchasers of HBL's products as new defendants to the suit. (Appx542-543). By the time of these communications, Lite-Netics was aware (through the June 21, 2022

email, Appx539) that HBL's Magnetic Cord was separately patentable, and was aware of the clear and undisputable factual bases for noninfringement and invalidity.

## IV. THE DISTRICT COURT'S ORDERS

Lite-Netics broadcast these inflammatory and defaming communications at the most sensitive sales time of the year in this industry. HBL responded promptly and defensively. Without seeking any extensions of time, HBL filed a motion for a temporary restraining order and preliminary injunction on September 30, 2022, in order to preserve the status quo, simultaneously with a Rule 12 motion to dismiss. (Appx544; Appx139-141). After providing a five-day period until October 5 for Lite-Netics to respond, the district court granted HBL's TRO motion on October 7, 2022. (Appx566-567; Appx636). In its 37-page order, the district court explained how HBL had successfully established its likelihood of success on tortious interference and defamation, that the threat of irreparable injury to HBL's reputation and goodwill was sufficient (and that HBL had acted promptly), and that the balance of equities and public interest favored the granting of the TRO. (Appx636–672).

On October 24, 2022, the district court held an evidentiary hearing on the preliminary injunction motion. The district court again gave the opportunity to both sides to present live testimony at the hearing. (Appx679-680). Despite the invitation, neither party presented live testimony (using written evidence instead). Following the evidentiary hearing (Appx911-962, Transcript), on October 27, 2022, the district

court issued its Preliminary Injunction order. (Appx1-71). The district court's 71-page Preliminary Injunction order found preliminarily that:

(1) HBL had a "fair chance of prevailing" on its claim that Lite-Netics had engaged in tortious interference with business relations and prospective business relations, and had engaged in defamation, when it sent false, baseless, and defamatory communications to businesses that Lite-Netics knew had business relationships with HBL, falsely accusing HBL of patent infringement and "copying" of Lite-Netics's products; and threatening to burden any known company using or reselling the HBL products as co-defendants in this lawsuit contrary to applicable law;

(2) HBL had shown a threat of irreparable harm to its reputation and goodwill caused by Lite-Netics' conduct that was not merely speculative;

(3) The balance of harms favored issuance of a preliminary injunction, because Lite-Netics would be free to pursue the marketing of its products by any other means, just not by such deceptive means, while HBL had established that it will suffer irreparable harm in the absence of a preliminary injunction; and

(4) The public interest favored enjoining false statements to customers and not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace.

(Appx69-70). As already mentioned, the present appeal does not challenge the irreparable harm or public interest findings.

The Preliminary Injunction included a threefold prohibition. Specifically, it enjoined Lite-Netics from making statements (1) suggesting "copying" by HBL, (2) suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, and (3) suggesting that HBL is a patent infringer. (Appx70). In issuing the Preliminary Injunction, the district court confirmed that Nebraska state common law likely protected HBL from such smears and threats, and under Eighth Circuit standards, preliminary injunctive relief was needed. Those standards required HBL only to show a "fair chance of prevailing" in support of the "likelihood of success" prong. (Appx19).

This appeal followed.

## V. LITE-NETICS' MOTION TO STAY PRELIMINARY INJUNCTION DURING PENDENCY OF APPEAL

On October 31, 2022, Lite-Netics timely filed its notice of appeal to this Court. (Appx845). After losing a similar motion in the district court (Appx74), Lite-Netics filed its FRAP 8 emergency motion to stay or dissolve the Preliminary Injunction in this Court on November 14, 2022. HBL responded to the stay motion on November 21, 2022, pointing out the numerous deficiencies in Lite-Netics' motion. HBL's response highlighted that Lite-Netics' stay motion had effectively addressed only

one sixth (1/6) of the district court's Preliminary Injunction. Thus, Lite-Netics' motion was facially non-responsive.

On November 30, 2022, this Court issued its order denying Lite-Netics' stay motion, without prejudice to the merits panel addressing the issues on appeal in the first instance.

## SUMMARY OF THE ARGUMENT

In granting the Preliminary Injunction, the district court properly took into consideration the four factors in determining whether HBL was entitled to relief: (1) likelihood of success on the merits; (2) the threat of irreparable harm to the movant that the injunction could avoid; (3) the balance between this harm and the injury that granting the injunction will inflict on the nonmovant; and (4) the public interest. In considering these factors, the district court conducted a thorough and complete analysis of the evidence in view of controlling law, resulting in a 71-page Preliminary Injunction order.

For the two issues that Lite-Netics bothers to address, the district court did not abuse its discretion, make any clear errors of fact, or make any legal errors when finding that Lite-Netics' marketplace statements to HBL customer were objectively baseless, and improperly motivated. Lite-Netics fails to conjure a legitimate claim construction dispute that a magnet having at least five pounds of pull strength can read on two magnets, each needing to have their pull strength aggregated to reach

that level. Nor can it escape the consequences of its own specification disclaimer of clips like the Magnetic Clip.

Lite-Netics only presents arguments related to the Magnetic Cord's alleged infringement under the '779 Patent and the Magnetic Clip's alleged indirect infringement under both Asserted Patents. Lite-Netics' brief does not include any argument regarding the district court's finding that the allegations of infringement by the Magnetic Cord under the '264 Patent were objectively baseless and improperly motivated. Nor did it try to attack district court findings that "copying" and "customers will be sued" statements were false and/or misleading. This appeal is therefore non-responsive for failing to address all grounds, and subject to summary affirmance.

Lastly, the district court did not err in its analysis of good faith when assessing Lite-Netics' improper and misleading marketplace statements to HBL customers. Lite-Netics sidesteps that the district court's Preliminary Injunction order is directed toward Lite-Netics' improper and misleading marketplace statements, and not its bringing of suit as such. In assessing Lite-Netics' bad faith, the district court properly considered the entire record of improper motive, and made no factual or legal error when doing so. Accordingly, the district court correctly concluded that a preliminary injunction was needed to prevent irreparable harm to HBL's reputation and

goodwill, and protect fair competition in the marketplace. This Court should therefore affirm.

## ARGUMENT

### I. STANDARD OF REVIEW

Both parties agree that this Court reviews a district court's grant or denial of a preliminary injunction using the law of the regional circuit. *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs.*, 881 F.3d 1323, 1328 (Fed. Cir. 2018). Lite-Netics conveniently omits, however, that the Eighth Circuit reviews a district court's decision granting a preliminary injunction for abuse of discretion, with factual findings examined for clear error and legal conclusions considered *de novo*. *Brakebill v. Jaeger*, 932 F.3d 671, 676 (8th Cir. 2019); *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019). Appellate courts give broad discretion to district courts to determine whether the facts of a case warrant the grant of an injunction and to determine the scope of the injunction. *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 945 (Fed. Cir. 1992). Accordingly, a district court's decision granting a preliminary injunction will be overturned on appeal ***only*** upon a showing that the court abused its discretion. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993). The term "abuse of discretion" appears nowhere in Lite-Netics' brief, despite these well-established standards of review.

In the Eighth Circuit, the factors that determine whether the movant is entitled to a preliminary injunction are: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "[N]o single factor is dispositive," and "the district court must balance all factors to determine whether the injunction should issue." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). With respect to probability of success, the movant must show only a "fair chance" of success on the merits, in cases like this one unrelated to a challenge to the constitutionality of a statute. *Rodgers*, 942 F.3d at 455.

## II. LITE-NETICS' BRIEF IS FACIALLY NON-RESPONSIVE TO MOST OF THE GROUNDS UPON WHICH THE DISTRICT COURT BASED ITS DECISION, PERMITTING SUMMARY AFFIRMANCE

Lite-Netics fails to address many of the independent grounds upon which the district court based its decision, which is fatal to its appeal and enables this Court to summarily affirm. Every federal appeals court to have addressed the issue (including this one) will affirm the district court's decision if it is based on multiple grounds, but the appellant's brief does not challenge all of them. *In re Motupalli*, 791 Fed. Appx. 895, 898 (Fed. Cir. 2019) (affirming the PTAB's decision to affirm the examiner's rejections after waived arguments that omitted challenge to all grounds

of rejection); *LabMD Inc. v. Boback*, 47 F.4th 164, 191 (3d Cir. 2022) (affirming the lower court's decision after appellant failed to challenge the lower court's separate independent reasons for dismissal, noting that "the failure to challenge an independent basis for a district court's decision is fatal to an appeal."); *United States v. Wells*, 38 F.4th 1246, 1262 (10th Cir. 2022) ("appellant must challenge each ground or risk waiver of the issue"); *Stewart*, 990 F.3d at 457 (affirming the district court's judgment because appellant raised only one argument while noting that it "needed to win two arguments for [the court] to reverse the district court's decision."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect. . . . [Otherwise,] he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed."); *Quezada-Duarte v. Holder*, 418 Fed. Appx. 754, 757 (10th Cir. 2011) (affirming district court's decision, stating that the Court will "affirm a decision of a lower tribunal if the party seeking reversal does not challenge each independent ground relied on by that tribunal in reaching its decision."); *Calle v. INS*, 22 Fed. Appx. 757, 757–758 (9th Cir. 2001) (summarily affirming the lower tribunal's decision after appellant failed to address an independent ground for denying the motion to reopen, thereby waiving argument on that ground.)

The district court outlined, in exhaustive detail within its 71-page decision, why the interests of justice necessitated a preliminary injunction in the underlying action. This included thorough discussion why Lite-Netics' assertion of the '264 Patent against the Magnetic Cord in marketplace statements was in bad faith—objectively baseless and motivated by intent to injure HBL. (Appx20-21; Appx52-54). After all, a protruding magnet obviously can never read on a patent claim requiring a non-protruding magnet. (Appx37; Appx656). The district court also included findings that the marketplace statements about "copying" and that HBL customers would be burdened by this litigation were false and/or misleading. (Appx23, Appx30, Appx36, Appx39, Appx45, Appx52, Appx54, Appx69). Lite-Netics' brief does not even contain a whisper on these subjects. In this appeal, there is therefore no dispute that Lite-Netics' marketplace infringement assertions were in bad faith, and needed to be stopped. Nor is there any dispute that marketplace-broadcasts about copying and customer-suit threats were false and/or misleading. This Court should easily affirm, notwithstanding the issues Lite-Netics attempts to raise.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE REMAINING LITE-NETICS MARKETPLACE STATEMENTS OF INFRINGEMENT WERE OBJECTIVELY BASELESS

Where Lite-Netics spends its appellate effort, that effort fails. Lite-Netics only presents arguments related to the Magnetic Cord's alleged infringement of the '779 Patent and the Magnetic Clip's alleged indirect infringement of both Asserted Patents.[1] As demonstrated below, Lite-Netics' limited arguments are unpersuasive and fail to show the district court abused its discretion in granting the Preliminary Injunction.

Not to belabor the point, but this Court need not reach the following rebuttal. As mentioned, Lite-Netics' non-responsive appellate strategy should lead to affirmance, whether or not its Blue Brief raises any meritorious issue. HBL nonetheless demonstrates in the rest of this Red Brief that Lite-Netics' piecemeal arguments are all wrong, or at minimum do not call into question the district court's exercise of discretion.

[1] Because Lite-Netics fails to raise arguments regarding the Magnetic Cord and the '264 Patent, HBL's Red Brief focuses on the '779 Patent. HBL reiterates its position, as accepted by the district court's Preliminary Injunction order, that the Magnetic Cord does not infringe the '264 Patent for including two "protruding" magnets while the claim limitations of the '264 Patent, as correctly understood by the district court, require a "non-protruding" magnet that does not stick out in any direction, either radially or vertically from the base. Lite-Netics concedes these points by its silence.

### 1. The District Court Correctly Found That Lite-Netics' Allegations of Infringement Regarding the Magnetic Cord and the '779 Patent are Objectively Baseless

a. The claim limitation of "a neodymium magnet . . . wherein said magnet has a pull strength of at least five pounds" does not cover multiple magnets with an aggregated pull strength greater than five pounds, but no single magnet of that strength

A structure where no single magnet has a pull strength of greater than five pounds cannot infringe the '779 Patent, and obviously so. The district court got that right. Lite-Netics tries to bend reality to argue otherwise.

First, Lite-Netics advocates for multi-piece items mapping onto single-piece patent claim limitations, and if that does not work, alternatively seeks to pluralize the indefinite article "a." (Blue Br. 19-30). Then, it argues that measured characteristics of such covered-plural-items must be "aggregated" when analyzing infringement. (Blue Br. 30-32). It needs both parts of its argument to succeed, to rewrite patent claims it drafted, and to foreclose this Court from reading and applying the claim language as written. As written, it is plainly obvious that "a" magnet (the singular) in a light socket must have a pull strength of greater than five pounds for infringement to be possible.

If Lite-Netics' claim construction advocacy sounds uncomfortable, stretched and implausible, that is because it is.

To begin, in an argument not presented in its opposition to the Preliminary Injunction at the district court, nor in its emergency stay motion before this Court,

Lite-Netics now points to this Court's "unitary structure" case law. It argues that "a neodymium magnet" as claimed can be one-piece or multi-piece under that case law. (Blue Br. 20, citing *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 F. App'x 23, 30 (Fed. Cir. 2012); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309 (Fed. Cir. 2005); *CCS Fitness, Inc. v. Brunswick Corp*. 288 F.3d 1359, 1367 (Fed. Cir. 2002); *Utica Enters., Inc. v. Fed. Broach & Mach. Co.*, 109 F. App'x 403, 407–408 (Fed. Cir. 2004); *Canon Computer Sys. v. Nu-Kote Int'l¸Inc.*, 134 F.3d 1085, 1090 (Fed. Cir. 1998)).

Lite-Netics presents a classic "red herring," albeit one that is both late and waived. This argument is misdirected, and obviously so. Neither HBL nor the district court ever suggested that any patent claim limitations must be constructed in one piece. Lite-Netics would argue that, under its cited cases, two fully functioning parts, separated in space so that they do not touch each other in any way, wholly integral in and of themselves, are one structure. That does not fly. Each of Lite-Netics' cases merely stands for the uncontroversial idea that a single composite structure may be made of multiple touching parts—a principle inapplicable here, since HBL's magnets are admittedly separated in space and are therefore not part of one structure.

In *Textron*, a helicopter landing gear assembly required a claimed "strap" in a certain location. This Court did not hesitate to find that three subparts assembled together (depicted in orange in the Court's decision) constituted such a "strap" with

its final configuration. *Textron*, 498 Fed. App'x at 25, 30. These were a "rubber gasket" that by itself did not meet the lateral movement-prevention requirement in the claims, and two "stop pieces" that were assembled to touch the "side ridges" of the rubber gasket on either side to prevent such movement. Nowhere does *Textron* suggest that two non-touching structures, separated in space and complete in and of themselves, can read on one structural claim limitation recited in the singular.

*Cross Medical Products* is even worse for Lite-Netics. There, this Court divided questions of claim construction and claim application. On claim construction, this Court held that an "anchor seat" for a spinal correction rod might hypothetically be made of multiple parts, in satisfaction of a limitation that a rod must "bear against" the channel of the anchor seat in a certain way. *Cross Med. Prods.*, 424 F.3d at 1309. Fatal for Lite-Netics, however, the Court's actual application of this claim construction supports HBL. The accused structure happened to use a "crown member" that the patentee alleged was part of a multi-piece anchor seat. This Court confirmed that, if a jury determined that the "crown member" was "separate from the channel in the anchor seat" because it spent some time "free floating," there would be no infringement. *Id.* at 1318-19 (finding genuine issue of fact, namely whether "the rod bears against the channel" in a structure interposing such a "crown member"). Whereas a fact question emerged in *Cross Medical Products* on whether a "separation" existed to foreclose two pieces being

considered one structure, here no fact question is possible. By Lite-Netics' own admission, the two HBL magnets are clearly separated in space. (Blue Br. 20).

The final three citations also do not aid Lite-Netics. In *CCS Fitness*, this Court merely applied the plain meaning of "member" derived from dictionary definitions to conclude that it might include a multi-piece structure. 288 F.3d at 1368-69 ("reciprocating member"). Nothing in *CCS Fitness* suggests that separate pieces that do not touch in any way can be one structure. In *Utica Enterprises*, this Court held that a claimed "tool holder" did not need to be machined from a single piece of metal. 109 F. App'x at 407–408. *Utica Enterprises* likewise does not speak to the question of whether two parts clearly separated in space can be considered a single "structure," as Lite-Netics argues.

And finally, Lite-Netics cannot get any aid from *Canon Computer*. There, a printer cartridge had a claimed "first chamber" defined by its walls and a partition, which functioned to hold ink. A "second chamber" communicated with the ink chamber and held a sponge-like material. 134 F.3d at 1086. To avoid a "likelihood of infringement" finding to support a preliminary injunction, Nu-Kote argued that its "first chamber" did not meet the structural limitations of the claim because it had a "stiffening rib or a partition" that created additional divisions within the chamber. This Court held that the "first chamber" may be subdivided, because adding a "piece of plastic" was an "additional component" that did "not prevent the cartridge from

falling within the scope of the claim." *Id.* at 1090. *Canon* explicitly stands for the proposition that addition of structures to an already-infringing structure does not negate infringement, *id.*, a principle not relevant to the present case.

Lite-Netics additionally relies on this Court's nonprecedential decision in *Comair Rotron, Inc. v. Matsushita Elec. Corp. of Am.*, No. 93-1410, 1994 U.S. App. LEXIS 18325 (Fed. Cir. July 19, 1994). This case, however, supports HBL. On the facts, the accused magnet in that case was formed of two construction pieces "affixed ***together*** in the rotor cup and ***then*** magnetized . . . ." *Id.* at *12 (emphasis added). The final part came into existence as a magnet at a time after it had already been formed as something "integral" and a "single piece." Easily, such a final constructed magnet was a single magnet. By contrast, HBL's two magnets are self-evidently never affixed together. Lite-Netics admits that they are separated by a plastic divider. (Blue Br. 20). *Comair* does nothing to rebut that the present patent assertion was objectively unreasonable, thus in bad faith. Certainly, the district court acted within its discretion on a preliminary injunction record to make that finding.

In sum, Lite-Netics has offered no credible arguments showing why the Court should consider the two separate magnets in HBL's Magnetic Cord as one structure.

Similarly, Lite-Netics' invocation of this Court's indefinite article pluralizing case law also fails. In its brief, Lite-Netics once again attempts to broaden "said magnet having a pull force of greater than five pounds" in the '779 Patent to

encompass multiple magnets, none of which have that characteristic, but all of which are used in the aggregate to achieve it. (Blue Br. 26-32). Contrary to Lite-Netics' assertions, the handful of this Court's holdings that broaden the claim term "a" or "an" beyond its normal singular meaning do not apply.

In situations where a patent claim defines the object-noun of the indefinite article "a" to have a particular specified quantitative measurable feature, no case has ever held that "a" means "one or more" such that the measurement can be aggregated among plural members of the set to read on that claim.[2] *See Salazar v. AT&T Mobility LLC*, No. 2:20-cv-00004-JRG, 2020 U.S. Dist. LEXIS 171135, *52-53 (Sept. 18, 2020) (explaining Federal Circuit law: "Thus, while a claim element introduced by an indefinite article and further defined by claim-recited characteristics may not be limited to one instance of that element, the way in which the characteristics are recited may dictate that at least one instance of the element must have all the claim-recited characteristics.").

---

[2] The present situation should not be confused with how the word "comprising" (or similar) signifies an open-ended claim. Lite-Netics' position raises the question of how the object-noun of the indefinite article is construed. HBL agrees that once that noun and its limiting features are construed, an open-ended claim may read on structures with a plurality of them. Thus, the '779 Patent claims may properly read on a light with a socket base having two magnets, as long as at least one of them has 5lbs+ pull strength. But all parties agree that this is not how HBL's Magnetic Cord is made, since neither magnet has the required pull strength. Quantity of magnets is not the issue here; quality of the one magnet is.

Lite-Netics' extraordinary claim scope proposition of "aggregated pull strength" defies common sense. "A building having over 30 stories" does not describe two adjacent buildings having 16 stories each. "A person weighing over 300 pounds" does not describe two people weighing 160 pounds each. And "a retiree with a net worth of over $10 million" does not describe two retired neighbors owning $6 million each. In fact, such propositions, if accepted, would result in dire consequences for the patent system. Consider the following simple claim construction "thought experiments,"

A. Claim Recites: "a container comprising ***an*** acid solution having between 2.0 and 2.2 pH."

Applying Lite-Netics' Framework: Claim would read on a two-chamber container where the first chamber has a 1.0 pH liquid and the second chamber of equal volume has a 3.2 pH liquid.

B. Claim Recites: "***a*** light bulb emitting 1,600 lumens."

Applying Lite-Netics' Framework: Claim would read on ten light bulbs, each emitting 160 lumens.

C. Claim recites: "***A*** DNA molecule comprising a DNA sequence selected from the group consisting of: a) a sequence with at least 99 percent sequence identity to SEQ ID NO: 50 . . . ."[3]

Applying Lite-Netics' Framework: Claim would read on two different individual DNA molecules, each with 75% sequence identity to SEQ ID NO: 50, if together they contain all of it. Effectively, a claim to monkey-related DNA could quite conceivably cover bacteria-related DNA.

Obviously, Lite-Netics exceeds all reasonable advocacy with its extraordinary claim scope proposition. Its logical fallacy, if adopted, would lead to absurd and destabilizing results. The public notice function of patents is too important to let Lite-Netics undermine it through its convenient conflation of the ordinary singular dictionary meaning of "a" and "an," just to shield bad faith marketplace conduct from judicial scrutiny.

Lite-Netics relies on a single case, *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1300 (Fed. Cir. 2005), to support its extraordinary claim scope proposition of "aggregated pull strength." But the decision in *Biagro* never suggested that the quantitative measurable feature of a claim limitation, introduced

[3] This example comes from U.S. Pat No. 11,466,282, assigned to Monsanto Tech., LLC. This is a typical style of DNA patent claiming.

by an indefinite article, must always be pluralized-then-aggregated. Instead, *Biagro* deals with a situation distinguishable from this case. This Court, in *Biagro*, agreed with the district court that "***both the written description and prosecution history require the aggregate amount*** of acids or salts to be within the claimed range." *Biagro*, 423 F.3d at 1304 (emphasis added). In other words, *Biagro* shows that for the Court to interpret the claim to cover an aggregation of such quantitative measurable feature, the intrinsic record of the Asserted Patent must require so. *See id.* But, as argued in more detail below (*see infra* pp. 31-33), the specification and the prosecution history of the '779 Patent show that the patentee never contemplated using more than one magnet or using the aggregated pull force of more than one magnet. Accordingly, *Biagro* cannot support Lite-Netics' proposition of "aggregated pull strength."

Hence, all indefinite article pluralizing cases cited by Lite-Netics are inapposite, and incapable of rehabilitating the bad faith marketplace communications at issue. For instance, nowhere in the marketplace communications, in the Complaint's claim charts, nor in its original TRO motion opposition, did Lite-Netics suggest it was relying on indefinite article case law to broaden the scope of "a magnet" in the '779 Patent claims to arrive at its extraordinary "aggregation" claim construction. (Appx131-134; Appx541-543; Appx568-595). That is a position that Lite-Netics first devised only after the TRO order exposed the objective

baselessness of Lite-Netics' effort to state that two magnets in HBL's product are (as a factual matter) a single magnet—a position untethered to reality. (*See* Appx636-672; *see also* Appx606-614).

Indefinite article pluralizing cases are inapposite, because the claim construction facts here differ substantially. Namely, if intrinsic evidence evinces a clear intent to apply the singular meaning, then the term cannot read on plural items. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1342 (Fed. Cir. 2016) ("a" logical table held to be a single logical table because "[t]he specification makes clear that the invention is directed to the arrangement of a single, logical table . . ."). When analyzing the specification for this purpose, the Court inquires whether there is an indication in the written description that the inventors intended a claimed feature preceded by "a" or "an" to have other than its normal singular meaning. *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1576 (Fed. Cir. 1993) (finding "no indication" of such intent, confirming singular meaning for indefinite article claim limitation). And "context matters." *In re Varma*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016).

*Varma* explains why context is so important, in a case in which this Court limited the claim term "a statistical analysis request" to cover only a single such request.

> And here the question is not whether there can be more than one request in a claim-covered system: there can. Rather, the question is whether

> "a" can serve to negate what is required by the language following "a": a "request" (a singular term) that "correspond[s]" to "two or more selected investments." It cannot. For a dog owner to have "a dog that rolls over and fetches sticks," it does not suffice that he have two dogs, each able to perform just one of the tasks. In the present case, no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments.

*Id.; see also Enfish*, 822 F.3d at 1342 ("a" logical table held to be a single logical table with both of two claimed characteristics—a row defining a column in that same table).

Here, similar to *Varma*, *North American Vaccine* and *Enfish*, the intrinsic record solely points to the inventor's intent to claim a singular magnet having, within itself, a particular measurable characteristic. A "magnet" (singular) introduces the term, which the claim then restricts by making "said magnet" have a pull strength of greater than five pounds. "[I]t does not suffice" (quoting the words in *Varma*) to have two magnets, each able to contribute just part of the measurable characteristic (akin to *Varma*'s analogy of having two dogs, one to roll over and one to fetch). *See also Hariri v. Lee*, 656 F.3d 1331, 1342 (Fed. Cir. 2011) (claims to read and write operation for Flash EEprom devices requiring "accessing a number of control lines and accessing ***a*** bit line, thereby accessing a number of memory cells" construed limited to single bit line); *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1376-77 (Fed. Cir. 2009) (claim required "a first substrate and a second substrate having inner surfaces that define a closed chamber therebetween;" intrinsic record

"provides no indication that a closed chamber is a 'system of enclosures.' Rather, it is *an* enclosure.").

*Agilent* is particularly instructive. There, this Court observed that the "closed chamber" was "defined by" its placement between a first and second substrate. *Id.* at 1376. The chamber was "not a nebulous space that could ambiguously span 'a system of enclosures.'" *Id.* Same here. The "magnet" is "defined by" a certain measurable specification—having greater than five pounds pull force. Thus, the magnet cannot be "a nebulous [set of magnets] that could ambiguously span [a variety of individual pull forces]." And, just as the specification in *Agilent* never suggested "a system" to make up the "closed chamber," *id.* at 1376-77, the '779 Patent never suggests multiple magnets in a system may be aggregated to supply the named force. *Accord TiVo, Inc. v. EchoStar Communications Corp.*, 516 F.3d 1290, 1303-04 (Fed. Cir. 2008) (claim language context confirmed "an MPEG stream" was singular, not plural).

Unlike Lite-Netics, the district court correctly formed its claim construction conclusions when relying on *AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997). In *AbTox*, this Court determined that the claim term "a metallic gas-confining chamber" is limited to a single gas-confining chamber because the claim's use of the term "said chamber" reinforced the singular nature of the chamber, and the written description evidence showed no contemplation of more than one chamber being

used. Id. at 1023-24. This Court's analysis in *AbTox* is directly applicable here. Like the asserted claim in *AbTox*, claim 1 of '779 Patent includes the term "said magnet" immediately after the term "a neodymium magnet." (Appx108, at 4:52-63). Any attempt by Lite-Netics to sidestep the implications of its use of the word "said" in the claim is unavailing. Use of the word "said," under Federal Circuit controlling law, strongly supports the determination that the indefinite article is not pluralized through claim construction. *Abtox*, 122 F.3d at 1024.

While Lite-Netics attempts to cite *Baldwin Graphics Systems v. Siebert, Inc.* to avoid this conclusion (512 F.3d 1338, 1343 (Fed. Cir. 2008)), no reasonable litigant could place reliance on that case. *Baldwin* was a panel decision, not en banc, and thus could not overrule prior panel law such as *AbTox*, which held the use of "said" "reinforces the singular nature of" the limitation, and "clarifies that only one . . . is in question." *See Dellew Corp. v. United States*, 855 F.3d 1375, 1382 n.4 (Fed. Cir. 2017) (prior panel decision controls). In any case, *Baldwin*'s reasoning for rejecting this holding was faulty and circular, positing that a claim that already connotes "one or more" will simply carry forward that pluralized meaning upon reaching the term "said." *Baldwin*, 512 F.3d at 1343. The *Baldwin* approach simply assumes the conclusion, rather than analyzing the term "said" to answer the question in the first instance of whether to pluralize "a" or "an." Lite-Netics' attempt to limit the scope of the *AbTox* decision is not supported by case law.

Relying on *KCJ Corp. v. Kinetic Concepts, Inc.*, Lite-Netics also claims that the *AbTox* holding is limited to claims defining a relationship between the element in question and other claim features. (Blue Br. 28, citing *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). However, *KCJ Corp.* never limited the *AbTox* holding in such a way.[4] Instead, *KCJ Corp.* supports HBL's position by explaining that the *AbTox* decision requires the Court to examine the written description and the prosecution history when the claim language or context indicates an ambiguity in application of the general meaning of an indefinite article. *KCJ Corp.*, 223 F.3d at 1356. An examination of the specification and the prosecution history of the '779 Patent shows that, similar to that in *AbTox*, the intrinsic record of the '779 Patent does not evidence the inventor intending to encompass more than one magnet, let alone "aggregated" pull strength of two side-by-side magnets.

The specification of the '779 Patent never includes any reference to the possibility of using more than one magnet in the claimed light fixture assembly, even though it expressly touts the open-ended nature of other characteristics of the magnet

[4] Even if the "functionally interconnected" standard Lite-Netics advocates were the law (it is not), it would apply here to confirm that the indefinite article is not pluralized through claim construction. The '779 Patent magnet as claimed is embedded in the base of the socket. It clearly has a functional interconnection with the rest of the socket, to promote ultimate securement of the whole unit to a metallic surface.

(*e.g.,* shape and thickness).[5] Moreover, the specification uses the term "magnet" in its singular form in every instance of its discussion of the configuration of the light fixture assembly. (*See* Appx108, at 3:12-37, "the assembly base containing ***a magnet*** in accordance with the present invention . . . . The assembly base 3 . . . has ***an embedded neodymium magnet*** 1 . . . ***the magnet*** 1 is a disc . . . . As shown, ***the magnet*** 1 is embedded flush . . . allowing only the face of ***the magnet*** to be exposed . . . . A plastic protection coating 2 is placed over the face of ***the magnet***;" and 4:1-3, "the assembly base containing ***the magnet*** in accordance with an alternate embodiment of the present invention) (emphases added). The prosecution history of the '779 Patent also corroborates no demonstrated intent for aggregation of more than one magnet to achieve the required pull strength. As one example, during prosecution of the patent, the patentee stated, in an attempt to distinguish prior art, that "Hofer does not disclose embedding ***a magnet*** within the base of the lamp …

[5] As the district court found, the specification acknowledges that "the magnet" (1) may be of "[o]ther shapes, sizes and thicknesses," not just a disc magnet ½ inch in diameter and 1/8 inch thick, see (Appx108, at 3:15-17); (2) may be "samarium-cobalt" rather than "neodymium," see (Appx108, at 3:22-23); (3) may have "[o]ther strength" than a 16 pound pull force, see (Appx108, at 3:29-30); and (4) may be embedded in various ways, including "flush with the surface of the base facing away from the light bulb," see (Appx109, at 5:19-20).

[t]he present invention disclose the use of ***an embedded magnet*** with enough pull force…." (Appx241-242) (emphasis added).[6]

Finally, Lite-Netics repeatedly and ironically invokes the interview summary it drafted and submitted during prosecution at Appx238 as proof that it consistently "refused" to add, or "rejected" adding, a structural limitation to unduly limit the magnet claim. (Blue Br. 14, 22, 30, 34). Lite-Netics misplaces reliance on its own prosecution statement. The very limitation Lite-Netics "refused" and "rejected" on page Appx238 (*i.e.*, the word "neodymium") got added as a structural limitation later. (Appx207). That interview summary is relevant, though, but not how Lite-Netics argues. Every use of the term "magnet" on that page to describe the invention and its distinction over prior art was a ***singular*** use. (Appx238).

Thus, the claim language, the specification, and the prosecution history of the '779 Patent all clearly demonstrate (and obviously so) that the patentee never contemplated using more than one magnet or using the aggregated pull force of one or more magnets.[7] Lite-Netics' attempt to broaden the express scope of claim 1 of

---

[6] Similarly, the patentee also stated, during prosecution, that "[the prior art references] do not disclose ***a magnet*** that is embedded within the base of the miniature light" (Appx241) (emphasis added); that "the claimed invention had ***a magnet*** that was embedded with the base of the structure, unlike any of the prior art cited . . . one of the novel aspects of the invention is the fact that ***the magnet*** is embedded . . ." (Appx239) (emphasis added).

[7] Lite-Netics argues that the boilerplate language in the specification suggesting the claimed apparatus may be modified is enough to avoid this Court's *AbTox* decision.

the ’779 Patent must fail. The language of the claim requires one neodymium magnet with “a pull strength of at least five pounds.”

b. The Magnetic Cord obviously does not infringe the ’779 Patent under the Doctrine of Equivalents

Similarly unpersuasive is Lite-Netics’ argument under the doctrine of equivalents. Its argument does not undermine the district court’s finding that there is a “fair chance” that HBL will prove that even this aspect of the infringement contention was objectively unreasonable, such that no reasonable litigant would expect to prevail. Lite-Netics misapplies the law, and ignores the maximally deferential review that this Court undertakes.

To begin with, Lite-Netics misunderstood the district court decision. The district court did not simply rely on the same reasoning as literal infringement. Instead, relying on this Court’s “specific exclusion” doctrine, the district court held that Lite-Netics cannot seek to recapture the Magnetic Cord under the doctrine of equivalents when the intrinsic record makes clear that claimed invention does not use the aggregated pull force of more than one embedded magnet. (*See* Appx42, citing *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014) (holding that “specific exclusion” prevents a patentee from using the doctrine of

(Blue Br. 30). Lite-Netics cites no decision of any court holding that such commonplace patent specification boilerplate about potential modifications being within the spirit of the invention changes “a” or “an” to a plural meaning.

equivalents to capture feature that "is opposite of, or inconsistent with the recited limitation.")).

The district court's decision is obviously correct, especially when viewed through the lens of the present appeal's standard of decision and standard of review. The standard of decision is whether HBL had a "fair chance" of proving the objective unreasonableness of this equivalency assertion at a later phase in the case. The standard of review is abuse of discretion, or at worst, clear error. Lite-Netics does not come close to meeting its appellate burden in these regards, and indeed never acknowledges that such burdens exist. It simply asserts (wrongly) that it deserves *de novo* review of claim construction and legal rulings, without understanding the layers of protection the law provides against reversal under the present case posture.

As shown above, the intrinsic record of the '779 Patent shows that the patentee never intended to use more than one magnet or to use the aggregated pull force of one or more magnets. The claim language clearly requires the embedded magnet having "a pull strength of at least five pounds." Allowing Lite-Netics to capture the Magnetic Cord, having two magnets but none with pull strength of more than five pounds, would be inconsistent with the plain language of the claim. Essentially, Lite-Netics cannot be allowed to capture "less than five pounds" for a magnet when it clearly intended the claim to mean "at least five pounds."

Additionally, as an alternative ground argued below but not reached by the district court, Lite-Netics' arguments under the doctrine of equivalents are barred by prosecution history estoppel as a matter of law.

"A narrowing amendment made for a substantial reason relating to patentability gives rise to a presumption that the patentee has surrendered all subject matter between the original claim limitation and the amended claim limitation." *Biagro*, 423 F.3d at 1305. During prosecution of the '779 Patent, the patent owner, in a May 30, 2008 response to an office action, added the narrowing amendment of "wherein said magnet has a pull strength of at least five pounds" to overcome the examiner's rejections of the claims for obviousness under 35 U.S.C. § 103. (Appx237-243). This addition of a new claim limitation was to demonstrate the patentability of the claimed invention based on the single magnet's enhanced pull strength over a refrigerator magnet, and Lite-Netics has thus presumptively surrendered any equivalents. *See Biagro W. Sales*, 423 F.3d at 1305–06 (determining that the patent owner surrendered equivalents when a narrowing amendment to claim terms were made during prosecution to overcome a prior art obviousness rejection).

Lite-Netics' attempts to overcome prosecution history estoppel fail. There is no question that HBL's device exists within the claim scope territory that this particular amendment gave up. Lite-Netics apparently believes that simply because the alleged equivalent is not identically present in the distinguished references,

prosecution history estoppel is not applicable. (Blue Br. 32-34). Lite-Netics misstates the law. Estoppel never turns on whether the alleged equivalent structure is the same structure as disclosed in the distinguished prior art references. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1358 (Fed. Cir. 2013) (citing *Chimie v. PPG Indus.*, 402 F.3d 1371, 1383 (Fed. Cir. 2005)). The "tangentiality" principle that Lite-Netics tries to invoke instead turns on whether the accused structure's deliberately weak magnets are unrelated to Lite-Netics' interjection of a strength requirement. Clearly the alleged equivalent is central to the reasons for amendment (to call out the utilized magnet's pull strength), not tangential.

In this case, contrary to Lite-Netics' characterization, one central reason for adding the limitation of "at least five pounds" during prosecution was to distinguish prior art that disclosed a magnet that "***does not have enough strength to hold the lamps***."[8] (Appx242) (emphasis added). Lite-Netics cannot possibly claim that such limiting amendment is "not related" to the Magnetic Cord (having magnets with pull strength less than five pounds), when the pull strength of the magnet was central during prosecution. *See Chime*, 402 F.3d at 1383 (holding that because the "dustiness" of the claimed silica was at issue during prosecution, the reason for

---

[8] Lite-Netics cannot assert that the pull strength of the magnet is not central when its own proposed interpretation of the claim-at-issue attempts to capture the aggregated pull strength of the Magnetic Cord.

adding this amendment cannot be tangential simply because a different form of silica was used in the alleged equivalent).

Finally, allowing Lite-Netics to allege infringement of the ’779 Patent under the doctrine of equivalents would vitiate the claim limitation of “wherein said magnet has a pull strength of at least five pounds,” as the purported assertion would effectively capture any magnet (or combination of magnets) with any conceivable pull strength per magnet. See *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 42 n.8 (1997); see also *Regents of the Univ. of Minn. v. AGA Med. Corp.*, No. 07-CV-4732 (PJS/LIB), 2011 U.S. Dist. LEXIS 615, at *40 (D. Minn. Jan. 4, 2011) (finding that applying the doctrine of equivalents to a claim limitation of “about 1.6” would vitiate the ratio limitation allowing any device with any diameter ratio to be covered by the claim).

Accordingly, because the Magnetic Cord so obviously does not infringe the ’779 Patent, literally or under the doctrine of equivalents, Lite-Netics’ corresponding marketplace allegations of infringement were objectively baseless. This means the district court cannot possibly have made a clear error, nor abused its discretion, when HBL (on its preliminary injunction request) more than showed a “fair chance of prevailing”—the relatively light merits-burden under which the district court properly analyzed all preliminary injunction issues under Eighth Circuit standards

for Nebraska common law torts. This Court should thus affirm the district court grant of the Preliminary Injunction.

### 2. The District Court Correctly Found That Lite-Netics' Allegations of Both Literal and Equivalents Infringement Regarding the Magnetic Clip are Objectively Baseless

We now turn to the other accused product—the Magnetic Clip. This is not itself a light string, but an accessory to clip onto cords at multiple places to add a magnetic capability to each socket of a light string. Lite-Netics' arguments fail to show that the district court abused its discretion or clearly erred here as well. The district court found, at least on the preliminary injunction record, clear noninfringement by any end-user when combining the Magnetic Clip with any other light string product. Express claim language of the Asserted Patents, bolstered by specification disclaimers, unequivocally show that there can be no infringement by the end user, and thus no indirect infringement by HBL.

To begin with, as the district court correctly recognized, after examining a physical example of the Magnetic Clip at the preliminary injunction hearing, the Magnetic Clip is a simple clip having two side arms capable of attaching to ("hugging") the ***electric cord*** connecting light bulb sockets on a light cord. (Appx25-26). The Magnetic Clip is neither "an assembly base attached to the second end of the light bulb socket," nor "an assembly base integrally attached to the second end of the light bulb socket" as claimed by the Asserted Patents. (Appx108, at 4:52–63;

Appx117, at 5:20-32). Instead, the Magnetic Clip pockets the already existing base of a light fixture and ***clips only onto the external electric cord***—the exact attachment structure disclaimed in column 1 and 2 of the specifications. (Appx107, at 1:34 to 2:2; Appx116, at 1:39 to 2:4) (stating that prior art light fixtures have the issue of requiring additional sets of clips or members that may be clipped to the electrical cord of a string of decorative lights; and that the light fixtures disclosed resolve this issue by providing an integral light fixture assembly without the need to install additional items to the light string).

Lite-Netics attempts to get around the district court's holding by proposing an extraordinary interpretation of the terms "attached to the second end of the light bulb socket" and "integrally attached to the second end of the light bulb socket." Lite-Netics essentially argues that the claim limitation of "attached" and "integrally attached" should be so broad as to encompass putting the Magnetic Clip onto the light fixture assembly by any means of attachment to any structure. This not only contradicts the plain language of the claim (an intervening structure is not the same as the second end of the light bulb socket), but also renders the term "the second end of the light bulb socket" superfluous. As the district court correctly determined, the attachment to the electric cord is not the same as the attachment to the bottom or base of the light fixture as "[n]owhere does the '264 [Patent] explain or suggest that the electrical wires are part of the 'base' of the light fixture." (Appx27).

Lite-Netics has not pointed to any support in the intrinsic record showing how a person of ordinary skill in the art would accept an interpretation of "attached" or "integrally attached" so expansive, that mere pressing into or touching an already-extant socket base would meet it. Two garments hanging in a closet touching are not "attached" to each other. Pushing a soccer ball against a goal net does not "attach" it to the net. Additionally, none of the cases cited by Lite-Netics supports its extraordinary interpretation.

In *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017), the Court determined that the infringing product's tube is "attached" to the housing when the tube is configured to receive water from the housing, because it is factually "connected" to it. Indeed, the toy in question would not work if the tubes were merely touching in an unconnected way, because they would fall out of the housing upon the first instance of water pressure. This decision is factually inapposite, since the Magnetic Clip merely touches a light socket's base when pocketing it, never "connecting" to it.

Similarly, both *In re Cuozzo Speed Technologies, LLC*, and *Regents of the University of Minnesota v. AGA Medical Corp.*, are unrelated to Lite-Netics' proposed interpretation. The Court in both cases tackled a question of whether two claimed items that are "attached" or "affixed" must have previously had a separate physical identity (*i.e.*, a thing cannot be attached to itself). This Court decided that

the terms "attach" or "affix" demonstrate the elements being attached or affixed together are not the self-referential identical thing. *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 937-38 (Fed. Cir. 2013). These holdings on the *a priori* "separateness" of attached elements have no bearing on Lite-Netics' proposed interpretation or application to Magnetic Clip.

The rest of Lite-Netics' cited cases support the district court's decision. In both *Douglas Dynamics, LLC v. Buyers Products Co.* and *Deere & Co. v. Bush Hog, LLC*, the Court found indirect connection because the specifications of the asserted patents specifically contemplated such attachment structures. *See Douglas Dynamics, LLC v. Buyers Prods. Co*, 717 F.3d 1336, 1342 (Fed. Cir. 2013); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012). Unlike those in *Douglas* and *Deere*, the specifications of the Asserted Patents in this case not only do not contemplate the Magnetic Clip's attachment structure, but ***specifically disclaimed*** such attachment structure. (Appx107, at 1:34 to 2:2; and Appx116, at 1:39 to 2: 4). *Southco, Inc. v. Fivetech Technology, Inc.* 611 F. App'x 681, 686 (Fed. Cir. 2015), is even worse for Lite-Netics. The Court in *Southco* found that the term "attached" cannot cover indirect attachment because such interpretation would contradict a subsequent claim limitation. *Id.* ("An indirect attachment would not satisfy the limitation that the [']the threaded shaft captivation means prevents the

ferrule and the knob from separating[']"). The Court's reasoning is directly applicable here. Lite-Netics' proposed interpretation of "attached" or "integrally attached" would render the subsequent claim language of "the second end of the light bulb socket" superfluous. Accordingly, Lite-Netics' attempt to broaden the scope of the term "attached" and "integrally attached" is not supported by Federal Circuit case law and must fail.

Lite-Netics also attempts to argue that the Magnetic Clip was not disclaimed because it is not the exact apparatus as in the cited prior art. (Blue Br. 39-41). Lite-Netics fails. The fact that Magnetic Clips present some advantages over the cited prior art does not negate the disclaimer of the exact attachment structure of the Magnetic Clip in the specifications, the patentee's declarations below, and Lite-Netics' own admission in its brief. As stated above, the specifications of the Asserted Patents boasted that the claimed light fixture assemblies of both patents do not need installation of additional items (or clips) to the light string ***cord*** and criticized and excluded prior art light fixture assemblies that, like HBL's Magnetic Clip, require ***separate members*** to be attached the light string cord for mounting. The patentee, Mr. Genenbacher, acknowledged such disclaimer in his declaration below. (*See* Appx761-775, at ¶¶8, 19 (emphasizing that his invention "overcomes" the cumbersomeness of requiring "a set of clips to fasten the light fixtures to the house" and acknowledges that the Magnetic Clip secures itself by inserting the electric cord

into the groves on its legs)). Lite-Netics further acknowledges such disclaimer in its brief by stating that "[t]he Asserted Patents distinguished Dougan and Clement because they utilized clips to attach to ***only the cord*** of a light fixture," and that "the Asserted Patents disclaimed a particular feature—clips attaching only to a cord not forming a part of the light fixture. . ." (Blue Br. 40-41).[9]

These points would dissuade a reasonable litigant from the type of infringement assertion made here. Lite-Netics cannot now attempt to capture HBL's Magnetic Clip, when the specifications of the Asserted Patents excluded materially identical apparatus from the scope of the claims. *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1307 (Fed. Cir. 2011) (stating that patent owners "cannot use the doctrine of equivalents to claim subject matter that the specifications expressly state fall outside the invention.").

And again, at risk of over-repeating, the issue now is not infringement *vel non*. The issue on appeal is whether HBL had a "fair chance" of proving during the case's later phases that the Magnetic Clip assertions were objectively unreasonable. And during appellate review, the district court's determination in this regard (on the "fair chance" conclusion) deserves maximum deference—abuse of discretion review, or

[9] Lite-Netics' argues that there is no broad disclaimer of all "clips." (Blue Br. 39-41). This argument misses the point as the central finding of the district court was that the specification disclaimed the structure of attaching additional items (or clips) to the external electric ***cord*** of the light fixture, as disclosed in the prior art mentioned by the specifications. (Appx43–45).

at least clear error. None of Lite-Netics' appellate arguments are on point, therefore all of them fail.

### 3. Lite-Netics' Continuously Shifting Arguments Confirm Its Bad Faith

In the limited range of issues that it brings up for appeal, Lite-Netics remarkably argues that HBL presented "no evidence" of Lite-Netics' subjective bad faith when it "brought this suit." (Blue Br. 42). That is the wrong question. Before the district court and this Court, the question is actually whether infringement assertions in the marketplace (not in court) were in bad faith. The subjective good faith component of the federal privilege analysis for marketplace communications asks whether the baseless activity "conceals an attempt to interfere directly with the business relationships of a competitor." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1375–76 & n.8 (Fed. Cir. 2004) (not reaching subjective good faith because objective reasonableness was established).

Without any doubt, and even by Lite-Netics' own admission, its purpose in sending the falsehoods and smears into the wilds of the marketplace in September 2022 was to capture sales that HBL would otherwise get—*i.e.*, interfere directly with HBL's business. (Blue Br. 11, complaining of price erosion, and that customers threatened to obtain products from HBL if Lite-Netics did not "defend" its patent). Its bad acts were to drive sales away from HBL. This satisfies the subjective prong of the bad faith inquiry, to the extent any of the numerous false and misleading

statements require analysis of the federal patent privilege. At minimum, the district court did not abuse its discretion to find, on the preliminary injunction record and under Eighth Circuit "fair chance" standards, that such subjective bad faith was adequately established. Lite-Netics thus raises only red herrings, debating irrelevancies like whether the district court shifted a burden improperly on Lite-Netics having any "exclusive" supply agreements[10] (Blue Br. 43), or whether improper "inferences" of subjective bad faith arose from the rank baselessness of the assertions alone (Blue Br. 42).

Consistently, since filing of this case below, Lite-Netics has made a moving target of what was truly on its mind in the relevant time. Lite-Netics' arguments regarding the limitation of "a neodymium magnet . . . wherein said magnet has a pull strength of at least five pounds" as presented in its Blue Brief before this Court were absent from its original oppositions to TRO below. (*Compare* Appx586-587). At the time, it simply argued that two magnets are really one magnet—a counterfactual distortion of reality. (Appx585).

---

[10] This was not a burden-shift. Rather, the district court impeached Lite-Netics' noncredible assertion that it did not know the letters went to HBL customers, and found that it did know—a finding not challenged on appeal. Such lack of knowledge that recipients were HBL customers could only have been plausible if Lite-Netics could point to exclusive relationships between it and the letter recipients, which it never did.

Currently, Lite-Netics effectively seeks judicial editing of a patent claim that it wrote, so that the term would now read "one or more magnets having an aggregated pull strength of at least five pounds," urging that the Court hold that a singular article is truly singular only when the components of the claims are "functionally connected." (Blue Br. 16-17). Not only are these arguments incorrect (*see supra*, Section III.1), Lite-Netics did not present them to the district court.

This speaks to subjective intent and motive. Lite-Netics sent emails or letters in September 2022 containing their falsehoods and smears, without having thought up the elaborate claim construction arguments it now presents to this Court. This Court should not lose sight of Lite-Netics' actual scienter at the time of its bad acts. In September 2022, it brazenly tried to use the judicial system to capitalize on its own objectively unreasonable suit to drive sales to itself and away from competitor HBL. To the extent Lite-Netics now paints itself an erudite scholar of esoteric patent law exceptions, that was not the reality in September 2022 when Lite-Netics bullhorned to HBL customers that it filed a Nebraska federal court action, and threatened HBL's customers with being dragged into the suit, all to divert sales from a competitor.

In its first brief opposing HBL's motion for TRO and Preliminary Injunction, Lite-Netics simply argued that the two magnets of the Magnetic Cord were one magnet as a matter of fact, without citing to any cases to support its position—a

ridiculous assertion that it has since dropped. (Appx585-587). In its subsequent brief in opposition to a preliminary injunction, Lite-Netics changed its tone and argued, for the first time, that the article "a" presumably means "one or more" and that the disputed term should be interpreted to cover "aggregated pull strength." (Appx730-732). HBL replied by pointing out the claim's use of the term "said magnets" and that the specification never contemplated using more than one magnet. (Appx823-824). During the preliminary injunction hearing, Lite-Netics simply asserted that the specification's silence on more than one magnet favors its position without formulating any of its "functional connection" arguments presented in its brief before this Court. (Appx32). It was not until its emergency stay motion before this Court that Lite-Netics suddenly discovered its "functional connection" arguments. (ECF No. 3, 12-13).

Accordingly, Lite-Netics' current arguments regarding the Magnetic Cord and the '779 Patent betray continuously shifting arguments before the district court and this Court. This alone is grounds for the Court to determine that Lite-Netics' marketplace smears, falsehoods and threats were baseless and made in bad faith. *See Takeda Chem. Indus. v. Mylan Labs.*, 549 F.3d 1381, 1387 (Fed. Cir. 2008) (holding that the district court was correct to rely on the generic company's "***shifting set of arguments***" at trial in finding that the company's original statement of invalidity in its certification letter baseless and made in bad faith.) (emphasis added).

## IV. THE DISTRICT COURT RECOGNIZED THAT DESIGNING AROUND OLDER PATENTS SUPPORTS INNOVATION, AND DID NOT JUSTIFY LITE-NETICS' RETALIATORY MARKETPLACE FALSEHOODS

A few words are appropriate on the public interest issues raised by this case. On page 9 of its Blue Brief, Lite-Netics attempts to characterize HBL as having a "less-than-sterling reputation" for being known to "design around" its competitors' products. (Blue Br. 9). This, too, cannot justify what Lite-Netics did, nor support arguments for error in the district court's remedial rulings. Contrary to Lite-Netics characterization, this case is not David v. Goliath, nor has HBL done anything improper. Lite-Netics apparently believes "designing around" patented technology was a bad thing. It is not. Instead, designing around a patent (and obtaining one's own) is not prohibited by law, and is encouraged as promoting innovation. *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991) ("Designing or inventing around patents to make new inventions is encouraged."); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (explaining that a court "should bear in mind that the patent law encourages competitors to design or invent around existing patents").

> Keeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer. One of the benefits of a patent system is its so called "negative incentive" to "design around" a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace. . . . The world of competition is full of "fair fights."

*State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985). The Magnetic Cord design that Lite-Netics attacked in its marketplace statements is the result of HBL's efforts to design around and improve upon Lite-Netics' inferior products. HBL's design is innovative over Lite-Netics' patents, having earned its own patent from the USPTO – U.S. Patent No. 11,333,309. (Appx169-176). HBL's legitimate and encouraged efforts to design around the Asserted Patents do not support any allegation of district court error. The district court acted within its discretion to protect fair competition, and Lite-Netics does not legitimately argue otherwise.

## CONCLUSION

Lite-Netics' appeal is non-responsive, opening the door to summary affirmance. The district court found the September 2022 copying and dragging-customers-into-this-suit statements to the marketplace false and/or misleading, and this appeal does not seek to overturn those findings. The district court found the '264 Patent assertion within statements to the marketplace was in "bad faith," and this appeal does not seek to overturn that independent finding. The district court made findings on irreparable harm, balance of the harms, and the public interest, and this appeal does not seek to overturn those conclusions. This leaves no possible legitimate pathway that could lead to the reversal that Lite-Netics seeks. The

Preliminary Injunction was entirely proper, and Lite-Netics does not come close to showing any abuse of discretion, clear error, or legal error of any kind.

Lite-Netics specifically fails to show error in the limited and few issues it raised, since the '779 Patent is obviously limited to structures with at least one magnet having more than five pounds of pull strength (the Magnetic Cord is not such a structure); and the Magnetic Clip falls squarely within Lite-Netics' specification disclaimers, not containing the "attached" limitation in any event. To the extent relevant, Lite-Netics' arguments do not show any abuse of discretion, factual error, or legal error by the district court.

This Court should affirm.

Respectfully submitted,

*/s/ Robert P. Greenspoon*

Robert P. Greenspoon
William W. Flachsbart
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

*Counsel for Defendant-Appellee*
*Nu Tsai Capital LLC*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1146

**Short Case Caption:** Lite-Netics, LLC v. Nu Tsai Capital LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,245 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 12/19/2022

Signature: /s/ Robert P. Greenspoon

Name: Robert P. Greenspoon

Save for Filing